IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FABIAN D. SMART,                          :
                                          :
            Petitioner,                   :
                                          :
       V.                                 :
                                          :  No. 10-cv-1447
                                          :
LOUIS S. FOLINO                           :
                                          :
            Respondent,                   :
                                          :

FILED
SCRANTON

OCT 1 2 2010

PER _____
        DEPUTY CLERK

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION...............................1

STATEMENT OF THE ISSUES PRESENTED.......................2

STATEMENT OF THE CASE...................................3

SUMMARY OF THE ARGUMENTS................................5

      ISSUES - I.........................9

      ISSUE - II........................13

      ISSUE - III.......................17

      ISSUE - IV........................18

      ISSUE - V.........................21

      ISSUE - VI........................25

      ISSUE - VII.......................25

CONCLUSION.............................................33

PROOF OF SERVICE.......................................34

## STATEMENT OF THE ISSUES PRESENTED

I. The state courts erred in determining that trial and appellate counsels were not ineffective for failing to file a motion to compel discovery of specific items of physical evidence tested by an expert.

II. The state courts erred in determining that trial and appellate counsels were not ineffective for failing to pursue petitioner's claim of racial bias based upon information provided by a juror post-trial, showing that jurors falsely answered questions during voir dire.

III. The state courts erred in finding that trial counsel was not ineffective for failing to move for a mistrial post-verdict, based on statements made by a juror relating to racial bias during voir dire.

IV. The state courts erred in not finding that trying the petitioner before a death qualified jury during the merits phase of the trial, deprived the petitioner of a trial before a cross-section of the community.

V. The state courts erred in not finding that the instances of prosecutorial misconduct when taken together, so tainted the fairness of the trial, that the petitioner should be granted a new trial in the interest of justice.

VI. Is Rule 606(b) unconstitutional as applied in a case where it prevents recitification of Fifth and Sixth Amendment violations.

VII. Did the state courts err or abuse it's discretion in determining that it could not hear testimony concerning racist statements made by a juror, where the trial court had discretion to inquire into the validity of the verdict by hearing the juror's testimony.

2

## SUMMARY OF THE ARGUMENTS

Trial counsel failed to request and pursue DNA Testing on physical evidence secured from the victim's body which would have significantly bolstered the petitioner's defense. There was no reasonable basis or tactic in not doing so. Counsels acknowledged that they were aware of the presence of DNA material from the victim's autopsy report, but they never pursued testing. Testing which would have provided material exculpatory evidence. The decision not to pursue this evidence cannot be viewed as any reasonable defense strategy.

It is well established that racial bias is not to be tolerated by the courts, and that even a single racist juror is sufficient to grant a defendant a new trial. Trial counsel acknowledged by a signed certification to the PCRA Court that a member of the jury contacted trial counsel following petitioner's trial requesting contact information so that she could correspond with the petitioner, while he was incarcerated. One of the petitioner's trial counsel testified, that upon speaking with Ms. Adams, it was discovered that other members of the jury exhibited racial bias toward the petitioner through the use of racial slurs. Even though trial counsel claimed that possible racial animus was a primary concern of counsel since the inception of the petitioner's case, petitioner's trial counsel took no action when provided with the information from Ms. Adams. This inaction was erroneous and prejudiced the petitioner.

During jury selection the court and trial counsel posed

the question to each prospective juror, as to whether he or she held any racial bias and/or prejudice toward African Americans. Each juror enpaneled answered those questions in the negative. If trial counsel did have knowledge of the content of the statements made, or that they answered voir dire questions falsely, within a reasonable time following the return of the verdict in this matter, trial counsel could be found ineffective for failing to move for a mistrial at that time, and for failing to preserve the issue on appeal.

The petitioner requested that the court empanel a jury, which was neither life nor death qualified, to hear and decide the first phase of the trial. This request was denied. Various studies have established that death qualified jurors are bias in favor of conviction. As a result, the exclusion of potential jurors, based on their death penalty attitudes served to deprive the petitioner of his state and federal constitutional right to be tried by a jurors drawn from a fair cross-section of the Clinton County community. The court effectively eliminated Clinton County citizens whose death penalty views would disqualify them from participating in the death penalty phase of a capital trial. As was the case with virtually all of the pretrial motions which were filed, the court summarily denied the motions without an evidentiary hearing, and thus prevented the defense from creating a record concerning the fact that, death qualified jurors are bias in favor of conviction.

The Commonwealth engaged in improper questioning of witnesses suggesting the existence of certain "facts," when there was no

record to support the unwarranted assertions, witness after witness. When challenged by defense objection, the Commonwealth did not attempt to offer a legitimate legal basis which would permit the question to be asked, and did not offer a "good faith" basis for asking the objected to questions. The continual practice of the Commonwealth was to state that the question was being "withdrawn" as the objection was being sustained. This pervasive practice of making unprovable assertions in front of the jury would leave behind the misleading, unprovable and willfully false innuendo for the jury to grasp. It is only when one reviews the trial transcripts and observes the continued conduct of the Commonwealth, that one is able to grasp the significant and egregious misconduct on the part of the Commonwealth.

Racist statements made by jurors during deliberations does fall into the "extraneous prejudicial information" exception to Rule 606(b) of the PA Rules of evidence, and likewise, Rule 606(b) of the Federal Rules of Evidence. At issue in this case is whether a defendant convicted by jurors who knowingly concealed racist views during voir dire and later openly espoused those views during deliberation, should be permitted to rely on testimony from other jurors in order to establish the existence of structural error, i.e., a violation of his Sixth Amendment right to an impartial jury, and, consequently, under the Fourteenth Amendment right to due process, his right to a new trial. Some sort of investigation was required to sufficiently insure the court, that the constitutional rights of the defendant were not violated. Especially where the statements clearly

constitute information. Furthermore, the statements were obviously extraneous because they were not heard in open court and subject[ed] to adversarial challenge. Lastly, the statements were prejudicial because they were clearly intended to assist the jury in finding fact, i.e., in concluding how black people acted or were naturally killers. The court cannot see how the principle that Rule 606(b) is unconstitutional as applied in a case where it prevents rectification of a Sixth Amendment violation, could be confined to the context of racial prejudice. But once it is held that the rules of evidence must be subordinated to the needs to admit evidence of Sixth Amendment violations, how could the courts stop at this most serious violation. The stopping point rests in the Sixth Amendment requirement of juror impartiality. As such, this is clearly unconstitutional!

The state court erred and/or abused it's discretion, in determining that it could not hear testimony concerning racist statements made by a juror. The rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare case where claims of racial or ethnic bias during jury deliberations, implicate a defendant right to due process and an impartial jury. The Four protections relied on by the Tanner Court do not provide adequate safeguards in the context of racially and ethnically biased comments made during deliberations. The trial court did have the discretion to inquire into the validity of the verdict by hearing juror testimony to determine whether racially biased statements were made during

8

jury deliberations and, if so, whether there was a substantial probability that any such comments made a difference in the outcome of the trial. Here, the judge stated that he did not have the discretion. This were an error.

> I. THE STATE COURTS ERRED IN DETERMINING THAT TRIAL AND APPELLATE COUNSELS WERE NOT INEFFECTIVE FOR FAILING TO FILE A MOTION TO COMPEL DISCOVERY OF SPECIFIC ITEMS OF PHYSICAL EVIDENCE FOR PURPOSES OF FORENSIC TESTING AND/OR TO HAVE SUCH EVIDENCE TESTED BY AN EXPERT.

In order to establish an ineffectiveness claim, the petitioner must demonstrate: (1) that the underlying claim is of arguable merit; (2) that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate petitioner's interest; and (3) that there is a reasonable probability that the act or omission prejudiced the petitioner in such a way that the outcome of the proceeding would have been different. **Commonwealth v. Fletcher**, 750 A.2d 261, 273 (Pa. 2000). The burden of proof for all three prongs is on the petitioner. **Commonwealth v. Abu-Jamal**, 720 A.2d 79, 88 (Pa. 1998). "If it is clear that petitioner has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met." **Commonwealth v. Travaglia**, 661 A.2d 352, 357 (Pa. 1995)(citing <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984)).

The petitioner specifically submitted, that a towel recovered by the police at the scene where the victim's body was found, was never tested for blood, hair or fiber evidence. The petitioner also alleged that forensic reports indicated that the victim was found to have organic material beneath his fingernails, however, no testing was ever conducted on said material to determine its origin or donor.

In support of this claim, the petitioner relied upon the PA Superior Court's opinion in **Commonwealth v. Godschaulk**, 679 A.2d 1295 (Pa.Super. 1996), in which the court opined that "where a conviction **rests largely** on identification evidence and where advanced technology could definitely establish the accused's innocence", such testing should be granted. Id. at 1297 (emphasis in original). DNA evidence has been held by the Superior Court to be a sufficient basis for the grant of a new trial. **Commonwealth v. Reese**, 663 A.2d 206, 210 (Pa.Super. 1995). DNA testing of genetic material could provide material exculpatory evidence, therefore, the petitioner had a due process right of access to genetic material for purposes of DNA testing. **Godschaulk v. Montgomery County District Attorney's Office**, 177 F.Supp.2d 366 (E.D.Pa. 2001).

In the petitioner's case, there is little doubt that trial counsels' failure to request and pursue DNA testing of physical evidence prejudiced petitioner. DNA evidence in and of itself could have provided a sufficient defense to the charges facing petitioner at trial.

Eric Lindhardt, Esquire, testified at the evidentiary hearing

10

held before the PCRA Court on February 28, 2008, on the claims raised in petitioner's Amended PCRA Petition. Lindhardt testified that at trial there was no physical evidence presented by the Commonwealth that placed petitioner at the alleged scene of the crime, or the location where the victim's body was found (R.52a). Mr. Lindhardt acknowledged that he and his co-counsel were aware that the victim's body had been processed at the time of autopsy to collect and preserve possible DNA evidence (R. 36a-40a). He further acknowledged that he was aware that the Commonwealth had not conducted DNA testing on the evidence collected at the time of the autopsy (R. 51a-52a). Lindhardt admitted that had DNA testing revealed the presence of an individual other than that of the victim, petitioner, or the petitioner's alleged coconsirators, it would have bolstered petitioner's defense at trial (R. 55a-56a). Lindhardt further testified that he did not recall discussing with co-counsel and petitioner, the decision not to request or compel Discovery of the DNA material collected at the time of autopsy, but believed he would have (R. 51, 56a).

Ronald Travis, Esquire, testified at the evidentiary held before the PCRA Court on March 17, 2008. He testified that he was unable to recall any discussion between trial counsel and petitioner regarding the defense's decision not to pursue DNA testing on the evidence collected at the time of the autopsy (R. 81a). Travis acknowledged that the Commonwealth's theory at trial, was that petitioner and the victim had been in a physical altercation prior to the victim's alleged death (R. 81a-82a). Travis opined that DNA testing could have bolstered the defense theory that

11

the victim was alive in the days or weeks following the alleged incident with petitioner, should such testing conclude that the blood discovered beneath the victim's fingernails was not from the victim, petitioner or petitioner's alleged co-conspirators (R. 83a-84a).

It is evident that potentially exculpatory DNA evidence would have been immeasurably helpful in petitioner's defense. The decision of trial counsel not to pursue DNA testing on physical evidence recovered during the course of autopsy, was not reasonable defense strategy when considering the significant support such evidence could have provided the petitioner's defense theory. Had the petitioner been told that counsels were not pursuing DNA testing, petitioner would never have agreed to the position taken by trial counsels. Had petitioner been privy to a conversation between trial counsel regarding a conscious decision not to pursue DNA and trace analysis testing, it begs the question as to why he remained unaware that trace analysis testing had already been concluded.

The petitioner avers that the state court proceedings resulted in decisions that were contrary to and/or involved an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); **Coleman v. Thompson**, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) and **Williams v. Taylor**, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The petitioner respectfully request that this Honorable

Court find that trial counsel was ineffective and grant petitioner a new trial or, alternatively, Order the Commonwealth to produce the above evidence so that the petitioner may have it tested. Should the above referenced evidence be unavailable or destroyed, and therefore unable to be tested, petitioner respectfully requests that the Court find that the petitioner's Due Process rights have been violated, and vacate his conviction.

II. THE STATE COURTS ERRED IN DETERMINING THAT TRIAL AND APPELLATE COUNSELS WERE NOT INEFFECTIVE FOR FAILING TO PURSUE PETITIONER'S CLAIM OF RACIAL BIAS BASED UPON INFORMATION PROVIDED BY A JUROR POST-TRIAL, SHOWING THAT JURORS FALSELY ANSWERED QUESTIONS DURING VOIR DIRE.

The petitioner submits that trial and appellate counsels were ineffective for failing to interview a juror, subsequent to trial, made statements to petitioner that other jury members had falsely answered questions posed to them during voir dire relating to racial bias.

It is well established in Pennsylvania that if a juror on his voir dire has misled the defendant and was actually prejudiced against the defendant, relief will be given by the granting of a new trial. **Commonwealth v. Cornitcher**, 291 A.2d 521, 527 at footnote 9 (Pa. 1972)(citing Commonwealth v. McCloskey, 273 Pa. 456, 460-461, 117 Atl. 192, 193 (Pa. 1922).

The petitioner acknowledges that the rule is well settled in Pennsylvania, that a verdict may not be impeached by evidence as to what was said during deliberations, or the effect of events or comments upon the emotions or mental processes of the jurors.

13

Pa.R.E. 606(b). Petitioner did not intend to introduce testimony from jurors for the purposes of impeaching the verdict, but for the sole purpose of showing that jurors falsely answered important voir dire questions.

During jury selection, the court and trial counsel posed questions to each prospective juror as to whether he or she held any racial bias and/or prejudice toward African Americans. Each juror empaneled answered those questions in the negative.

Trial co-counsel, Eric Lindhardt, testified that he was contacted by Attorney Travis and informed that a juror named Vicki Adams, had contacted him following petitioner's trail (R. 41a). He testified that he was provided a telephone number for Ms. Adams, but ultimately decided not to attempt to contact her (R. 41a). He further testified that possible racial bias of the jury was a significant concern of trial counsel from the beginning of petitioner's case, and that had he thought to speak to Ms. Adams in relation to the possible racial animus exhibited by jury members, he would have done so, but he did not consider that possibility at the time (R. 42a).

By his Amended PCRA Petition, petitioner averred that juror, Vicki Adams, would testify that other member(s) of the jury had used racial slurs to describe petitioner during the course of trial. When called to testify, Ms. Adams stated that those instances had occurred entirely during the course of deliberations, at which time the PCRA Court, citing Rule 606(b) of PA Rules of Evidence, prohibited her from testifying further on the subject (R. 62a-68a).

14

Trial counsel, Ronald Travis, testified that he personally had spoken to Ms. Adams and was provided information about juror misconduct during petitioner's trial (R. 85a). Travis testified that Ms. Adams had informed him that racial slurs were used throughout the deliberation process (R. 86a). Travis testified that he forwarded the contact information of Ms. Adams to his co-counsel, Attorney Lindhardt, as well as the information she had provided to him regarding racial bias in the jury room (R. 85a). During the direct examination of Attorney Travis, the PCRA Court prohibited any additional testimony regarding the information gleaned from Ms. Adams regarding racial bias in the jury room, referencing the court's previous ruling at the evidentiary hearing of February 28, 2008 (R. 84a-87a).

While the record clearly remains incomplete due to the PCRA Court's misguided application of Pa.R.E. 606(b), petitioner contends that sufficient evidence had been presented through testimony of trial counsel and Ms. Adams, to show that petitioner was clearly prejudiced by trial and appellate counsels' failure to act when provided information regarding racially biased jurors. The petitioner should not have been convicted because of his race, let alone sentenced to life imprisonment based on trial and appellate counsels' ineffective assistance of counsel and dereliction of duty, prohibited by the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, and Articles 1, §9 and V, §9, of Pennsylvania's Constitution.

The three-pronged test petitioner set forth above is satisfied even with the limited evidentiary record in the instant

15

case. **Commonwealth v. Fletcher**, supra. Trial counsel acknowledged receipt of the racially charged information from the juror and Mr. Travis, any decision not to further pursue the racial bias of the jury upon receipt of the information from Ms. Adams could not be grounded in any **reasonable** decision or strategy of trial counsel, trial counsel admitted that racial bias was an issue at the beginning of the case, and any decision by trial and appellate counsels to overlook evidence of such bias, must be viewed as a complete failure by counsels to protect the interests of their client, even as they continued to represent him through his appeal.

Finally, petitioner was clearly prejudiced by trial and appellate counsels' failure to raise the issue of jury racial bias to either court or on appeal. As discussed in **U.S. v. Henley**, 238 F.3d 1111, 1120 (2001), **Dyer v. Calderon**, 151 F.3d 970, 973 (9th Cir. 1998)(en banc) and **Shillcut v. Gagnon**, 827 F.2d 1155, 1159 (1987), racial bias is not to be tolerated in the jury room under any circumstances, with the Ninth Circuit going so far as to say even a single racist juror warrants the grant of a new trial to petitioner. **Dyer**, 151 F.3d at 973. Trial counsel and appellate counsel were presented with information that precisely was the kind of behavior they had feared from the inception of petitioner's case had been exhibited by jurors empanelled to determine the guilt of their client, yet they took no steps in bringing that information to the attention of the lower state court.

As such, the petitioner had satisfied and met the

16

ineffectiveness standard under both **Strickland v. Washington**, supra, and **Commonwealth v. Pierce**, 515 Pa. 153, 527 A.2d 973 (Pa. 1987). The correctness or integrity of the procedural denial, amounts to a constitutional violation triggering denial of Due Process and Equal Protection of Law. In this case, the Pennsylvania state courts' application of **Strickland** and Pierce, surrendered the petitioner's right to counsel. The Sixth Amendment entitles a defendant to counsel who functions in the active role of an advocate. This is clearly not what the petitioner got. Their unreasonable decision deprived the petitioner of his right to effective counsel under the Sixth Amendment.

The state courts' judgment resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petitioner respectfully requests that this Honorable Court find that trial and/or appellate counsel were ineffective, and grant the petitioner a new trial or, alternatively, grant the petitioner an evidentiary hearing.

III. THE STATE COURTS ERRED IN FINDING THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO MOVE FOR A MISTRIAL POST-VERDICT, BASED ON STATE-MENTS MADE BY A JUROR RELATING TO RACIAL BIAS DURING VOIR DIRE.

The petitioner hereby incorporates by reference herein the facts and arguments in Issue II above, as though set forth at length herein.

Additionally, the petitioner avers that if counsel did have

knowledge of the contents of the statements made by Ms. Adams, within a reasonable time following the return of the verdict in this matter, trial counsel was ineffective for failing to move for a mistrial at that time, and furthermore, failing to preserve the issue on appeal. Finally, a petitioner may obtain an evidentiary hearing on a claim for which the petitioner has failed to develop a factual basis in state court proceedings.

IV. THE STATE  COURTS ERRED IN NOT FINDING THAT TRYING THE PETITIONER  BEFORE  A  DEATH QUALIFIED JURY  DURING  THE MERITS PHASE OF THE TRIAL,  DEPRIVED THE PETITIONER  OF  A TRIAL BEFORE A CROSS-SECTION OF THE COMMUNITY.

One of the pre-trial motions filed by the petitioner requested that the court empanel a jury, which was neither life or death qualified, to hear and decide the first phase of the trial. The motion asserted that various studies have established that death qualified jurors are biased in favor of conviction, and also contended that the exclusion of potential jurors, based on death penalty attitudes, would serve to deprive petitioner of his state and federal constitutional right to be tried by jurors drawn from a fair cross-section of the Clinton County community. The Court summarily denied the motion without an evidentiary hearing, thus preventing the defense from creating a record concerning the fact that death qualified jurors are biased in favor of conviction.

In holding that the same jury would hear the merits phase

18

and also the penalty phase, if a first degree conviction was returned, the court effectively eliminated from jury service, Clinton County citizens whose death penalty views would disqualify them from participating in the penalty phase of a capital trial. The fact that an individual's views with respect to the death penalty would serve to disqualify the potential juror from participating in the penalty phase of a capital trial, does not serve to disqualify such an individual from being able to render a fair and impartial verdict of not guilty or guilty in the merits phase of the trial. Thus, requiring one jury to handle the two potential phases of the trial, the petitioner was deprived of being tried by a fair cross-section of the Clinton County community. Any number of potential jurors were excused for cause due to their death penalty views or because of problems arising from the potential aggravators, or as a result of mitigation impairment. Had the procedure suggested by petitioner been employed, the individuals excused for cause based upon the death penalty views, would have been available potential jurors to determine the innocence or guilt of petitioner. Those actually seated to determine the innocence or guilt of petitioner, did not represent a true cross-section of the Clinton County community, as a result of the challenges for cause based on death penalty views. Ones death penalty attitudes and beliefs have no relevance with regard to an ability to be fair and impartial with respect to the merits phase of a homicide trial. If there was a correlation between death penalty attitudes and beliefs, and the ability to be fair during the merits phase of a criminal

19

trial, death penalty attitudes and beliefs would become a common source of inquiry during voir dire in any criminal case. Since death penalty attitudes and beliefs served to "trump" the eligibility of otherwise qualified individuals to serve as jurors with respect to the merits phase of the trial. Petitioner was deprived of his entitlement to be tried by a representative cross-section of the community.

The concept which the petitioner was presenting to the state courts for employment in his case, is one which has been found to be meritorious in sister jurisdictions. **State v. Biegenwald**, 126 N.J. 1, 70, 594 A.2d 172, 194 (1991); **State v. Moore**, 113 N.J. 239, 550 A.2d 117 (1988) and **State v. Pinnell**, 311 Ore. 98, 121, 806 P.2d 110, 116 (1991).

In a capital prosecution there is an inherent conflict between the merits phase and the punishment phase, in that during the merits phase the evidence is to be limited to a determination of what the defendant did, whereas, during the penalty phase other criminal conduct becomes relevant to the determination of the appropriate sentence. **U.S. v. Meyers**, 550 F.2d 1036, 1044 (5th Cir. 1997)("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not who he is.").

The summary rejection of the petitioner's pretrial motion, recluded petitioner from creating a record in the form of the various studies which have established that death qualified jurors are in fact bias toward conviction, with respect to the merits phase of a capital trial. Thus, using one jury system to hear

and decide both the merits and punishment phase of the trial, served to deprive the petitioner of a true cross-section of the community and, resulted in his trial being heard by a group of citizens inclined to convict. This procedure is not only inherently unfair, but runs afoul of petitioner's constitutional rights under both the State and Federal Constitution. A petitioner may obtain an evidentiary hearing on claim for which petitioner has failed to develop factual basis in state court proceeding). **Williams v. Taylor**, 120 S.Ct. 1179 (2000).

The state courts' judgment resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petitioner respectfully requests that this Honorable Court find that the state courts' decisions were unreasonable and grant the petitioner a new trial or, alternatively, grant the petitioner an evidentiary hearing on this claim.

> V. THE STATE COURTS ERRED IN NOT FINDING THAT THE
> THE INSTANCES OF PROSECUTORIAL MISCONDUCT
> WHEN TAKEN TOGETHER, SO TAINTED THE FAIRNESS
> OF THE TRIAL, THAT THE PETITIONER SHOULD BE
> GRANTED A NEW TRIAL IN THE INTEREST OF JUSTICE.

The pervasive misconduct engaged in by the prosecution, denied the petitioner due process of law, under both the federal and state constitutions. Further, the accumulated taint occasioned

21

by each individual act of prosecution misconduct, served to deprive petitioner of his constitutional entitlement to a fair trial under both the federal and state constitutions. No fair minded person can review the transcripts in this case and avoid the conclusion that the chances for petitioner to have the question of his innocence or guilt fairly deliberated by the jury, was significantly negatively impacted by the repeated and unrelenting misconduct engaged in by the Commonwealth. The inescapable conclusion is that counsel for the Commonwealth tried the case in manner demonstrating an attitude of the ends justifying the means, and win at all costs. This approach is totally inconsistent with the appropriate approach for a prosecutor to take in a criminal case, and in violation of petitioner's federal and state constitutional rights.

The correct approach to the role of prosecutor was eloquently defined by Justice Douglas in his dissenting opinion in **Donnelly v. DeChristoforo**, 416 U.S. 637 (1974), wherein he stated, "Prosecutors are often eager to take almost any shortcut to win, yet as I have said they represent not an ordinary party, but We the People. As I have noted, their duty is as much 'to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' **Berger v. U.S.**, 295 U.S. 78, 88," at 651. The Douglas dissent is totally consistent with the unanimous decision of the U.S. Supreme Court in **Berger**, supra, speaking with a unanimous voice.

Although the language from the Supreme Court was directed

22

towards misconduct engaged in by federal prosecutors, it certainly has equal application to state prosecutors. When this court considers the totality of the repeated foul blows struck by the Commonwealth, day after day, witness after witness, unrelenting and undeterred even when chastised by the trial court, the Commonwealth has earned "disqualification." The cumulative impact of the acts of misconduct clearly scuttled petitioner's chances for a fair deliberation on the issue of innocence or guilt, thus depriving him of his due process rights and fair trial entitlement as recognized under both the U.S. and Pennsylvania Constitutions.

As a review of the transcripts in the instant case clearly shows, day after day, witness after witness, the attorney for the Commonwealth engaged in improper questioning of witnesses suggesting the existence of certain "facts," when there was no record to support the unsupported assertions. When challenged by objection, the Commonwealth did not attempt to offer a legitimate legal basis which would permit the question to be asked, and did not offer a "good faith basis" for asking the objected to question. The continual practice of the Commonwealth was to announce that the question was "being withdrawn" as the objection was being **sustained**. This pervasive practice of making unprovable factual assertions in front of the jury would leave behind the misleading, unproven and willfully false inuendo for the jury to grasp. It is only when one reviews the trial transcripts and observes the continued conduct of the Commonwealth, that one is able to grasp the significant, egregious misconduct on the part of Commonwealth. In holding **Commonwealth**

23

**v. Hickman**, 319 Pa.Super. 261, 466 A.2d 148 (Pa.Super. 1983), that the District Attorney's conduct warranted a new trial, our Superior Court noted, "We conclude that the cumulative effect of the District Attorney's remarks so prejudiced the appellant that a fair trial was impossible. The status of the District Attorney as an officer of the court, places him in a position of trust with the responsibility to fairly and objectively prosecute criminals. It is in this light that he or she is seen by the jury, and, as such, his or hers remarks are given great weight by the members of the jury in reaching their determination." Id. at 268, 152. Just as the repeated foul blows struck in **Hickman** resulted in the awarding of a new trial, so to do the blatant and unrestrained misconduct engaged in by the Commonwealth in the instant case, support the granting to petitioner of a new trial.

The litany of the instances of misconduct engaged in by the prosecutor during the merits phase of the trial are set forth in the petitioner's Brief On Appeal (pages 16-27) to the Superior Court of Pennsylvania, Harrisburg, District, Docket No. 588 MDA 2005, which the petitioner incorporates by reference herein, as though set forth at length herein. See also Exhibit - 6a attached.

The state courts' decisions were based on an unreasonable determination of the facts in light of the evidence presented at trial. The factual findings made by the PCRA Court and the Superior Court, in this case, cannot be presumed to be correct, and the petitioner has rebutted this presumption (in all claims

24

raised) by clear and convincing evidence. Accordingly, the petitioner respectfully requests that this Honorable Court find that the state courts' decisions were unreasonable and grant the petitioner a new trial or, in the alternative, grant the petitioner an evidentiary hearing on this claim.

VI. IS RULE 600(b) UNCONSTITUTIONAL AS APPLIED IN A CASE WHERE IT PREVENTS RECITIFICATION OF FIFTH AND SIXTH AMENDMENT VIOLATIONS?

VII. DID THE STATE COURT ERR OR ABUSE IT'S DISCRETION, IN DETERMINING THAT IT COULD NOT HEAR TESTIMONY CONCERNING RACIST STATEMENTS MADE BY A JUROR, WHERE THE TRIAL COURT HAD DISCRETION TO INQUIRE INTO THE VALIDITY OF THE VERDICT BY HEARING THE JUROR'S TESTIMONY?

In the interest of judicial economy and continuity, these issues will be argued together. The petitioner did not raise these issues in the state courts because he was unaware as to whether or not the constitutionality of this rule was ever challenged, and because trial counsel believed that a juror could not testify concerning jury deliberations. However, there is a narrow exception to the no impeachment rule which allows "post-trial" testimony of extraneous influences which may have affected (prejudiced) the jury during deliberations. Trial counsel was aware of this exception, but failed to pursue it, or the constitutionality of this rule, which prejudiced the petitioner by violating his due process rights, and his rights under both the Fifth and Sixth Amendments.

25

Under the Sixth Amendment of the U.S. Constitution, a defendant has the right to be tried "by an impartial jury." Included in that right is the right to a jury "capable and willing to decide the case solely on the evidence before it.". When a juror's bias against a defendant affects the juror's evaluation of trial evidence, the bias violates the defendant's constitutional right to a fair trial. A court confronted with such a claim has wide discretion in deciding how to proceed and appropriately denies a hearing when a party presents only thin allegations of jury misconduct. A hearing is not required when it would not be useful or necessary in determining whether a defendant's rights were violated.

The record shows that an evidentiary hearing was held for the petitioner's PCRA Petition. Testimony was taken concerning racial bias by jurors, and the PCRA Court prohibited further testimony concerning this matter (R. 85a-87a).

The petitioner avers that both actual and implied (or presumed) bias occurred during his trial and jury deliberations. Actual bias exists when a juror fails to answer a material question honestly on voir dire, and a correct response would have provided a basis for a challenged for cause. **U.S. v. Bishop**, 264 F.3d 535, 554 (5th Cir. 2001)(citing and applying **McDonough Power Equip., Inc. v. Greenwood**, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984)). A claim of alleged bias is ordinarily addressed in a hearing where the judge examines the juror and obtains assurances of the juror's impartiality. There is also a narrow class of relationships described by Justice

26

O'Connor's concurrence in **Smith v. Phillips**, 455 U.S. 209, 217-18, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982), and recognized by many courts on several occasions, for which a juror can be presumed bias. See for example **Solis v. Cockrell**, 342 F.3d 392, 395-400 & n. 44 (5th Cir. 2003)(discussing the court's implied bias case law). In the instant case, the court ceased testimony, and stated that "when Mr. Travis is available, we'll come back. You can put him on first and then we'll see what the factual basis is for going any further with Ms. Adams" (R. 62a-69a). However, no further testimony or inquiry occurred on the matter.

The blatant bias was brought out by counsel (R. 41a-45a, R. 62a-68a, and R. 85a-87a).

Under the exception to the no impeachment rule, a juror "may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. **Carter v. U.S. Steel Corp.**, 529 Pa. 409, 415, 604 A.2d 1010, 1013 (Pa. 1992). Under no circumstances may jurors testify about their subjective reasoning process. Id.

The key case in this area is **Tanner v. U.S.**, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), which involved allegations, brought to light after conviction, that several jurors had consumed alcohol and drugs during lunch breaks, causing them to sleep through the afternoon sessions of trial and possibly affecting their reasoning ability. The Court recognized the common law exception to the bar against post-verdict juror testimony in cases involving an "extraneous influence." The external/internal distinction employed by the Tanner Court is

27

not a locational distinction, but rather is based on the nature of the allegation. Juror testimony about a matter characterized as "external" to the jury is admissible under Rule 606(b), while testimony about "internal" matters is barred by rule. Intoxication did not fit into the exception to Rule 606(b) for outside influences, but rather was more properly labeled an internal issue. Tanner did not address the issue of racial bias, but instead involved issues of juror competence. The Supreme Court recognized that a defendant has a Sixth Amendment right to an unimpaired jury, but concluded that, because there were several aspects of the trial process that could protect this right, the court's invocation of a rule of evidence to bar juror testimony did not amount to a constitutional violation. Tanner, 483 U.S. at 126-27. The Court listed voir dire, observation of the jury by counsel and the court during trial, opportunities for jurors to report inappropriate jury behavior prior to reaching a verdict, and theadmissibility of non-juror testimony as to wrongdoing as examples of "other sources of protection" for a defendant's Sixth Amendment rights. Id. at 127, 107 S.Ct. 2739.

After Tanner, courts have struggled with its application to cases involving the possibility of Sixth Amendment violations during jury deliberations. In two habeas challenges involving state convictions, two circuits have suggested that the use of juror testimony may be appropriate in the rare case where due process and Sixth Amendment concerns are implicated. In **Shillcutt v. Gagnon**, 827 F.2d 1155, 1159 (7th Cir. 1987), the Seventh Circuit held that the intent of Rule 606(b) was to preclude post-

verdict juror testimony, but nonetheless proceeded to address the constitutional question:

> "The rule of juror incompetency cannot be applied
> in such an unfair manner as to deny due
> process. Thus, further review may be necessary in the
> occasional case in order to discover the
> extremely rare abuse that could exist
> even after the court has applied the
> rule and determined the evidence incompetent. In
> short, although our scope of review is
> narrow at this stage, we must consider whether
> prejudice pervaded the jury room, whether there is
> a substantial probability that the alleged racial
> slur made a difference in the outcome of the trial."

827 F.2d at 1159 (involving the following comment made by a juror during the last twenty minutes of six hour deliberations: "Let's be logical; he's black, and he sees a seventeen year old white girl--I know the type"). See also **Anderson v. Miller**, 346 F.3d 315, 327-29 (2d Cir. 2003)(raising constitutional concerns regarding scope of Rule 606(b)'s preclusion of juror testimony if there were credible allegations that a juror's safety was threatened by fellow jurors; but see **Williams v. Price**, 343 F.3d 223, 225-35 (3d Cir. 2003)(Alito, J.)(applying the narrow habeas standard in a case involving allegations that one juror called another a "nigger lover," the court stated that Tanner "implies that the constitution does not require the admission of evidence that falls within Rule 606(b)'s prohibition," and as such, "the state courts did not violate clearly established Federal law' in refusing to consider those statements.").

Many courts have recognized that Rule 606(b) should not be applied dogmatically where there is a possibility of Juror bias during deliberations that would violate a defendant's Sixth

Amendment rights. See, e.g., **Heller**, 785 F.2d at 1527 (involving a voir dire of jurors who made anti-semitic comments); **Wright v. U.S.**, 559 F.Supp. 1139, 1151 (E.D.N.Y. 1983)("Certainly, if a criminal defendant could show that the jury was racially prejudiced, such evidence could not be ignored without trampling the Sixth Amendment's guarantee to a fair trial and an impartial jury."); **Tobias v. Smith**, 468 F.Supp. 1287, 1289-90 (W.D.N.Y. 1979)(requiring an evidentiary hearing when the petitioner presented **a juror affidavit** describing two racially charged statements allegedly made during deliberations, including the remark "you can't tell one black from another. They all look alike."); **Smith v. Brewer**, 444 F.Supp. 482, 490 (S.D.Iowa 1978)("Where ... an offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by influence of racial bias in the jury room, to ignore the evidence might very well offend fundamental fairness"); **Commonwealth v. Laguer**, 410 Mass. 89, 97, 571 N.E.2d 371, 376 (1991)(concluding that, although juror bias could not be considered admissible as an extraneous matter under the state's non-impeachment rule (which is similar to Fed. R. of Evid. 606(b), a hearing on the question of ethnic slurs against Hispanics was nevertheless required to determine whether the ethnically-biased statements were made because of the "possibility raised by the affidavit that the defendant did not receive a trial by an impartial jury, which was his fundamental right, cannot be ignored"). See generally, Racist Juror Misconduct During Deliberations, 101 Harv. L.Rev. 1595, 1597 (1988)("Although few

30

courts have admitted juror testimony of racist jury misconduct, most courts at least acknowledge that Rule 606(b) could not be applied to exclude such evidence if, taken at face value, the evidence established a constitutional violation."

All these case, and others not brought to light, demonstrate the need for change. The rule against juror impeachment cannot and should not be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicates a defendant's right to due process and an impartial jury. The four protections relied on by the Tanner Court **do not provide adequate safeguards** in the context of racially and ethnically biased comments made during jury deliberations.

The petitioner submits that the four protections relied on by Tanner and other courts, do not adequately or sufficiently protect defendants or uncover true biases or prejudices. Unlike jurors' ingestion of alcohol or drugs, the act or effect of which can be observed by others and brought to the attention of the court, jurors' racial biases can be much more easily hidden from observation. Indeed, that appears to be precisely what occurred in the petitioner's case. There was a structural defect in the petitioner's case. One or more of the jurors lied on their jury questionaire and failed to honestly respond to the court's questions during voir dire, consequently, the existence of a structural defect was established, i.e., the deprivation of his Fifth and Sixth Amendment right to due process and an impartial jury. Because the impartiality of the adjudicator goes to the

31

very integrity of the legal system, the Chapman harmless error standard cannot apply. It is indisputable that such a defect would have existed from the onset of the petitioner's trial and would not be amenable to harmless error review. Thus, contrary to being an "inquiry into the validity of the verdict rendered by the jury, the petitioner's claim is more properly viewed as an inquiry into the legitimacy of the pre-trial procedures, and, in turn, the constitutionality of the overall proceedings. 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedures: Evidence 2d §6074 at 516 (2007).

The petitioner's avers that the court had the discretion to inquire further into the racial allegation testified to by an officer of the court and a juror, that counsels were ineffective for failing to challenge Rule 606(b) in light of the evidence presented, and that the petitioner was severely prejudice by the court's acquiescence and counsel's failure to challenge the rule and pursue it in the state court.

Finally, several other case demonstrate a need to challenge this rule. **U.S. v. Benally**, 560 F.3d 1153 (10th Cir. 2009)(Dissenting opinion); **U.S v. Humphrey**, 208 F.3d 1190, 1199 (10th Cir. 2000); **Morgan v. Illinois**, 504 U.S. 719, 729-31, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992) and **Gomez v. U.S.**, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). Accordingly, a petitioner may obtain an evidentiary hearing on a claim for which he has failed to develop factual basis in state court proceedings. **Williams v. Taylor**, 120 S.Ct. 1179 (2000). The state courts' judgments resulted in decisions that were based

on unreasonable determination of facts in light of the evidence presented in the state court proceedings. Accordingly, the petitioner respectfully requests that this Honorable Court find that the state courts decisions were unreasonable and grant the petitioner a new trial or, in the alternative, grant the petitioner an evidentiary hearing on this claim.

## CONCLUSION

Based on the foregoing, the Pennsylvania courts erred in affirming the petitioner's judgment of conviction. Trial counsel were ineffective as set forth above and the petitioner was denied his constitutional rights as set forth above.

Respectfully submitted,

Fabian D. Smart, pro se

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the fore-going Brief In Support of Petition For Writ of Habeas Corpus has been served via first class prepaid U.S. Mail, by depositing the same into the institutional mail system at SCI Greene, Waynesburg, Pennsylvania, upon the Office of the District Attorney of Clinton County, Pennsylvania, 322 East Water Street, Lock Haven, PA 17745, on this the 8th day of October, 2010.

Respectfully submitted,

Fabian D. Smart, pro se

DOC No. GC-2983
175 Progress Drive
Waynesburg, PA 15370-8082

## VERIFICATION

I hereby certify, verify or affirm that the foregoing Brief and Certificate of Service are true and correct under the penalty of perjury per 28 U.S.C. §1746.

Date: October 8, 2010

Fabian D. Smart, pro se

1          A.        No.   I believe, to the contrary, that there was no

2    organic material found on the towel, no blood or semen.

3          Q.        Okay.   Where in any of these reports, as you would

4    recall, was there any indication that this towel had actually

5    been tested for these types of substances?

6          A.        I believe it was.

7          Q.        Okay.   Do you have any idea what report that would

8    have been listed in?

9          A.        I don't have that report here, but I believe the

10   District Attorney has that report.

11         Q.        Okay.   So, according to this other report, would

12   there have been testing for trace carpet fibers or hairs?

13         A.        On the towel?

14         Q.        Yes.

15         A.        I don't recall specifically with regard to the

16   towel.   I know all the clothing that was found at the scene with

17   Mr. McMann was tested for hair and fiber evidence as was Mr.

18   Smart's trunk, the theory being that Mr. McMann was placed in the

19   trunk of Mr. Smart's car.   So, there was significant forensic

20   testing done of both and the conclusion was that there was no

21   blood in the back or the trunk of Mr. Smart's car.   There was no

22   hair or fiber evidence that had anything to do with Mr. McMann.

23   There was hair and fiber evidence in the trunk of his car, but

24   none of it attaches to the victim.

25              MR. STROUSE:   Just a second, Your Honor.

R 36a

BY MR. STROUSE:

Q.     I'm going to go back to the autopsy report by Doctor Land, if you would please.  If you would look back on page 3 once again, just below the heading of External Examination there are four numbered paragraphs.  The first line following No. 4 says:  The body has also received manila envelopes on both hands.

A.     Yes, I see that.

Q.     Why, to your knowledge, would the body have been received with manila envelopes over both hands?

A.     Presumably, to preserve potential evidence.

Q.     Okay, and in Doctor Land's report, does it indicate anywhere whether or not any evidence was preserved or any evidence taken from the hands of the victim, if you recall?

A.     I believe that there were some fingernail clippings that were sent for testing, and I believe, actually, that some of the victim's -- one or more of his fingers were removed for identification purposes.

Q.     Okay, and you say that you believe some of the fingernail clippings were removed and sent for testing?

A.     Yes.

Q.     Do you have any reports with you here today that would indicate or show that these fingernails were tested?

A.     I don't; but, again, the District Attorney does.

Q.     Okay.  At any point did you or Attorney Travis

R 377a

1    request the production of this towel that was supposedly found

2    with the victim's body for the purpose of testing yourselves or

3    through an expert that you had retained?

4         A.      I would have personally looked at every item of

5    evidence in the case.  So, I recall briefly seeing the towel as

6    well as every item of clothing that was recovered.  We did not

7    ask for additional testing beyond the test that was done

8    indicating that there wasn't anything -- no genetic material was

9    found on the towel.  We didn't ask for further testing.

10        Q.      You do recall seeing this report that no genetic

11   material was found on the towel prior to trial?

12        A.      Yes.

13        Q.      Are you aware, Attorney Linhardt, of what type of

14   information genetic testing or trace analysis testing could

15   produce?

16        A.      I'm sorry.  Could you repeat the question?

17        Q.      Are you aware of what type of information or what

18   type of evidence could be produced through genetic testing or

19   trace analysis testing, say, in a criminal prosecution?

20        A.      DNA testing; is that what you're referring to?

21        Q.      Yes.  What potentially could that prove, the

22   existence or absence of DNA testing?

23        A.      Well, hypothetically, if there was blood on the

24   towel, it could tie to a potential source of the blood assuming

25   we had some comparative analysis done.  In other words, we had

R 38a

1    blood on the towel and a known blood sample from the victim, we

2    could determine whether or not the blood was the victim's.   If

3    there was blood on the towel and we had drawn blood from a known

4    suspect, we could determine whether or not the blood was from a

5    known suspect.

6         Q.      And, of course, this type of evidence could

7    potentially exculpate Mr. Smart if it would be shown that there

8    was a third party donor of this type of evidence; isn't that

9    correct?

10              MR. SALISBURY:   Objection.

11              THE COURT:   What's the objection?

12              MR. SALISBURY:   That he's asking for an assumption

13   on behalf of this witness as to whether or not this would

14   exonerate him.   I don't believe this witness is in a position to

15   make that determination or to render an opinion.

16              THE COURT:   I'll sustain the objection.   I don't

17   know that it would exculpate him.   It might raise a question as

18   to whether or not there was some reasonable doubt somebody else

19   was involved with it, but I don't know that it would exculpate

20   him.

21              MR. STROUSE:   Yes, Your Honor.   Perhaps I'll

22   rephrase.

23   BY MR. STROUSE:

24        Q.      Mr. Linhardt, the existence of a third party donor

25   with DNA evidence or trace analysis testing, in your opinion,

R 39a

1    would that have strengthened or weakened Mr. Smart's case at

2    trial?

3         A.      Well, Mr. Strouse, the entire -- our entire case

4    was a reasonable doubt case.    There was substantial reasonable

5    doubt in this case.    When we cross-examined Trooper Rausher for

6    three hours, we were cross-examining him about, I believe,

7    nineteen investigative leads that he failed to follow.    When we

8    cross-examine Troopers about a lack of forensic evidence found in

9    Mr. Smart's trunk that would have tied the victim to the trunk of

10   that car, that was a reasonable doubt issue.    When we call

11   witnesses to testify that they had seen Mr. McMann alive in the

12   days and weeks following when Mr. Smart was to have killed him,

13   that's reasonable doubt.    So, if there wasn't any testing done on

14   a towel or if there wasn't any hair and fiber to tie Mr. Smart to

15   the victim, that was a reasonable doubt argument that we made.

16   There was no -- other than the testimony of the four witnesses

17   that testified it was Mr. Smart, his alleged Co-conspirators,

18   there was no evidence to tie Mr. Smart to this crime.

19        Q.      Very well.    We're going to move on to some of the

20   other issues raised in the petition aside from the forensic

21   testing.    You and Mr. Travis also represented Mr. Smart through

22   his appeal process; is that correct?

23        A.      That's correct.

24        Q.      You had submitted a certification to the Court I

25   believe yesterday, on February 25th, the date it was filed,

R 40a

1    indicating in that document that you do recall a member of the

2    jury had contacted Attorney Travis to request contact information

3    for Mr. Smart.   Is that a fair assessment of your certification?

4         A.        I recall Mr. Travis had indicated to me that a

5    female juror, and I recall her name being Vicki Adams, had

6    contacted Mr. Travis or his office, I don't recall which, wanting

7    a mailing address for Mr. Smart.

8         Q.        You do, however, indicate in your certification

9    that you never contacted Ms. Adams and you never had any contact

10   with her whatsoever that you recall.

11        A.        Yes.   What had happened is -- what I recall is that

12   I would have had a small piece of notepaper on my desk in my

13   office with Ms. Adam's name.   I believe it also had her phone

14   number.   I don't recall who provided me that phone number.   I had

15   considered contacting her and ultimately decided not to.

16        Q.        Could you explain to the Court why you would have

17   decided not to follow through with the contact to Ms. Adams?

18        A.        I have never in my seventeen years of practicing

19   law -- as a matter of personal policy, I have never talked to a

20   juror about jury deliberations or why or how they reached a

21   verdict.   I believe that what goes on in the jury deliberation

22   room should remain amongst and between the jurors; and whether I

23   agree with a verdict or not, I don't think it's my role to

24   question their verdict or their deliberation process.

25        Q.        In your contacts with Attorney Travis, did he

R 41a

1   provide you with any information as far as what type of things

2   Ms. Adams was saying?

3         A.      I don't even know that Mr. -- to the best of my

4   recollection, I don't know if Mr. Travis ever personally spoke

5   with her.  As I said, he had either contacted her or her office.

6   Now, the issue that you're raising about whether or not there was

7   racial animus that had been going on throughout the course of the

8   trial as opposed to particularly the deliberation stage was not

9   something that I had considered to ask her.

10        Q.      In your role as Appellate Counsel for Mr. Smart,

11  did you feel as though you had any responsibility to speak with

12  Ms. Adams?

13        A.      Well, let me say this:  Had it -- had I thought --

14  the possibility of racial animus was a concern of mine and Mr.

15  Travis' and Mr. Smart's, I'm sure, from the very beginning of

16  this case.  So, to the extent that I had considered that I could

17  speak to Ms. Adams not about the deliberation but whether or not

18  there was any racial animus expressed during the course of the

19  trial, had I thought to do that, I would have done that; but

20  it -- I never thought to do that.

21        Q.      Had you heard any reports -- you said you were

22  concerned about racial animus from the get-go.  Had you heard any

23  reports or did you observe any reports or were you given any

24  reports about any racially offensive remarks or racial slurs

25  being used by any members of the jury by anyone?

R 42a

1      Q.      And was all this information made available to both

2   you and Attorney Travis?

3      A.      Yes.

4      Q.      And was it also made available and discussed with

5   Mr. Smart?

6      A.      I don't have a specific recollection of talking to

7   Mr. Smart about this Commonwealth's Exhibit 7, but Mr. Travis and

8   I and Mr. Smart were in regular communication throughout the

9   trial preparation.

10              THE COURT:   Commonwealth Exhibit 7?

11              THE WITNESS:   I'm sorry.   Is this 3 or 7?

12              MR. SALISBURY:   3.

13   BY MR. SALISBURY:

14      Q.      Mr. Linhardt, with respect to the results on the

15   left fingernails, there was reference that there was a stain on a

16   fingernail indicating the presence of blood.   No further analysis

17   was performed on the blood.   How did that fit in with your

18   Defense theory?   Did you discuss with Attorney Travis or at any

19   time with the Defendant as to whether or not further testing

20   should be completed on that fingernail?

21      A.      I don't recall having a specific conversation with

22   Mr. Travis about that particular item; but knowing the extent of

23   the decomposition of the body, it doesn't surprise me that there

24   was blood on the fingernail.

25      Q.      And assuming that the blood came back and would

R $l

1  have belonged to the Defendant, Mr. Smart, if you had it further

2  tested, how would that have fit in with your theory or Defense in

3  this case?

4          MR. STROUSE:   Objection, Your Honor.   He's assuming

5  a fact that is not -- that has not been presented here.

6          THE COURT:   Well, I'll let him answer the question

7  if he can.   Go ahead.

8          A.      As I had indicated, our -- our Defense was that

9  this was a reasonable doubt case for a substantial number of

10  reasons.   So, the failure of law enforcement to test a particular

11  item of evidence just feeds into the theory of reasonable doubt.

12  As I said, there was no objective, certainly there wasn't any

13  scientific or forensic evidence to tie Mr. Smart to this crime.

14          THE COURT:   Well, if the blood had been analyzed

15  and recognizing as you have pointed out that you would have to be

16  able to take a sample; but if the blood had been tested and it

17  turned out to have been from somebody other the Defendant or the

18  other three or four people that were with him, wouldn't that have

19  caused even more of a reasonable doubt than just the mere fact

20  that it hadn't been tested at all?   In other words, if it turned

21  out to be blood from Jose Gonzalus who was in a federal prison

22  for another murder or something like that, wouldn't that have

23  helped your case?

24          THE WITNESS:   Absolutely.

25          THE COURT:   Well, did you and Mr. Travis make a

R 52a

1    with regards to petitioning to the Supreme Court in this matter.

2         Q.        In any of those writings that you received from Mr.

3    Smart, was there any reference to having been contacted by Miss

4    Adams?

5         A.        Not that I recall.

6              MR. SALISBURY:   I have no further questions.

7              THE COURT:   Redirect?

8              MR. STROUSE:   Yes, Your Honor.

9

10                        REDIRECT EXAMINATION

11

12   BY MR. STROUSE:

13        Q.        Mr. Linhardt, referencing back to Commonwealth

14   Exhibit No. 3, the Harrisburg Regional Laboratory report, as the

15   Court and Mr. Salisbury has pointed out, there was no additional

16   testing performed on the blood beneath the fingernails of 1.9.4.

17        A.        Correct.

18        Q.        Do you believe that testing of that material could

19   prove potentially very important in this case?

20        A.        Well, it could prove to be Mr. McMann's blood.   So,

21   it wouldn't help.   That wouldn't be important.   It could be

22   important if it was some third person's blood.   Whether or not

23   it's helpful to our Defense, we don't know until it's tested.   It

24   could be hurtful or it could be helpful.

25        Q.        However, if it was the blood of a third person, it

R 55a

1    would be very helpful; would it not?

2             MR. SALISBURY:   Objection to the form of the

3    question.

4             THE COURT:   Overruled.   You may answer if you can.

5        A.       Well, it's helpful unless the third person is Mr.

6    Smart.

7    BY MR. STROUSE:

8        Q.       I'm talking about if it's another individual other

9    than Mr. Smart.   If it's another individual and it's not -- it

10   wasn't one of the other four -- or three men who are alleged to

11   have been with Mr. Smart on the night in question and it wasn't

12   Mr. Smart himself; if it was another individual's blood beneath

13   the fingernails of Mr. McMann, would that not have been very

14   helpful to your case?

15       A.       Obviously, that would have been helpful.

16       Q.       And I just want to make sure that we have this

17   clear, you did not -- you do not recall specifically having a

18   discussion with Mr. Travis where you -- the two of you made a

19   conscious decision, maybe a strategic decision, not to pursue any

20   additional testing or request the production of that fingernail

21   evidence; is that correct?

22       A.       That is not to say that we didn't.   I just, as I

23   sit here now three years later, I don't recall.

24       Q.       As far as any -- the information you received, the

25   contact information from Ms. Adams, do you have any idea what

R 56a

1           MR. STROUSE:  Okay, Your Honor.

2           THE COURT:  They're admitted.  Next?

3           MR. STROUSE:  Next, Your Honor, the Petitioner

4    would call Ms. Vicki Adams.

5

6                VICKI LYNN ADAMS, having been called

7        as a witness, was duly sworn and testified as

8        follows:

9

10                    DIRECT EXAMINATION

11

12   BY MR. STROUSE:

13      Q.     Would you please state your name and address,

14   please.

15      A.     Vicki Lynn Adams.

16           THE COURT:  Would you spell your name, please --

17   all names.

18           THE WITNESS:  V-i-c-k-i  L-y-n-n  A-d-a-m-s.

19           THE COURT:  Thank you.

20   BY MR. STROUSE:

21      Q.     Are you currently employed, Ms. Adams?

22      A.     No.

23           THE COURT:  All right, Ms. Adams.  Let me make some

24   preliminary comments to you, okay?  This is a somewhat difficult

25   area that we're getting into.  So, when you're asked a question,

R 62a

1    I don't want you to answer it immediately.  I want you to look at

2    me and I'll either ask you another question or I'll tell you

3    whether or not you may answer the question; but do not answer

4    until you're sure that I am going to permit you to answer the

5    question, okay?

6                    THE WITNESS:  Um-hum.

7                    THE COURT:  Thank you.  Go on.

8    BY MR. STROUSE:

9         Q.      Have you been subpoenaed to be here today, Ms.

10   Adams?

11        A.      Yes.

12        Q.      And which party --

13                    THE COURT:  Ma'am, you didn't look at me.  Even if

14   it seems to be totally harmless, you need to look at me first,

15   okay?

16                    THE WITNESS:  Okay.

17   BY MR. STROUSE:

18        Q.      Now, which party would have subpoenaed you to be

19   here?

20        A.      You did.

21        Q.      And have I contacted you prior to this hearing in

22   an attempt to speak with you?

23        A.      Yes.

24        Q.      And have we spoken or have you refused to speak

25   with me?

R 63a

1        A.      I refused.

2        Q.      Could you please inform the Court why you would

3    have refused to speak to me regarding this matter?

4                THE COURT:  Well, let me ask you this, Ma'am:  Were

5    you a juror on this case?

6                THE WITNESS:  Yes.

7                THE COURT:  After your deliberations were

8    completed, there's a suggestion that you may have contacted

9    Attorney Travis.  Did you do that?

10               THE WITNESS:  Yes.

11               THE COURT:  Did you speak with Attorney Travis?

12               THE WITNESS:  Yes.

13               THE COURT:  Without telling me what you told him

14   specifically, did you tell Attorney Travis anything about the

15   case or did you simply inquire as to Mr. Smart's address?

16               THE WITNESS:  Just his address.

17               THE COURT:  Did you tell Mr. Travis anything about

18   why you wanted to talk to Mr. Smart?

19               THE WITNESS:  Yes.

20               THE COURT:  Do you recall how soon after the

21   verdict was reached that you talked to Mr. Travis?

22               THE WITNESS:  No, I don't recall.

23               THE COURT:  Could you guess?  Would it have been

24   two days, two weeks, two months, two years?

25               THE WITNESS:  Two months or more.

R 646

1          THE COURT:   After receiving Mr. Smart's address,

2   did you write to him?

3          THE WITNESS:   Yes.

4          THE COURT:   Did he write back?

5          THE WITNESS:   Yes.

6          THE COURT:   Since you have written to Mr. Smart,

7   have you spoken with anyone else about the subject you wrote to

8   Mr. Smart about?

9          THE WITNESS:   No.

10          THE COURT:   In Mr. Smart's petition that we're

11   hearing today, there's an allegation that comments were made in

12   your presence by another juror which were of concern to you.   Is

13   that true; Yes or No?

14          THE WITNESS:   Yes.

15          THE COURT:   The comments that were made by this

16   juror, were they comments that were made only during the jury

17   deliberations or were they comments that were made during

18   recesses or on the street or walking in and out of the courtroom

19   as the trial was going on?

20          THE WITNESS:   During deliberations.

21          THE COURT:   Okay.   At this point, Mr. Strouse, tell

22   me how I can permit this witness' testimony to continue

23   considering Rule 606 which absolutely prohibits her from

24   testifying about anything that happened during the deliberations.

25          MR. STROUSE:   Well, Your Honor, as indicated in the

R 65c

1   filings and the PCRA that we filed, Petitioner's position is that

2   the testimony of Ms. Adams is not for purposes of impeachment of

3   the verdict.   Under that understanding, we believe that her

4   testimony is permissible to show that another juror had knowingly

5   or intentionally answered voir dire questions falsely.   We

6   believe that since her testimony in no way is being offered for

7   the purpose of impeachment of the verdict or to attack the

8   deliberation process that the no impeachment rule should not

9   apply in this case.

10             THE COURT:   Well, you are, though, because you're

11   saying, No. 1, that at least one of the twelve jurors rendered a

12   verdict based on something other than the instructions given to

13   the panel by Judge Saxton; and, I guess, by implication you're

14   also suggesting that perhaps other jurors may have voted in a way

15   that was consistent with the viewpoint expressed by that juror;

16   but no matter what the theory is, you're still attempting to have

17   this Court take testimony concerning something that occurred

18   during the deliberations, and I don't believe you're entitled to

19   do that.   If I permit you to do that, then it seems to me I have

20   to then have Ms. Adams identify the juror that she believes made

21   those statements, which I think would be improper.   Then, we have

22   to bring that juror in and have that juror either admit or deny

23   that those statements were made; and if that juror then denies

24   making those statements, then we have to bring in the other

25   twelve -- the other ten; and where do we go from there?   If we

R 66a

1    come down to a seven to five vote, I mean, what's the Court going

2    to do?

3                 MR. STROUSE:   I understand the position the Court

4    has in this case, Your Honor; and I understand that you don't

5    want to open Pandora's box here.   You want to protect the

6    sanctity of the jury room.   However, we're talking about rather

7    serious allegations here.   As indicated in the Petitioner's

8    supplemental PCRA petition, we believe that there's good basis

9    for this inquisition, and also the Petitioner has come into --

10   has been provided information that Ms. Adams previously may have

11   provided to Mr. Travis that these racial terms or these

12   suggestive terms were used, not just once and not just during

13   deliberations, but during other points in time when the jury was

14   together.   I understand she has answered here today that is not

15   the case.

16                THE COURT:   And she is your witness.

17                MR. STROUSE:   And she is my witness.   However, Your

18   Honor, she has not indicated any willingness to assist the

19   Petitioner or to testify in Petitioner's behalf in this case, and

20   I would appreciate the opportunity to ask her why she doesn't

21   exactly want to cooperate in this case.   There is significant

22   concerns there as well.   I understand your position, Your Honor.

23   I just --

24                THE COURT:   Well, I guess since Mr. Travis isn't

25   here, we may very well be in a position where this -- we're going

R 67a

1    to stop right now.

2              MR. STROUSE:  Okay.

3              THE COURT:  When we come back when Mr. Travis comes

4    back from his vacation, we're going to schedule this again, and

5    then we'll start from there with Mr. Travis.

6              MR. STROUSE:  Okay.

7              THE COURT:  But even if Mr. Travis says that Mrs.

8    Adams told him that these comments occurred sometime other than

9    during the deliberations, you're still faced with her testimony

10   today that said that's not true.

11             MR. STROUSE:  I understand.

12             THE COURT:  So, at this point in these proceedings,

13   I am ruling that Ms. Adams may not testify and ask her to step

14   down now, if you would do that, please; and I guess I'll instruct

15   you, Ms. Adams, that it is not necessary for you to talk to

16   anybody about this case.  You should not -- most likely, the

17   normal instructions given to jurors are that you can freely talk

18   to other people about your role in the deliberations, but you are

19   not to talk about the role of other people in the deliberations.

20   We are going to have another hearing.  I assume you're going to

21   be subpoenaed to be back for that one.  So, we'll see you then,

22   but you're free to leave today.

23             THE WITNESS:  Thank you.

24             THE COURT:  And unless there's other testimony that

25   anybody wants to put on today, my suggestion is we simply adjourn

R 68a

1   done because we were aware of the fact that there had been

2   physical interaction between Mr. Smart and Mr. McMann that

3   evening and the fear that there may have been some blood from Mr.

4   Smart as a result of that exchange and the concern that if we did

5   a test and the blood was shown to be that of Fabian Smart that

6   the jury would never be acceptive of what we believed to be a

7   very strong case of reasonable doubt.  That was my mental

8   analysis of the situation.

9        Q.       Was Mr. Smart ever advised or a part of these

10  discussions or analysis of this issue that you recall?

11       A.       You know, I have wracked my brain on that subject

12  and I can't tell you that we ever had that type of discussion

13  with Mr. Smart.

14       Q.       On January 23, 1999, the Commonwealth's theory was

15  basically, according to the record, that Mr. McMann was to have

16  gotten into a fight with a number of other individuals at this

17  football house party; is that correct?

18       A.       Yes.  Depending on whose version of events you

19  believe, he was involved in an altercation of two within the

20  house and an altercation of one, two, three outside the house.

21       Q.       And were these altercations allegedly, like, fist

22  fights?

23       A.       Yes.

24       Q.       So then, according to at least some of the versions

25  of these stories from witnesses presented by the Commonwealth,

R 81a

1    Mr. McMann would have been throwing punches and hitting other

2    individuals, correct?

3         A.      Throwing punches and receiving punches, as I

4    understood it.

5         Q.      In Mr. Smart's defense -- and you just stated, I

6    think -- that you had called some witnesses who testified that

7    they had seen Mr. McMann in downtown Lock Haven in the days and

8    weeks following January 23rd, correct?

9         A.      Correct.

10        Q.      Was there any forensic evidence produced at trial

11   to controvert the Defense theory that Mr. McMann was actually

12   alive in the days and weeks following January 23rd?

13        A.      I would -- in my view there was no forensic

14   evidence presented that contradicted the testimony that was given

15   by the lay people or the testimony that was given by our expert.

16        Q.      If you recall, did you or Attorney Linhardt ever

17   question any of the witnesses at trial or call any witnesses

18   specifically to testify about the lack of forensic evidence and

19   the lack of DNA analysis conducted on the crime scene or the

20   evidence that was actually present?

21        A.      We -- we did call as part of the Defense case an

22   expert who testified about what I'll call the quality of the

23   investigation that was conducted from the forensic perspective.

24   Whether he specifically addressed the lack of DNA testing, I

25   don't have a recollection of that.

P 820

1       A.      Yeah.

2       Q.      I would shift your attention to some of the other

3  issues presented in the petition.   In preparation for your

4  testimony here this morning, did you also review any

5  correspondence from the juror, Vicki Adams, that would have been

6  forwarded to you by Mr. Smart?

7       A.      Yes.

8       Q.      Okay, and to your knowledge how many letters were

9  written by Ms. Adams to Mr. Smart?

10      A.      I received three -- from Mr. Smart I received three

11  letters.

12      Q.      Do you have any indication that there were ever any

13  other letters?

14      A.      I presume there were not because I continually

15  encouraged Mr. Smart to provide to me copies of any letters that

16  he received from the juror.

17              THE COURT:  I'm not sure I understand your

18  testimony.   You received from the Defendant three letters that

19  had been sent to him by the juror; is that correct?

20              THE WITNESS:  That's correct.

21              THE COURT:  Thank you.

22  BY MR. STROUSE:

23      Q.      In any of these letters, does Ms. Adams make any

24  reference to possible juror misconduct or false testimony during

25  voir dire?

R 840

1      A.      No.

2      Q.      Did you personally have any contact from Ms. Adams?

3      A.      I did.

4      Q.      Through your contact with Ms. Adams, did she

5  provide any information about possible juror misconduct?

6      A.      Yes.

7      Q.      Was this information provided only to you that you

8  are aware of?

9      A.      I know it was provided to me.  I know that I passed

10  the information along to Mr. Linhardt at some point in time.

11     Q.      Did you pass this information on to Mr. Smart as

12  well?

13     A.      No.

14     Q.      Do you recall giving me permission to come to your

15  office to look through your case file?

16     A.      I certainly do.

17     Q.      Okay, and do you recall approximately what date I

18  was to come to your office to review your files?

19     A.      All I can tell you is it was a Monday.

20     Q.      Do you recall writing me a brief note and attaching

21  it to one of the boxes of documents in your office?

22     A.      Yes, I do.

23     Q.      And did I reference this letter to you in our

24  recent conversations?

25     A.      Yes.

R 85c

1        Q.      Specifically, in that note you indicated that there

2    was a statement by Ms. Adams that there was racial slurs used in

3    the jury room early and often -- quote -- early and often.

4    That's the term you used in your note.  Would you care to explain

5    what exactly you meant by early and often if it delineates any

6    time frame that Ms. Adams would have told you?

7                THE COURT:  By early and often, do you mean early

8    and often in the jury deliberation process?

9                THE WITNESS:  Yes.

10               THE COURT:  All right.  That's as far as we're

11   going.  I have already ruled that as far as I'm concerned what

12   happened in the jury room is inviolate.  When the Appellate

13   Courts decide they want to change what I believe to be the law,

14   Mr. Smart may be able to take advantage of that; but,

15   unfortunately, the way the law is and, unfortunately for Mr.

16   Smart, the way the law is now, we're not getting into that.

17               MR. STROUSE:  Yes, Your Honor.  I just wanted to

18   clear up the issue of --

19               THE COURT:  And the juror has already testified and

20   the only references she made were references to conduct that

21   occurred during the jury deliberation process.

22               MR. STROUSE:  Yes, Your Honor.

23   BY MR. STROUSE:

24       Q.      Did you specifically ask Ms. Adams when these

25   comments were made when you spoke to her?

R 860

1       A.      Frankly, I don't remember how that subject matter

2   came up.  I can tell you that after the subject matter came up I

3   attempted to elicit information as to whether that type of

4   conduct occurred outside of the deliberative process and was

5   unsuccessful, put it that way.

6       Q.      Approximately how long after the verdict was

7   returned in the penalty phase of Mr. Smart's trial would you have

8   first had contact with Ms. Adams, if you recall?

9       A.      Fourteen months after the fact.

10      Q.      Did you make any additional inquiries of Ms. Adams

11  after your initial contact?

12      A.      The initial contact with Ms. Adams was made

13  after -- after -- I'm trying to answer the question.  The initial

14  contact, Ms. Adams called me.  She happened to call me the day

15  before I was getting on an airplane to go away for a month, and I

16  followed up on the information she had provided me.  I

17  immediately notified Mr. Linhardt that I had received a call and

18  gave him her name; and after I had returned from vacation,

19  although I can't tell you specifically when it was, I did have

20  some telephone contact with Ms. Adams; and, again, I don't

21  remember whether I called her or she called me; and, basically, I

22  was monitoring the letters that the Defendant received; what, if

23  anything, she was sharing with Mr. Smart.

24      Q.      Directing your attention to another issue in this

25  case, Mr. Travis, during the course of your preparation of Mr.

R 87a

leave behind the misleading, unprovable and willfully false inuendo for the jury to grasp. It is only when one reviews the trial transcript and observes the continued conduct of the attorney for the Commonwealth that one is able to grasp the significant, egregious misconduct on the part of the attorney for the Commonwealth. In concluding in <u>Hickman</u> that that District Attorney's conduct warranted a new trial, this court noted, "We conclude that the cumulative effect of the District Attorney's remarks so prejudiced the Appellant that a fair trial was impossible. The status of the District Attorney as an officer of the court places him in a position of trust with the responsibility to fairly and objectively prosecute criminals. It is in this light that he or she is seen by the jury, and, as such, his or her remarks are given great weight by the members of the jury in reaching their determination." <u>Id</u>. at 268, 152. Just as the repeated foul blows struck in <u>Hickman</u> resulted in the awarding of a new trial, so to do the blatant and unrestrained misconduct engaged in by the attorney for the Commonwealth in the instant case support the granting to Smart of a new trial.

The litany of the instances of misconduct engaged in by the prosecutor during the merits phase of the trial are as follows:

1.     On the first day of trial during cross-examination of one of the first police witnesses the facts were developed that crime scene tape was placed in various areas near where the body was found in order to allow these areas to be checked for the possible existence of tire tracks. Defense counsel established that no tire tracks matching the vehicle owned by the Defendant were lifted from any of these areas. On redirect examination, counsel for the Commonwealth asked a leading question asserting the fact that because of the passage of time from January 23rd until April it would not be expected

that any tire tracks would remain. (R.R. 173a) The question was immediately objected to on the basis that it was a leading question, and further that it assumed facts not in evidence. The court sustained the objection and counsel for the Commonwealth stated he was withdrawing the question. (R.R. 173a-174a) Counsel for the Commonwealth did not offer to the court any argument as to why the question was proper, and did not question on the subject matter in a correct manner. Since it was redirect examination counsel for the Commonwealth was well aware that the use of leading questions was improper, but nonetheless framed the question in a leading manner in order to plant with the jury the concept that the lack of any tire tracks tied to Smart's vehicle was explainable by the passage of time.

2.    During the examination of Commonwealth witness Allen in trying to develop why witness Allen initially told the police he knew nothing about the death of the victim, but now was claiming that Smart told him in January that he had killed the victim and how he killed the victim, the Commonwealth attorney asked the leading question, "Would not getting killed, that would be in your best interest, too, wouldn't it?" (R.R. 176a) The question was objected to, the objection sustained, and the Commonwealth attorney indicated he was withdrawing the question. Since the question was asked of a Commonwealth witness by the Commonwealth attorney, clearly it was known that the use of the leading question was improper. Nonetheless, counsel for the Commonwealth went forward and asked the question in order to put in front of the jury the suggestion that witness Allen was fearful of Defendant Smart and that witness Allen's life possibly would have been taken by Smart had Allen disclosed his knowledge of what Smart allegedly told him.

17

3.      On September 30, 2004 the Commonwealth called Sgt. Shoemaker as a Commonwealth witness.  The Commonwealth intended to attempt to put in through Sgt. Shoemaker the content of a statement given by a female individual claiming that Jamie Allen had told her that Fabian Smart had told Mr. Allen that Fabian Smart killed the victim.  Counsel for the defense objected to Sgt. Shoemaker being allowed to testify concerning the content of the statement taken from the female.  (R.R.177a-182a)  The court sustained the objection and specifically ruled that Sgt. Shoemaker was limited to testifying to the fact that he took a statement from the female individual on a certain date. As part of the ruling the court specifically instructed counsel for the Commonwealth not to elicit from Sgt. Shoemaker the content of the statement. (R.R. 177a-182a)  When counsel for the Commonwealth resumed questioning he elicited the information he was permitted to elicit, and then posed the following question, "And had you been advised at some point during the course of the investigation that Jamie Allen had told Nicole Killinger what Fabian Smart said about the murder of Jason McMann?" (R.R. 181a)  The question was objected to and the objection was sustained.  After sustaining the objection the court called counsel to sidebar and admonished counsel for the government about having specifically disobeyed the court's ruling entered less than five minutes earlier. Counsel for the Commonwealth could not have had a good faith basis for asking the question given the court's ruling made immediately prior to the question having been asked.

4.      On redirect examination of one of the prosecuting officers, Trooper Rausher, the first question asked was, "Gee, I thought you did a pretty good

investigation?" (R.R. 187a-188a)  The question was objected to, the objection sustained, and even Commonwealth counsel was moved to offer an apology for asking the question.

5.      During the redirect examination of the forensic pathologist, Dr. Ross, Commonwealth counsel asked a leading question containing the factual assertion that Dr. Land had only been a forensic pathologist for a year at the time he did the initial autopsy on the victim.  (R.R. 190a)  The question was objected to and the court instructed the jury to ignore the suggested factual assertion contained in the question put by Commonwealth counsel.  Not content to leave well enough alone, after the judge gave the jury the instruction to ignore the suggested factual assertion, counsel for the Commonwealth stated on the record, in front of the jury, "I'll support that with testimony later, Your Honor."  (R.R. 190a)  The fact of the matter is the Commonwealth did not support the factual assertion with later testimony, for in fact the factual assertion was totally false.  The conclusion arrived at by Dr. Land when he did the initial autopsy was that the victim had died of a drug overdose.  The obvious intention of Commonwealth counsel in making the totally false factual assertion, by way of leading question, that Dr. Land had only been a forensic pathologist for one year when he did the initial autopsy was to suggest to the jury that obviously Dr. Land could not have been right in his conclusion given his limited experience.  Not only was the question put in improper form, as it was leading, it also included the totally inaccurate factual assertion concerning Dr. Land's experience.

6.      In cross-examining defense witness Duck, commonwealth counsel, without a good faith basis, suggested that the tire tracks which were seen in the snow on Lily Pond Road were there because "somebody got lost." (R.R. 192a-193a)  This is but

another example of counsel for the Commonwealth making factual assertions by way of leading question where he had no good faith basis to support the facts being asserted.

7.      During the same cross examination counsel for the Commonwealth stated the following, "And there would probably be enough snow – well, in your hunting experience, somebody is laying down flat down there at the bottom and snow covering that body, you couldn't even see it." (R.R. 193a)  An objection was made and the Commonwealth immediately said the question was withdrawn.  Commonwealth counsel did not attempt to support the propriety of having asked such a question as he well realized that he had succeeded in making this factual assertion in front of the jury, which was the whole purpose for asking the question.

8.      During the cross-examination of defense witness Kristin Hull, a teenage girl who had been at a party with the victim on some date in January other than January 22, counsel for the Commonwealth asked the following question, "If you spoke with a private investigator would that help you?" (R.R. 194a)  An objection to the question was made, the objection was sustained, and the trial judge admonished counsel for the Commonwealth to not question a witness in that manner.

9.      During the cross-examination of Coroner Walker counsel for the Commonwealth asked the following question, "And in part, you would agree that was because he was just completing or had completed a kind of complex baby murder investigation in which Dr. Ross had been the medical examiner?"  This question was immediately objected to, and the objection was sustained, which prompted counsel for the Commonwealth to announce that he was withdrawing the question.

10.     While cross-examining a defense expert entomologist the attorney for the Commonwealth asked a series of questions concerning whether the witness had asked for and reviewed statements of Commonwealth witnesses. (R.R. 196a-198a) These questions were objected to on the basis of relevancy, and counsel for the Commonwealth asserted that although he believed the information to be relevant he would move into another topic area. The topic area he moved to was to ask, "Did you ever ask the Defendant anything about this?" (R.R. 198a) The defense objected to the question and moved for mistrial. The mistrial motion was denied, but the objection was sustained, and counsel was directed by the court to move on to another area of questioning.

11.     As a further part of the cross-examination of the forensic entomologist, counsel for the Commonwealth asked about membership in professional organizations and then asked: "Have there ever been efforts to remove you from any of those?" (R.R. 199a-200a) The question was answered no by the witness, and at no future date did the Commonwealth put into the record any evidence to establish that Commonwealth counsel had a "good faith basis" for asking this "smear" question.

12.     When expert witness Siek, who was not a forensic pathologist, was being cross-examined, counsel for the Commonwealth asked the following question: "Are you in any position to argue with the conclusion of Dr. Ross that the cause of death was the result of blunt trauma?" (R.R. 202a) This question was objected to and the objection was sustained. It should be noted that witness Siek had not been called to testify concerning cause of death, and had not been asked any questions about cause of death as part of the direct examination. The fact that the question was put on a subject matter Siek did not testify about did not deter the Commonwealth's attorney from asking the

21

question.  No evidence was presented to establish there was a good faith basis for the question.

13.     In cross-examining defense witness Weber, counsel for the Commonwealth asked witness Weber: "Which of your friends dated him [Smart]?" (R.R. 203a)  Witness Weber was a female Caucasian college student at the time of the disappearance and death of the victim, and certainly the Commonwealth had no good faith basis for attempting to create the impression that Weber was committing perjury to assist Smart because of some romantic relationship between one of her friends and Smart. Commonwealth counsel did not ask if any of her friends had ever dated Smart, he asserted as a fact that one of her friends had in fact dated Smart and he was asking her to identify which friend had dated Smart.

14.     During cross-examination of defense witness Rini, counsel for the Commonwealth injected into one of his questions that he personally had been a lead investigator in one hundred homicide cases.  (R.R. 205a)  The injection of this "fact" into the trial could have only been an effort by Commonwealth counsel to elevate his status in the eyes of the jury and to improperly cause the jury to believe that if he had that much investigative knowledge and experience that for sure the Commonwealth had arrested the right person.

15.     In further cross-examination of witness Rini, Commonwealth counsel asserted that a laboratory report from the Pennsylvania State Police Crime Lab concluded that soil samples taken from the trunk of Smart's automobile were "identical" with soil samples from the area where the victim's body was found.  (R.R. 206a)  This allegation of "identical" was an utterly false factual assertion made by Commonwealth counsel.

16.     During the cross-examination of witness Cicconi counsel for the

Commonwealth asserted that her recollection of when she had last seen Jason McMann

alive was inaccurate because of the "emotional impact" on her of Jason's loss at the time

she talked to the police. (R.R. 207a) Witness Cicconi was a former girlfriend of Jason

McMann's who testified that she saw him alive and well in the business establishment

where she worked on Ground Hog's Day, some two weeks after the Commonwealth

theorized that he had been murdered by Fabian Smart. Witness Cicconi had talked to the

police in February and the body of Jason McMann was not discovered until April and

therefore as of the time of her initial interview there was no "loss" which would have

upset her emotionally. Thus, clearly Commonwealth counsel lacked a good faith basis

for making this factual assertion. Immediately following the question about loss having

elicited an objection which was sustained, counsel for the Commonwealth next asked:

"And at the time you reported to the police about seeing Jason just a few days before that,

that you were still under the emotional impact of learning of his death; isn't that true? Or

did you get over it that quick?" (R.R. 207a) It bears repeating that the initial contact

between witness Cicconi and the police occurred in February and the body of Jason

McMann was not discovered for another two months, nonetheless counsel for the

Commonwealth falsely asserted in his question that she was still under the emotional

impact of learning of his death. The question was objected to and the objection

sustained; the court also observing how unfair the question was. The egregious nature of

this second question falsely asserting that when initially interviewed witness Cicconi was

under the emotional impact of knowing Jason McMann was dead is compounded by the

fact that the question immediately before this question had elicited an objection which

was sustained.  Since the initial interview with the police was months prior to the

discovery of the body, counsel for the Commonwealth could not have had a good faith

basis for suggesting for the jury's benefit that her observations of McMann on February 2

were inaccurate because of her emotional state.

17.     Not being satisfied with being chastised by the court for the improperly

asked questions, counsel for the Commonwealth continued his efforts to undermine the

credibility of witness Cicconi by asserting as a fact in his question that she had heard

rumors about him being dead at the time she spoke to the police.  (R.R. 208a)

18.     Apparently, unsure whether his cheap shots and low blows had sufficiently

damaged the credibility of witness Cicconi, the attorney for the Commonwealth displayed

to the witness the photograph of a black t-shirt which the victim's parents had picked up

from the apartment where he was squatting, and without a good faith basis for doing so,

suggested in questions to witness Cicconi that the black t-shirt in the photograph was in

fact the black t-shirt she described McMann as wearing when she saw him on February

2nd.  (R.R. 209a)

19.     At his parting shot at witness Cicconi, counsel for the Commonwealth

factually asserted in a question that she had left her employment "because of stress and

disorders" connected with her pregnancy.  (R.R. 210a)  The attorney for the

Commonwealth had no good faith basis for asking the question, and certainly produced

no evidence during the course of the trial to support the suggestion he made in the

question.

20.     In addition to the misconduct by the attorney for the Commonwealth

insofar as his questioning of witnesses the prosecution engaged in additional misconduct

24

in failing to follow orders entered by the court during the trial itself to produce certain withheld discovery items. Specifically, the Commonwealth was ordered to produce, and failed to produce, the following:

a. Through witness Rodriguez the government produced a photograph which was allegedly taken on the evening of January 22 at a party which preceded the party at the football house. This photo was one of a series of photos on a roll of film, and witness Rodriguez, who took the photograph, testified that she gave to the police all of the negatives. The defense asked for access to the negatives, and counsel for the Commonwealth was directed to turn those negatives over to the defense. (R.R. 184a-185a) The January 22 date as the date when the photograph was taken was in dispute, and Ms. Rodriguez testified that possibly the production of the negatives would have shown some photograph which would have helped to establish when in point of time the photograph in question was taken. For example, if the negatives showed photos of a Christmas tree which was taken subsequent to the date on which the photograph in question was taken, this obviously would establish that the photograph was taken sometime in December as opposed to sometime in January. Notwithstanding the court's direct order that the negatives be produced for the defense, the Commonwealth failed to do so.

b. During his direct examination Dr. Ross testified that he was the only one involved in conducting the autopsy of the victim insofar as his

office was concerned.  When the Coroner was called as a defense

witness the Coroner identified a bill submitted by Dr. Ross which

showed time charges on it for individuals in addition to Dr. Ross.  The

defense requested, and the court ordered, that the Commonwealth

produce any bench notes or other writings made by Dr. Ross or any of

the other identified individuals with respect to conducting the autopsy

of the victim.  No documents were produced by the Commonwealth.

c.   Dr. Ross testified that although his initial bill was submitted to the

Coroner, his bill for work done on the case after the initial bill was

submitted would have been submitted to the Office of the District

Attorney, and he just did not recall how much he had been paid for his

additional work.  The defense requested and the court ordered that the

District Attorney turn over to defense counsel copies of subsequent

bills from Dr. Ross, and this was not done.

21.     In addition to the misconduct engaged in with respect to the questioning of

witnesses, and the failure to produce documents as directed by the court, the District

Attorney also offered inflammatory and prejudicial closing argument during the merits

phase of the trial.  Counsel for Appellant objected to the inflammatory and prejudicial

closing comments, and moved for a mistrial.  The judge denied the motion for mistrial,

but indicated the court was bothered by the content of the closing offered by the District

Attorney, and was going to give further thought to how best to deal with the improper

comments made during the Commonwealth's closing.  Unfortunately, the court reporter

has yet to provide to counsel a copy of the transcript of the closing argument as made by

the Commonwealth.  Because of the failure of the court reporter to provide a transcript,

counsel is unable to specifically identify the improper arguments which were made.

Smart relies on the record of the sidebar discussion of the objection, which the court will

hopefully have when considering this appeal.

Although it may be true that none of the individually identified acts of

misconduct, standing alone, would warrant the granting of a new trial, it is abundantly

clear that the accumulated taint occasioned by each of these individual acts serve to

deprive Smart of a fair trial in violation of both the state and federal constitutions.

II.     DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION
        TO DECLARE CLINTON COUNTY'S JURY POOL IN VIOLATION OF
        42 PA.C.S.A. §4521(a), 4521(d), 4524 AND THE SIXTH AMENDMENT
        TO THE UNITED STATES CONSTITUTION?

Title 42 Pa.C.S. §4521(a) is the statutory section governing the selection of jury pools

in Pennsylvania state courts. Section 4521(a) states that, in preparing a master list of

prospective jurors, "the list shall contain all voter registration lists of the County, which

list may be incorporated by reference, or names from such other lists which in the opinion

of the Commission will provide a number of prospective jurors which is equal to or

greater than the number of names contained in the voter registration list."

On or about November 6, 2003, Appellant Smart filed a Motion To Declare Clinton

County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of

the United States Constitution. At that time, Clinton County selected its pool of potential

jurors from the occupational tax rolls only. These names then comprised the pool from

which one hundred and thirty-two (132) names were pulled every two months for jury

selection. The names are put into a wheel and were drawn from the wheel.

1    A.    Well, during the jury selection process, the way

2  the process had worked, we had a pool of, I believe, about two

3  hundred potential jurors.  They were brought in in groups of

4  thirty to forty jurors, I believe, into this courtroom.  Judge

5  Saxton asked them a series of thirty questions, approximately,

6  which included general questions about their feelings about race;

7  and based on those potential jurors' responses to the Judge's

8  questions, each juror was then brought in for individual voir

9  dire and we followed up on questions about race or any other

10  issue that we thought was relevant.

11    During one day of jury selection, and I don't

12  recall which day, there was a potential juror when asked whether

13  or not any juror would have a difficult time -- because Mr. Smart

14  is black and the victim is white, would they have a difficult

15  time being fair and impartial, I recall this juror rising to his

16  feet and saying yes, he had a problem with that, that Mr. Smart

17  was black.  He, in fact, came to jury selection that day wearing

18  a Confederate flag tie; and I remember that after that response

19  there were, I think, four or five other potential jurors who then

20  also rose to their feet and said, We also have a problem with the

21  fact that Mr. Smart is black.

22    Other than that one day, I don't believe any juror

23  had indicated during the voir dire process that they had any

24  racial animus.  Obviously, those jurors who expressed their views

25  were all excused for cause.

R 43a

1      Q.      You stated that the way the voir dire was done is
2   there was a big group of jurors at one time in here, thirty to
3   forty jurors at one time; is that correct?

4      A.      Yes.

5      Q.      And then, after you got past the general questions
6   asked by Judge Saxton, you then went back and, one on one,
7   questioned each juror?

8      A.      Yes.

9      Q.      Do you recall what type of questions were asked in
10  the larger group about any racial bias?

11     A.      I don't -- I have in my -- at the office Judge
12  Saxton's prepared thirty, thirty-one questions.  My recollection
13  is about three of those questions, perhaps four, had to do
14  directly with race.

15     Q.      Did you feel at that time that those questions
16  sufficiently -- were sufficiently composed to determine whether
17  or not, if answered honestly, a juror had any racial bias?

18     A.      The question was raised that general questions
19  about race -- oftentimes, it's difficult to get people to be
20  honest in a public forum about that, but Judge Saxton allowed Mr.
21  Travis and I to ask whatever individual questions we wanted of
22  every potential juror, including questions about race.  I don't
23  recall that Judge Saxton ever cut us off or precluded us from
24  asking any questions about race of any juror.

25     Q.      Okay, and as the record obviously reflects from the

R 44a

1   jury selection, of any of the jurors who were actually chosen to

2   serve on the panel, did any of them indicate that race was a

3   problem or that they had any racial bias or race was an issue for

4   them in this case?

5       A.      No, no, no.

6       Q.      Okay.

7       A.      And every juror that was selected indicated that

8   they had no issue with regard to Mr. Smart's race.

9               MR. STROUSE:  I have no further questions, Your

10  Honor.

11              THE COURT:  Mr. Salisbury?

12

13                  CROSS-EXAMINATION

14

15  BY MR. SALISBURY:

16      Q.      Mr. Linhardt, just some preliminaries.  You are --

17  you were retained on behalf of Mr. Smart by Clinton County; is

18  that correct?

19      A.      Yes.

20      Q.      And, essentially, you were a specially appointed

21  Public Defender?

22      A.      Yes.

23      Q.      And in tandem with your appointment, were you

24  essentially given an open checkbook in this case to secure any

25  type of experts or pursue any evidence leads that you would have

R 45a

1  at this point; and when Mr. Travis is available, we'll come back.

2  You can put him on first and then we'll see what the factual

3  basis is for going any further with Ms. Adams.

4          MR. STROUSE:  Yes, Your Honor.

5          THE COURT:  Any objection to that?

6          MR. SALISBURY:  Your Honor, I just wanted to put on

7  the record that I had subpoenaed Dave Rausher of the Pennsylvania

8  State Police today.  Unfortunately, he has caught the flu that

9  everybody else has.  He was not available.  So, this continuance

10  will be fine.

11          THE COURT:  All right.  "Now, this date, this

12  matter will be continued until --"

13          MR. STROUSE:  Just one more question, Your Honor.

14  Would Mr. Smart remain in Clinton County?

15          THE COURT:  "2.  The Defendant shall remain in the

16  Clinton County Correctional Facility until further hearing."

17          All right.  That's all for today.

18          (Whereupon, the hearing in the above-

19          entitled matter was recessed at this time.)

20

21                  ****************

22

23

24

25

R 690

PLEASE PRESS FIRMLY



**PRIORITY MAIL**

**UNITED STATES POSTAL SERVICE**



PRIORITY MAIL
POSTAGE REQUI

Schedule package pickup right from your home...
Print postage online - Go to usps.com/postageonline

## Mailing Envelope
### For Domestic and International Use



$ 05.86⁰



RECEIVED
SCRANTON

OCT 12 2010

PER

DEPUTY CLERK



**Visit us at usps.com**

**INTERNATIONAL RESTRICTIONS
LIMITATIONS ON CONTENT:**

Customs forms are required. Consult the
*International Mail Manual* (IMM) at pe.usps.gov or
ask a retail associate for details.

From:/Expéditeur:

FABIAN D. SMART GC-2983
S.C.I. GREENE
175 PROGRESS DRIVE
WAYNESBURG, PA 15370

To:/Destinataire:

OFFICE OF CLERK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
235 NORTH WASHINGTON AVENUE
P.O. BOX 1148
SCRANTON, PA 18501

Country of Destination:/Pays de destination:



USPS packaging products have been awarded Cradle
to Cradle Certification℠ for their ecologically-intelligent
design. For more information go to mbdc.com/usps

Cradle to Cradle Certified℠ is a certification mark of MBDC.

**Please recycle.**

PLEASE PRESS FIRMLY



EP-1