IN THE SUPERIOR COURT OF PENNSYLVANIA
MIDDLE DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **NO. 588 MDA 2005**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMMONWEALTH OF PENNSYLVANIA

VS.

FABIAN D. SMART

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **BRIEF OF APPELLEE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Appeal from the Judgment of Sentence entered on October 21, 2004, in the
Court of Common Pleas of Clinton County, at No. 175-02.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Joseph E. McGettigan, Esquire
Special Assistant District Attorney
Attorney for Appellee
Attorney I.D. No. 35821
Ted McKnight, District Attorney
322 East Water Street
Lock Haven, PA 17745
Attorney I.D. No. 15703

## TABLE OF CONTENTS

Page

Table of Citations.................................................................... ii

Counterstatement of Questions Involved .................................. 1

Counterstatement of the Case ................................................ 2

Summary of Argument............................................................ 11

Argument................................................................................ 15

Conclusion.............................................................................. 63

Certificate of Service.............................................................. 64

## TABLE OF CITATIONS

**Statutes**:                                                    Page

42 Pa. C.S.A. §4521                                          39, 42

42 Pa. C.S.A. §4524                                          39

42 Pa. C.S.A. §4527                                          12, 42

42 Pa C.S.A. §9711(a)(1)                                     60
Pa. Const. Art.I §6                                          43
Pa. R.App. P. 1925(a)                                        10
Pa. R.Crim. P. 631                                           60

**Cases**:

**Commonwealth v. Breakiron**, 524 Pa. 282, 288, 571 A.2d 1035,
    1037 (1990).                                        44, 45

**Commonwealth v. Bryant**, 524 Pa. 564, 574 A.2d 590 (1990).     62

**Commonwealth v. Burton,** 491 Pa.13, 22, 417 A.2d 611 (1980).   15

**Commonwealth v. Casper**, 481 Pa. 143, 151-1 54, 392 A.2d 287,
    292-293 (1978).                                     44

**Commonwealth v. Chambers**, 546 Pa. 370, 385, 685 A.2d 96 (1996)  43, 61

**Commonwealth v. Cox**, 556 Pa. 368, 728 A.2d 923,929.          61

**Commonwealth v. Craver**, 547 Pa.17, 27-28, 688 A.2d 691, 696 (1997).  39

**Commonwealth v. Craver**, supra, at 25.                        43

**Commonwealth v. Goosby,** 450 Pa. 609, 611, 301 A.2d 673, 674 (1973).  16

**Commonwealth v. Johnson**, 576 Pa. 23, 838 A.2d 663 (2003).    40

**Commonwealth v. Jones**, 452 Pa.299, 312, 304 A.2d 684, 692 (1973).  40

**Commonwealth v. Kichline**, 468 Pa. 265, 274, 361 A.2d 282, 287 (1976).     45

**Commonwealth v. La**, 433 Pa. Super 432, 640 A.2d 1336, 1351
    (1994), appeal denied, 540 Pa. 597, 655 A. 2d 986 (1994).     50, 59

**Commonwealth v. McCloskey**, 835 A.2d 801 (2003).     59

**Commonwealth v. McCullum**, 529 Pa. 117, 125, 602 A.2d 313,
    317 (1992).     44, 62

**Commonwealth v. Pronkoskie**, 498 Pa. 245, 251, 445 A.2d 1203,
    1206 (1982).     49

**Commonwealth v. Pursell**, 508 Pa. 212, 220-221, 495 A.2d 183, 187
    (1985).     44

**Commonwealth v. Sneed**, 519 Pa. 597, 526 A.2d 373 (1986), cert denied,
    479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed. 2d 1010 (1987).     62

**Commonwealth v. Stoltzfus,** 462 Pa. 43, 61, 337 A.2d 873, 882 (1975).     16

**Commonwealth v. Sullivan**, 2003 Pa. Super 123, 820 A.2d, 806 (2003).     50

**Commonwealth v. Taylor**, 324 Pa. 420, 425, 471 A.2d 1228, 1230 (1984).     49

**Commonwealth v. Widmer**, 560 Pa. 308, 744 A.2d 745, 751 (2000).     50, 59

**Commonwealth v. Williams,** 532 Pa 265, 278, 615 A.2d 716, 722 (1992).     16

**Lockhart v. McCree**, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed. 2d, 37 (1986).     62

**Wainwright v. Witt**, U.S. 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d
    841 (1985).     61

**Werts v. Vaughn,** 228 F 3d.178, 197 (3rd Circuit, 2000).     15

**Witherspoon v. Illinois**, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 776 (1968).     61

## COUNTER-STATEMENT OF THE QUESTIONS INVOLVED

1. **DID THE PROSECUTION ENGAGE IN ANY MISCONDUCT, WHICH, IF PRESENT, ALONE OR IN THE AGGREGATE ENTITLES THE DEFENDANT TO A NEW TRIAL?**

   — Answered in the Negative

2. **DID THE TRIAL COURT ERR IN DENYING THE DEFENDANT'S MOTION TO DECLARE CLINTON COUNTY'S JURY POOL IN VIOLATION OF 42 PA. C.S.A. §4521(a), §4521(d), §4524, AND THE SIXTH AMENDMENT OF THE CONSTITUTION?**

   — Answered in the Negative

3. **DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION FOR CHANGE OF VENUE OR VENIRE?**

   — Answered in the Negative

4. **WAS THE VERDICT AGAINST THE WEIGHT OF THE EVIDENCE?**

   — Answered in the Negative

5. **DID TRYING THE DEFENDANT BEFORE A DEATH-QUALIFIED JURY DEPRIVE THE DEFENDANT OF A FAIR TRIAL BEFORE A PROPERLY SELECTED JURY?**

   — Answered in the Negative

1

## COUNTER-STATEMENT OF THE CASE

On October 14th, 2004, the defendant was convicted of murder in the first degree and other charges related to the killing of Jason McMann. The trial was conducted before Clinton County President Judge Richard N. Saxton and a death-qualified jury. The defendant was represented at trial by Ronald Travis, Esq., and Eric Linhardt, Esq. The Commonwealth was represented by Clinton County Special Assistant District Attorney Joseph McGettigan. After a penalty hearing the jury was unable to reach unanimity on the issue and the Court imposed a sentence of life imprisonment. On January 24, 2005, the Court imposed additional sentences on the related charges. Subsequently, the defendant filed post sentence motions which were denied by Order of the trial Court on March 15, 2005.   The defendant's appeal followed. All counsel remain in place for purposes of this appeal.

At the time of the murder Mr. McMann was a resident of Lock Haven and intermittently employed.   During that same time the defendant was a student and scholarship football player at Lock Haven University (LHU). Both had reportedly had some involvement in drugs and drug sales independent of each other.

The Commonwealth presented testimony that the victim was last seen during the night-time hours of January 22nd -23rd 1999. Neither Mr. McMann's roommates, his family, or friends reported seeing Mr. McMann after that date.   The victim was reported missing to the Lock Haven Police Department in early February of 1999. An extensive investigation into the whereabouts of Mr. McMann was then pursued by  both  the  Lock

2

Haven Police Department (LHPD) and the Pennsylvania State Police (PSP). This investigation met with no success until the body of the victim was recovered from a streambed in a wooded area of Clinton County, approximately twenty miles outside of Lock Haven, on April 8, 1999. His body was partially clothed and mummified. He was twenty one years old at the time he was discovered.

Testimony at trial reflected that the initial contact between the defendant and the victim occurred as a result of drug transactions in 1998 between the defendant and a third party, Jeffrey Stauffer, Mr. McMann's cousin. During a series of transactions, the defendant accepted six thousand dollars ($6000) from the cousin, then refused to transfer the drugs (marijuana) that the cash was to purchase. The transaction involving $6000 took place in part, in Philadelphia, at the home of one Willie Williams, a former LHU student and the defendant's source of larger quantities of drugs. (N.T. 9/29/04, p.41-43) The cousin informed Mr. McMann, then living in Maryland, that the defendant had "ripped him off," and asked for McMann's assistance in either recovering the money or obtaining the drugs. (N.T. 9/29/04, p.46-47)

The victim apparently accepted this task, moving in with roommates in Lock Haven and proceeding to confront the defendant on a number of occasions in the fall of 1998. (N.T. 9/29/04, p. 47) Some of these confrontations resulted in physical conflict, but none succeeded in resolving the dispute over the money and drugs.

On the night of January 22, 1999, the defendant was at a party at a LHU fraternity house, known as the "football house." Among those also present were

3

defendant's football teammates, Jermaine Ballard, Jamie Allen, who was also the defendant's roommate, and Quincy Teel, a football player who had arrived at Lock Haven only recently, and who was rooming with Jermaine Ballard. Also present was Willie Williams, AKA "Diggy," who had come to Lock Haven that day to visit the defendant. (N.T. 9/30/04, A.M., p.96-97)

Mr. McMann and a number of his friends also attended the party. The defendant noted Mr. McMann's presence, and apparently as a result of the antagonism between the two, advised a fellow LHU football player that McMann had vandalized the teammate's car. (N.T. 9/29/04, P.M., p.77-78)  That player, Jason Grassi, confronted McMann and a series of altercations ensued between McMann and a number of football players.  Eventually, all of the antagonistic parties and numerous on-lookers ended up outside of the house. During the series of altercations, the victim's friends had attempted to dissuade him from continuing the fights, but when unable to do so they abandoned him.  At that point, the defendant injected himself into one dispute involving the victim and another football player. The defendant and victim then fought until that fight was broken up by Willie Williams. (N.T. 10/4/04, A.M., p.40-41)  The victim then fled from the street outside the football house into the courtyard area of a nearby low-rise apartment complex.

The defendant and Willie Williams pursued the victim into the courtyard, where the defendant was observed "stomp[ing]" the victim, rendering him unconscious. (N.T. 10/4/04, A.M., p.41)  The defendant then returned to his apartment where a number of

4

the earlier partygoers and others had gathered. During the course of the next few hours the defendant expressed increasing anger at the victim. He then persuaded three people to accompany him back to the courtyard: Ballard, Teel, and Williams. (N.T. 9/30/04, A.M., p.98-102) None of those three had ever met the victim before that night. Teel had only met the defendant that week. Neither Teel nor Ballard knew Williams or had seen him before that night. Neither saw Williams again after that night until after the defendant's arrest.

The defendant and his three companions went in the defendant's car back to the apartment courtyard. At the defendant's direction they carried the victim from the courtyard and lifted him into the trunk of the defendant's car. They noted that the victim was unconscious, but still breathing. (N.T. 9/30/04, P.M., p.59)

The defendant, Teel and Williams got back in the car. Ballard refused to get in the car, and instead implored the defendant to abandon this course of action. The defendant ignored him, and Ballard left. After the car had driven a short distance Teel fled the vehicle. (N.T.9/30/04, A.M., p.105) The defendant and Williams continued on, driving in the early morning hours into the snowy woods surrounding Lock Haven. After approximately forty minutes of driving, the defendant pulled his car onto a small road and backed up to a ditch. He directed Williams to help him get the victim from the trunk. Williams noted that the victim was still breathing then, as well, though unconscious. The defendant first tried to shoot the victim, but the pistol wouldn't fire. He then beat the victim with the pistol, dragged him further down the sloping ground

5

and beat the victim some more with a tree branch while Williams stood on the road. The defendant then dragged the victim to the frozen streambed, left him there and returned to his car. (N.T.10/4/04, A.M., P.43-51)

The defendant then drove with Williams to a car wash in Lock Haven and cleaned his car, particularly the trunk.   They then returned to the defendant's apartment.  Williams left Lock Haven the next day.  Within a few days Mr. McMann's absence was noted and reported to the local police.  Police learned of the ongoing dispute between the victim and the defendant, as well as the fight between the victim and others including the defendant at the football house party.  The defendant, Ballard and Teel were all interviewed, along with many, if not all of the partygoers.   The defendant, Ballard and Teel admitted contact with the victim but denied knowledge of his whereabouts or the circumstances of his disappearance.   Versions of the events at the party that preceded the victim's flight to the courtyard were offered by numerous persons with varying levels of agreement, consistent with the chaotic nature of the events and the consumption of alcoholic beverages by most attendees.    The investigation continued, but uncovered no hard evidence regarding the circumstances of Mr. McMann's disappearance.

Mr. McMann's family was convinced of the defendant's involvement in the victim's disappearance, even confronting the defendant outside his apartment on one occasion.   The defendant eventually abandoned his residence and moved back into University housing briefly, before leaving school altogether and returning to his home

6

state of Georgia. Before he left, however, the defendant made two statements of admission to the crime. Both were to Jamie Allen. On the first occasion, the defendant went into Allen's bedroom and told Allen that he, Smart, had "took him out to the woods and beat him to death." Later, when a report of the victim's disappearance was broadcast on television in the presence of Allen and the defendant, the defendant then "...pointed up to the t.v.", and said, "...I told you."    Allen refrained from telling authorities, but later confided in his then girlfriend, Nicole Killinger. (N.T. 9/30/04 A.M., p.38-40, 44)

Meanwhile, on April 8th, 1999, the victim's body was recovered and an autopsy was performed.  The forensic pathologist, Dr Land, offered no opinion regarding the cause and manner of Mr. McMann's death for over five months.  Finally, in August of 1999, he rendered the opinion that Mr. McMann had died of the combined effects of an overdose of the "designer drug" GHB, and hypothermia. (Land's initial announcement was an informal one, by telephone to the State Police.  His formal report was issued in November of 1999.)  Dr. Land's theory, never fully explained, was apparently that the victim had overdosed at some unknown location and then been taken to the streambed by equally unknown companions to prevent the body being found and revealing the existence of a group of GHB users.  Dr. Land later recanted his opinion as to cause of death, and at trial conclusively negatived the possibility that GHB had been a factor in Mr. McMann's death. The damage had already been done, however, as a result of his initial opinion. Authorities, particularly the PSP, no longer focused on an investigation of

7

McMann's death "at the hands of another," but were instead misdirected into an investigation of the possible sources of GHB in the vicinity of Clinton County. ( N.T. 10/4/04, P.M., p. 30-31) Local police, however, continued to entertain the possibility that McMann had been the victim of foul play.

In 2000, Jamie Allen was arrested on drug charges. After his arrest he related to authorities the statement made to him by the defendant about the murder of Mr. McMann. In 2001, Ballard and Teel were interviewed. After initial denials, both admitted their involvement and named the defendant as the initiator of the criminal events. After Ballard and Teel's statements, PSP Trooper Rausher and Lock Haven Police Sergeant Shoemaker interviewed Willie Williams in Philadelphia. Williams made a videotaped statement in which he admitted his involvement in the murder and named the defendant as the killer (N.T. 10/4/04, P.M., p. 38-41). The District Attorney asked the Coroner to get a second opinion from another forensic pathologist, Dr. Wayne Ross. After reviewing the initial autopsy report and related materials, Dr. Ross determined that the cause of death was not an overdose of GHB, but was instead the result of blunt trauma and hypothermia. (N.T. 10/5/04, A.M., p.10) At trial, the first pathologist, Dr. Land, agreed that the cause of death was not GHB overdose, but he declined to offer any opinion on the cause of death, stating that he was unable to reach a conclusion. (N.T. 10/8/04, P.M., p.5)

Before charges were lodged against Williams, Ballard and Teel, all three entered into agreements with the District Attorney regarding the crimes they would be charged

8

with in return for their testimony.  Ballard and Teel were charged with Conspiracy to Kidnap, Williams was charged with Conspiracy to Commit Third Degree Murder. The only agreement on sentencing of these three was that they were free to seek sentences in the mitigated range of the guidelines and the Commonwealth was free to seek sentences no higher than the standard range of the guidelines.    None of the defendant's three companions was sentenced before the trial of the defendant.

In addition to the testimony of those witnesses cited herein, the Commonwealth also presented the testimony of Brian Genis, another football player who attended the party and participated in the altercations, Ms. White, the young lady who discovered the victim's body, PSP troopers who were present at the scene where the body was discovered, Rosa Rodriguez, who photographed the victim earlier on the night of his murder, LHPD Det. Charles Shoemaker, who took Nicole Killinger's statement, and, on rebuttal, Marvin Fritts, an LHPD police officer and  Dr. Kim, a forensic entomologist. The trial Court also permitted the jury to view the scene of the initial assault in Lock Haven and the scene of the murder/recovery of the body in Loganton. (N.T. 10/1/04, A.M., p.3-6).

After hearing testimony from the Commonwealth's fifteen (15) witnesses, visiting the scenes, and hearing a stipulation as to the statement of one additional witness, and then hearing the testimony of approximately twenty eight (28) defense witnesses, the jury heard argument and was instructed in the law by the trial Court on October 13th, 2004. The jury returned with a unanimous verdict on October 14th, 2004.

9

It should be noted that after the trial Court's imposition of a life sentence on October 21, 2004, pursuant to the jury's deadlock on penalty, this trial Court imposed sentences on the additional related charges on January 24, 2005.  Defendant's post-sentence motions were denied on March 15, 2005.  As of the filing of this Brief, the trial Court has not yet filed an Opinion pursuant to Pa. R.App. P. 1925(a), nor are the notes of testimony of the trial entirely completed.

10

## **SUMMARY OF THE ARGUMENT**

First, the defendant offers a "litany" of complaints alleging prosecutorial misconduct. In a manner that is as inappropriate as it is unfortunate, the defendant continually employs overheated rhetoric and ad *hominem* attacks wholly unsupported by the record. In its Argument, the Commonwealth undertakes a careful review of each of the instances of alleged misconduct, and reveals that the claims are baseless individually and collectively. Indeed, many of the claims should be deemed waived due to the absence of an objection at trial. Other claims are incapable of being understood as stated. Some claims characterize a question as leading when even a casual reading will reveal the opposite. Still others claim that a question is without a "good faith basis" when a review of the record reveals otherwise. And finally, defendant continually makes a claim of misconduct and refers to a question or statement without providing the context in which the question was asked or the statement made. A considered review of the trial record of the testimony of over forty (40) witnesses reflects that the prosecution conducted its case in a manner well within the bounds of proper advocacy, and that the trial Court scrupulously oversaw a fair trial with zealous regard for the rights of the defendant.

Second, the defendant claims that the jury pool from which defendant's petit jury was selected was assembled in violation of Pennsylvania statutes and the U.S. Constitution, by the trial Court's denial of his second pre-trial motion on this issue. Defendant's argument ignores the action taken by the trial Court to address his first

11

(identical) motion.  That is, the court ordered the supplementing of the pool initially derived from those on the occupational tax roles with those on the voters registration list.  In that matter of selection of the jury pool, as well as in his additional claims regarding the form of the jury summons and the "publicly" and "random" requirements, defendant further ignores the dictates of 42 Pa. C.S.A. §4527, which unequivocally state that as regards such allegations of error, "Except as otherwise prescribed by general rule,... the trial by jury and its rendition of a verdict in any matter shall constitute a waiver of all such errors and omissions."  Appellant was ably assisted by his counsel during a meticulous jury selection process.  He did not exhaust his peremptory challenges, and the trial Court gave him great latitude in the exercise of challenges for cause.

Third, defendant claims that the trial Court abused its discretion in denying his Motion for Change of Venue or Venire.  The trial Court gave careful consideration to defendant's Motion before trial, and in the proper exercise of its discretion determined that neither the quantity of publicity nor the tenor of the community was of such a nature to require any change in venue or venire before an effort was made to empanel a petit jury.  During the selection of the petit jury no additional evidence was produced to support defendant's Motion, and, in fact, it became increasingly evident that the publicity, such as it was, had not impeded the selection of a fair and impartial jury.  As noted above, the defendant did not exhaust his peremptory challenges, nor did he renew his Motion during jury selection as a result of responses from the panel.

12

Fourth, the defendant claims that the weight of the evidence does not support the verdict. The prosecution's case was, in fact, an overwhelming one.   The Commonwealth provided evidence of motive by the testimony of the victim's cousin, who had engaged in a failed drug transaction with the defendant, for which the victim had repeatedly sought a resolution by confronting the defendant.  By the testimony of numerous witnesses (including the defendant's) the Commonwealth's evidence placed the victim and the defendant together and in conflict on the last night he was credibly reported to be alive.  The prosecution provided to the jury the testimony of three persons who helped the defendant place the unconscious victim in the trunk of his car, one of whom testified that he drove with the defendant with the victim in the car's trunk and then observed defendant beat the victim at his place of final rest. All three of those witnesses admitted to their participation in the events described and accepted the attendant criminal liability by entering guilty pleas to various serious crimes.   The Commonwealth also offered the testimony of the defendant's roommate, to whom he had confessed his crime, not once, but twice. Against the strength of this presentation the defendant offered testimony that was irrelevant and non-dispositive, or uncertain and speculative, or patently incredible.  In examining those oppositions, no reasonable assessor could claim that the acceptance of the Commonwealth's case and the guilty verdict "shocks the conscience."

Fifth, the defendant claims that he was denied a trial before a jury consisting of a "cross section of the community" in what he calls the "merits phase" of his trial because

13

his jury was death qualified. The defendant offers no relevant law in support of this argument. Nor does he contest that the Court adhered to the requirements of existing Pennsylvania law during the jury selection. He merely urges this Honorable Court to discard a legislatively enacted scheme supported by decades of appellate decisions in favor of his self - described "novel" concept. He is untroubled that his construction would empanel jurors who could not follow the law, and that it would seemingly require a second jury in all capital cases. The Commonwealth submits that given a jury properly selected under current Pennsylvania and federal law, the defendant's scheme, and his argument should be summarily rejected.

14

## **ARGUMENT**

**I.     THERE WERE NO INSTANCES OF PROSECUTION MISCONDUCT, AND SPECIFICALLY, NO INSTANCES OF PROSECUTION MISCONDUCT WHICH WHEN TAKEN TOGETHER WOULD SO TAINT THE FAIRNESS OF THE TRIAL SUCH THAT DEFENDANT SHOULD BE GRANTED A NEW TRIAL IN THE INTEREST OF JUSTICE.**

Defendant asserts that the trial Court erred in denying his motion for a new trial because "pervasive misconduct engaged in by the prosecution denied Smart due process of law under both the federal and state constitutions." (Defendant's Brief, p.13) Defendant lists a "litany" of twenty one (21) distinct items of alleged prosecutorial misconduct. Although the Commonwealth denies that the prosecutor engaged in any misconduct whatsoever, and we will address each of the alleged instances of prosecutorial misconduct seriatim, we note, initially, it is well settled, under state and federal law, that with respect to allegations of prosecutorial misconduct, "a new trial is not required unless its [i.e. the prosecutorial misconduct] unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." Commonwealth v. Burton, 491 Pa.13, 22, 417 A.2d 611 (1980). See, also, Werts v. Vaughn, 228 F 3d.178, 197 (3rd Circuit, 2000), noting that "for due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in a denial of the defendant's right to a fair trial."

Moreover, "even where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. (Citations omitted).

15

The effect of such remarks depends upon the atmosphere of the trial... and the proper action to be taken is within the discretion of the trial Court." Commonwealth v. Stoltzfus, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975). See, also, Commonwealth v. Goosby, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973). ("Every unwise or irrelevant remark made in the course of a trial by a judge, a witness or counsel does not compel the granting of a new trial.")

The defendant's recitation of what he calls a "litany" gains no strength from its number of claims. One who grasps at many straws should never fail to remember that they are all still straws. Or, as our Supreme Court has stated, in the context of an ineffectiveness claim, "...and no number of *failed* claims may collectively attain merit if they could not do so individually. Defendant's reliance upon error arising from the cumulative impact of 'repeated *improper* remarks' is misplaced." Commonwealth v. Williams, 532 Pa 265, 278, 615 A.2d 716, 722 (1992). (Italic in original) The Commonwealth will now address each of defendant's alleged instances of prosecutorial misconduct in the numbered sequence presented by defendant.

1.     Defendant alleges that the Commonwealth's trial counsel committed misconduct by asking the question below, posed on redirect examination to the Commonwealth's witness, Pennsylvania State Police Corporal Stephen Fultz. The allegation of misconduct rests on the assertion that the question was leading and that it assumed facts not in evidence, which was the objection at trial.

Question to witness Stephen Fultz: (by Mr. McGettigan)

16

In your experience, would you expect tire tracks, say, from the Defendant's car to remain there from January through snow, rain, et cetera, from January 22nd, 23rd, until April ?

Answer: (by witness Fultz)

> No.
> (N.T. 9/29/04, A.M., p.91)

Counsel for the defendant then interposed an objection on the ground that the question was leading and assumed facts not in evidence. The objection was sustained and the question was, in fact withdrawn. Notwithstanding the objection and its outcome at trial, the question posed to Corporal Fultz was not objectionable. It is simply not a leading question. A leading question is one which suggests or seems to compel, by the structure, form or content of the question, a particular answer. Nor does the question at issue assume facts not in evidence. It is simply posed in a fashion that is consistent with the Commonwealth's case, and which was in fact supported by the later testimony of the Commonwealth's witness, Willie Williams, that the defendant did indeed transport the victim in his vehicle to a secluded location on a deserted rural road. The remainder of the question refers to the witness' familiarity with both the local weather conditions and the likelihood of tire tracks enduring through those conditions, both of which are well within the capacity of the witness to offer a responsive answer. Indeed, both the question and its answer are not only innocuous, but, frankly self-evident.

2. Defendant next complains of the question posed to Commonwealth witness Jamie Allen during redirect examination.

17

Question to Witness Jamie Allen: (by Mr. McGettigan)

> Would not getting killed, that would be in your best interest,
> too, isn't it ?
> (N.T. 9/30/04, A.M., p.82)

The objection posed might have had some arguable, if minimal, merit, if it were
examined only in a vacuum. Defendant neglects to even offer the entire question,
much less fully explore the relevant questions which preceded the portion of the
question cited. Those questions do much to illuminate the propriety of the question
posed by the Commonwealth. First, a recitation of the entire question is revealing:

Question to witness Jamie Allen: (by Mr. McGettigan)

> Okay, Mr. Travis asked you on direct (sic) examination, he
> said that during the time that you were interviewed by the
> police in April of 1999 relative to Jason McMann's murder,
> you said that you thought it was in your best interest not to
> tell police the truth. Would not getting killed, that would be
> in your best interest, too, wouldn't it ?
> (N.T. 9/30/04, A.M., p.82)

This question on redirect examination was posed not only in response to earlier
questions on cross examination, but with reference to the witness' answer to a question
on direct examination. Defense counsel was in the midst of a series of questions about
the witness' lies to the police when initially questioned in April of 1999 about the
McMann murder.

Question to witness Jamie Allen: (by Defense counsel Ronald Travis)

> Okay. All right. They asked you questions, and you
> deliberately, in your own mind, said, I'm just –I'm
> going to say something other than the truth; is that
> a fair statement ?

18

Answer: (by witness Jamie Allen)

>   Correct.

Question:

>   And you did that because at that point in time you believed
>   it was in your best interest to do that; is that correct ?

Answer:

>   Right.
>   (N.T. 9/30/04, A.M., p.58 - 59)


Defense counsel's question was limited in scope to the admitted falsehoods of

the witness under police questioning.   The portion of the Commonwealth's question

objected to by defendant should be viewed not only in light of defense counsel's query,

but also with reference to earlier questions posed to the witness on direct examination.

Question to witness Jamie Allen: (by Mr. McGettigan)

>   Okay. And also fair to say that you had an opportunity to tell
>   them  what the Defendant told you; and you didn't do it the
>   first times, did you?

Answer: (by witness Jamie Allen)

>   No.

Question:

>   Why not?

Answer:

>   Well, I was kind of scared after that.   I mean, I'm still living
>   with him. And if he could do that to somebody, I didn't know
>   -  - me knowing what happened, I didn't know what he was
>   capable of doing to me or having done to me or doing to me.
>   I mean we had a lot of family.   So I just – I didn't want any
>   part of it.  I just wanted to stay out of it.

Question:

>   When you say you're scared of him, were you scared of him
>   like he'd beat you up ?

19

Answer:

> No. I'm not scared of him physically. But I mean if he could
> do that to somebody, I didn't know. I didn't want to risk
> myself of being involved in it.
> (N. T. 9/30/04, A.M., p.40 - 41)

When the portion of the question objected to is viewed in the context of the series of questions posed by both counsel on direct, cross, and redirect examinations, it becomes evident that the query complained of is, at worst, inartfully posed, and not objectionable. That is, the issue of the witness' fear of the defendant had been raised by the witness himself in a responsive answer to a question posed on direct examination. On cross-examination, defendant's counsel had sought to focus solely on the fact of the witness' admitted lies to initial police interviews. On redirect, the Commonwealth's question merely, and properly, returned the issue to its broader significance - why the witness first lied.

3.      Defendant's complaint at 3, of his Brief is difficult to interpret in light of the record. The Commonwealth posed a question intending to properly set the stage for the introduction of later testimony by a subsequent Commonwealth witness, Nicole Killinger. The question quoted by defendant, asking whether the witness, Detective Shoemaker, "... had been advised at some point during the course of the investigation that Jamie Allen had told Nicole Killinger what Fabian Smart said about the murder of Jason McMann?" is, in fact, innocuous. It did not ask for the language of the statement, or that the detective witness read the statement of the interviewee. It merely asked that the witness offer the reason the statement was taken and the general subject of

20

the statement. The completely innocuous and proper nature of the question is underscored by the fact that on the very same day that the objection at issue was made, the defendant stipulated that the statement had been given about the subject and under the circumstances that the question contemplated. Defendant further agreed to the reading of the pertinent portion of Ms. Killinger's statement to the jury. (N.T. 9/30/04, P.M., p.40 - 46)

4. Next in defendant's list of somewhat ill-defined complaints is that the first question posed to Pennsylvania State Police Trooper David Rausher on redirect examination by the prosecution constituted "misconduct." Again, defendant's Brief neglects to provide any context to the remark which he baldly asserts is "misconduct." When the question was posed, Trooper Rausher had just undergone approximately two hours of cross-examination at the end of a full day in court. Trooper Rausher's testimony reflected his participation in interviews of almost one hundred (100) persons over a period of years, and the maintenance of the investigative file which included over two hundred fifty (250) interviews, as well as reports of a multitude of additional investigative efforts. The questions last posed to Trooper Rausher on cross examination by Mr. Lindhart, counsel for the defendant, were posed in an accusatory tone. Their clear implication was that Trooper Rausher was derelict in his duty because he had failed to order a forensic examination for trace evidence of a car wash used by the defendant after the murder.

Question to witness Rausher: (by Mr. Lindhart)

And it's also my understanding, then, that neither you or any

21

> other law enforcement officer conducted any tests - - you
> didn't send Trooper Kirkendall out to look the drains (sic) of
> any of these car washes, you know, blood evidence, hair, fiber,
> any trace evidence? Nothing like that was ever done?

Answer: (by Trooper Rausher)

> That's correct. I would say more due to the fact that two years
> had passed by the time we had that information.

Question:

> The point is, you didn't try; is that correct?

Answer:

> That's correct.
> (N.T. 10/4/04, P.M., p.141-142)

Counsel's questions thus sought to condemn Trooper Rausher's efforts by pointing out that he had failed to order forensic examinations of a public (and open-air) car wash for trace evidence nearly two years after the date on which the defendant's car had been washed there, which is when the fact of the car washing was first made known to investigators. The trial prosecutor posed the complained of question immediately thereafter. "Gee, I thought you did a pretty good investigation?" (N.T. 10/4/04, P.M, p.142) After defense counsel's objection, the trial Court's response to the objection offers clear evidence that the court viewed the question not as an infraction, but more as an end of the day distraction. "We ask you to ignore that. We'll chalk it up to the time of day. And Mr. McGettigan is probably getting hungry and light-headed." (N.T. 10/4/04, P.M., p.143) The court was clearly aware of the inconsequential nature of the question, even if defense counsel was not.

5. Defendant next complains that the trial prosecutor willfully misled the jury

22

regarding the length of experience of the initial forensic pathologist in the investigation, Dr. Samuel Land, during his questioning of the Commonwealth's expert, Dr. Wayne Ross. Defendant fails to note that the trial prosecutor later addressed that issue in front of the jury during his questioning of Dr. Land on his qualifications, explaining both the source of his misinformation and apologizing. (N.T. 10/8/04, A.M., p.79) Moreover, Dr. Land, as a witness called by the defense, unequivocally admitted his error in initially stating that the cause of death was by an overdose of the designer drug GHB. He further agreed that in light of his later research that no reasonable forensic pathologist would conclude that GHB was a cause of Jason McMann's death. (N.T. 10/8/04, P.M., p.5-6) It is impossible to discern how an inadvertent error in stating Dr. Land's experience could have had any effect on the jury or the verdict, particularly when corrected.

6.        Defendant's complaint at 6, is that the trial prosecutor's question, posed to defense witness Duwaine Duck on cross examination, was "without a good faith basis." This is an astonishing claim. Defendant's trial counsel called a witness to relate events that the witness apparently divined from seeing some tire tracks in the snow. Trial counsel then objected when the Commonwealth offered an explanation for the tracks different from that which the defense would prefer, *which the witness actually adopted!* Question to witness Duwaine Duck: (by Mr. McGettigan)

> Okay. So actually what you saw, and I think that's what you told Trooper Bramhall because you thought it was important, was it looked like a kind of smallish car drove up there, maybe got stuck doing the turn around, some people got out, maybe to get it out of the gravel- -

23

Answer: (By witness Duwaine Duck)

        Yeah.

Question:

        And push it and be on their way?

Answer:

        Yeah.

Question:

        Okay. Somebody got lost. Went up Lily Pond, didn't know
        where they were, turned around, drove out.

Answer:

        I believe.
        (N.T. 10/6/04, A.M., p. 42-43)

Defendant's trial counsel then objected, apparently on the theory that any explanation by the witness that was unhelpful must be objectionable.

7.      At 7, defendant complains again about a question posed to witness Duck on cross examination. The witness had already stated his familiarity with the area as a lifelong resident. He had offered that he had experience as a hunter. The question posed called on both of those factors and allowed for the conditions at the time, then asked the witness to offer his assessment of his ability to discern an object in the snowy ravine. Defendant characterizes the question as a "factual assertion," which is quite wrong. It was a proposition based on the immediately preceding testimony, that the witness was at liberty to accept or reject. That is, the witness would have been at liberty to accept or reject had not defense trial counsel interposed his ill considered

24

objection.

8.          Defendant fails to state with specificity the nature of the "misconduct"

complained of at 8.  Indeed, the question as read is innocuous, particularly when seen

in context.

Question to witness Kristian Hull: (by Mr. McGettigan)

> When was the last time before that picture was taken that
> you were at that apartment?

Answer: (by witness Kristian Hull)

> I don't know.

Question:

> If you spoke with the private investigator, would that help you?

By Mr. Lindhart:

> Objection.
> (N.T.10/6/04, A.M., p.80)

Defendant fails to include that portion of the testimony that immediately preceded the

passage cited in which the witness admits the assistance of the defense private

investigator in "refreshing her recollection."

Question:(by Mr. McGettigan)

> And it was at that point after speaking with the private
> investigator that your recollection was refreshed about
> when this particular date was?

Answer:(by witness Kristian Hull)

> Yes.
> (N.T. 10/6/04, A.M., p.79)

25

It is impossible to discern from defendant's claim what error or harm is alleged.

9.      Defendant fails to state a claim at 9. He merely cites a question to which an objection was sustained. Without further explanation of the wrong or the alleged harm the complaint is incapable of interpretation or response.

10.      At 10, defendant alleges "misconduct" because the Commonwealth's trial counsel asked defense witness Haskell, an entomologist, whether he had ever "asked the defendant anything about this?" referring to the general circumstances surrounding the events in question and the charges. There is nothing in the least improper about this line of inquiry. The witness Haskell had been called as an expert witness, and a bedrock principle regarding the validity of expert testimony, indeed, of all scientific inquiry, is that the opinion of the expert or scientist can only be as valid as his data is complete. The question complained of was just one of many directed to the witness to demonstrate not just the incompleteness of his data, but the weakness of his methodology. (N.T.10/8/04, A.M., p.41-70) The Commonwealth's cross examination was directed at revealing gaps in the witness' knowledge, caused, in part, by his failure to pursue all lines of inquiry. This witness was just one of many persons who came in contact with the case, and who could have inquired of the defendant. Not only is the question proper, trial counsel would have been remiss for failing to ask it.

11.      Defendant next complains of a question posed to defense witness Haskell, the entomologist discussed in 10, above. It should first be noted that at the time the question was posed no objection was made, and the question was answered. (N.T.

10/8/04, A.M., p.67) In fact, no actual objection was made at any time. Given those facts, any claim now made by defendant is properly deemed waived. However, defendant's trial counsel did inquire at side bar following Haskell's testimony whether Commonwealth's counsel had a good faith basis for the question. In an abundance of caution, and in the interest of clarifying the instance complained of, the Commonwealth offers a fuller explication of the issue at hand. Commonwealth's counsel advised the trial Court that he did, indeed, have a good faith basis for the question, that is, information provided to Commonwealth's counsel by Dr. Kim, who would be the Commonwealth's expert witness in entomology, to be called in rebuttal.

(Sidebar conversation with counsel and the Court)

Mr. Travis:

> I think one of the last questions asked Dr. Haskell, are you a member of various groups or organizations, anybody ever try to kick you out of one of those organization. I don't know. I mean, do you have a good faith basis?

Mr.McGettigan:

> Yeah. I was advised– I spoke on the telephone last night to Dr. Kim, and we spoke specifically about the Van Damm case. And he said he[Haskell] had trouble with an organization. There was a move to remove him. I didn't inquire anymore because he gave me a negative. But I can tell you that Dr. Kim spoke – I spoke with him myself. In addition to that, it was one of my classmates in law school who was both a trial counsel and appellate counsel on the Van Damm matter.

Mr. Travis:

> Okay. I just wanted to clear that up before he left the stand. (N.T. 10/8/04/, A.M., p.73-74)

27

Dr. Kim was later called as a Commonwealth witness in rebuttal. In addition, Dr. Kim was available to speak with defendant's trial counsel, both before and after his testimony. Defendant offers no evidence that the statement by Commonwealth's trial counsel regarding his basis for the question was erroneous. Nor does he challenge the propriety of the question itself. He merely challenges the "good faith" basis for the question, and the record could not display more clearly that such a basis existed.

12. At 12, defendant alleges that Commonwealth's trial counsel committed misconduct by asking defense witness Siek, a toxicologist, whether he was in "any position to argue with the conclusion of Dr. Ross that the cause of death was the result of blunt trauma." (N.T. 10/8/04/, P.M., p.64) Defendant's argument ignores the broader context of Dr. Siek's testimony. In fact, it ignores the reason that Siek was called to begin with. The sole reason for Siek's testimony was to attempt to promote the defense theory (one of many) that the victim had died of an overdose of the drug GHB. Having been unable to discover even one forensic pathologist who would subscribe to that theory, and having had their own forensic pathologist witness conclusively negative that theory, defendant put forth the testimony of Dr. Siek, a toxicologist, and not a medical doctor. His testimony on direct examination largely consisted of a lecture on the likelihood of GHB formation in the body pre-mortem versus post mortem. It is hard, no, impossible, to locate any relevance to the existence of GHB in the body of the decedent unless it was at least a factor in the cause of death. After the question complained of was asked, Dr. Siek was then asked if he was qualified to determine the

28

cause of death of a decedent. Of course, his reply was in the negative. The irrelevance and, indeed, uncertainty of Dr. Siek's testimony is reflected in the last question posed to him on cross examination, and his answer.

Question to witness Dr. Siek: (by Mr. McGettigan)

> Okay. Yet the reality is, and this is my last question, toxicological findings in this case are equivocal in terms of what they mean, and, in fact, may be the result of nothing more than typical postmortem artifact, isn't that the case ?

Answer: (by witness Siek)

> That's a possibility, yes.
> (N.T. 10/8/04/, P.M., p.65)

And, finally, defendant declines in his Brief to discuss the aftermath of Dr. Siek's testimony. Notwithstanding the irrelevance of Siek's testimony, the Commonwealth was prepared to rebut it on a factual, scientific basis. The trial Court was disinclined to prolong the trial by hearing testimony on a subject area whose relevance had been dissipated by defense counsel's own arguments to the court. Defense trial counsel then persuaded the court to prohibit the Commonwealth rebuttal testimony by agreeing to forego any argument to the jury that GHB was a factor in the cause of the decedent's death.

(In the Judge's Chamber's)

Mr. Linhardt:

> Okay. So my understanding then is if I intend to comment on Dr. Siek's testimony in closing – if I'm letting the Court know it's my intention to do that, you will allow him to call a forensic toxicologist.

29

The Court:

>That's correct.

Mr. Linhardt:

>Okay. And I'll let the Court know as soon as Mr. Travis
>– I may, in light of that statement, say I'm not going to
>comment on Dr. Siek.
>(N. T. 10/12/04, A.M., p.4)

The most generous interpretation that can be made of defendant's complaint is that Commonwealth's trial counsel erred in asking a question whose answer was self-evident and detrimental to the defense theory, when defendant had hoped to put forward and argue that unsupportable theory to the jury.

13. Defendant complains, at 13, of a question posed on cross examination to defense witness Angela Weber. No objection was made at trial to that question, or any other question posed to Ms. Weber at trial. The question complained of is innocuous on its face and reasonable in context. Defendant fails to state a cognizable claim.

14. At 14, defendant complains of a remark, an aside, made in the context of a question involving the experience of the witness, Rini, and purportedly resulting in the comparison of the relative experience of the trial prosecutor to that of the witness. It must first be noted that there was no objection at trial to the complained of remark or question, and the issue should be deemed waived. Furthermore, that the comparison alleged was, in fact, made as asserted is by no means clear from the record available. It should also be noted that the witness' curriculum vitae was many pages long and that the reference may have been to the length and extensiveness of his body of work.

30

In addition, the witness' testimony proved, in any reasonable sense, to be not at issue. The prosecution, in effect, agreed with Rini that no physical evidence of value in determining the identity of the murderer had been recovered at the crime scene or anywhere else. Thus, the innocuous remark, of ambiguous meaning, unobjected to at trial, could not conceivably had any detrimental impact on the defendant's case. (N.T. 10/11/04, P.M., p. 52, 59-60)

15.     At 15, defendant asserts that the trial prosecutor committed misconduct when in fact he merely mis-spoke, and only arguably and momentarily, at that.  At trial, defense counsel objected when the Commonwealth prosecutor used the word "identical" when referring to soil samples recovered from the crime scene and from the defendant's car,

respectively.   After the interposition of the objection, the prosecutor rephrased the question even before the objection was ruled on:

(By Mr. McGettigan)

> Similar in color and texture and characteristics. I will withdraw
> the identical.  That's as close as I can get, Judge.
> (N.T. 10/11/04, A.M., p.68)

In addition, earlier in the cross examination, the witness had agreed with the police laboratory report and its meaning with regard to the characteristics of the soil samples.

Question to witness Rini: (by Mr. McGettigan)

> Okay.  What that means in shorthand is that soil is taken from
> right near the crime scene, compared to vacuum sweepings that
> recovered soil from the trunk of the Defendant's car and  they
> were similar in color, texture, and physical characteristics, doesn't it?

31

Answer: (by the witness Rini)

> Yes, sir

Question:

> And that would seem to indicate that there was a possible
> transfer, wouldn't it ?

Answer:

> Yes, sir.
> (N.T. 10/11/04, A.M., p.62)

Thus, after the defense witness had agreed that the soil samples at issue were so "visually and microscopically" similar in "color, texture, and physical characteristics" that they could have originated from the same location, defense counsel objects because of the momentary use of the word "identical," in place of "similar." The Commonwealth submits that items that are microscopically and visually indistinguishable from each other in color, texture, and physical characteristics are for all practical purposes "identical," at least for a moment.

16.-19. In 16 through 19 of his Brief, defendant makes various complaints about the cross-examination of Christine Cecconi. Mrs. Cecconi (formerly Christine Hostrander) had given a number of statements to the police at different times following the disappearance of Jason McMann. Her first statement was given on February 21st, 1999, to Lock Haven police officer Marvin Fritts. At that time, the victim had been reported missing, but his body had not yet been found.

Mrs. Cecconi was employed at the "Old Corner Bottle Shop," as an "overnight manager," and in some other unspecified position. In her direct testimony she asserted

32

that she had seen the victim for a "couple of seconds to a minute" on Groundhog Day of 1999. This was generally consistent with her statements to the police during the investigation, until July of 2001, when she expressed uncertainty about the date of her contact with the victim.

Mrs. Cecconi's statements to the police were a cause of some difficulty to the investigating officers because they were at odds with the statements of the eyewitnesses/participant to the kidnapping/ murder. Willie Williams had testified to observing the victim beaten to death on January 23rd, 1999. Jamie Allen testified to the defendant's admission to the murder on that date, and Quincy Teel and Jermaine Ballard had testified to their participation in the events immediately preceding the murder on that same date. In addition, the record reflects that other than Mrs. Cecconi, nobody else who actually knew the victim had reported seeing him or having any contact with him after the night of January 22nd -23rd, 1999.(N.T. 10/4/04, P.M., p.132)

The witness Cecconi, herself, testified to the victim's closeness to his family and that it was "a little odd" that he had no contact with his family or friends during the time he was missing. (N.T. 10/11/04, A.M., p.139, 141) Mrs. Cecconi also testified that her alleged contact with the victim on Groundhog Day lasted "between a couple of seconds and a minute." (At p.134) In part, her recollection of Mr. McMann's visit was made certain by her recollection of the beer she said he ordered. She then agreed that her testimony differed in that respect from the statement she had tape recorded on

33

April 10, 1999. She stated in testimony that during that couple seconds to a minute that the victim was in her shop he told her that he "may be going away for a little while," but that he "would be back." Notwithstanding Mrs. Cecconi's singular knowledge of the victim's plans to go away for a while, she testified that she was "devastated" when she heard he was missing. She further testified that she was so devastated that she took a while to decide whether to tell the police of her contact with Mr. McMann. She agreed that she didn't know what to do and debated it back and forth. (At p.136) She offers no reason why her devastation would cause this conflict. She further testified that a tape recorded and transcribed statement she gave to the police was in error, and that she had later been browbeaten by the police in an effort to get her to change her story. When confronted with that (last) statement to the police in which she stated some uncertainty as to the date of her contact with the victim, she denied ever having made such a statement. This testimony by Mrs. Cecconi was directly rebutted by Trooper David Rausher, who took the statement. (N.T. 10/12/04, A.M., p.14-15)

Mrs. Cecconi testified that she and the sister of the victim were "enemies", but that she would have resumed a relationship with the victim had the opportunity arisen. (N.T. 10/11/04, A.M., p.137, 138) She offered these comments notwithstanding that she was married and pregnant at the time she allegedly last saw Mr. McMann. Her prior relationship with the victim had ended approximately seven (7) years before their alleged meeting on Groundhog Day. She and Mr. McMann were fifteen (15) years old

34

when the relationship ended. Mrs. Cecconi did not know where the victim lived, even though his residence was approximately one and a half blocks from her shop. She was uncertain of his other relationships , and she testified that she had, in fact, asked him for proof of age when he came to her shop on one recent occasion.

Mrs. Cecconi agreed that her job at the Old Corner Bottle Shop was stressful "a lot of times." And near the conclusion of her testimony on cross examination, Mrs. Cecconi provided to the jury a reasonable basis to question the reliability of her testimony. In response to a question about the reason she had left the Old Corner Bottle Shop, Mrs. Cecconi denied that stress was a cause and instead, stated the following:

Question to witness Cecconi: (by Mr. McGettigan)

Okay.

Answer: (by Mrs. Cecconi)

> Because I had asked for a week off because I was suffering through severe postpartum depression due to my pregnancy, being taken out of my management position, losing my apartment, and trying to stay on my feet. So I was on my medication. I was going through therapy to try to get out of my relationship, to get a better job, to better myself, and to better my life and I told Donny that my doctor and my therapist agreed that I did need some time off of work. I had a doctor's excuse to take a week off work. Donny told me that if I needed to take a week off work I was to leave, pack my stuff, get out , and never come back.
> (N.T. 10/11/04, A.M., p.152)

In the entirety of Mrs. Cecconi's testimony on cross examination, counsel for the defendant interposed two objections, to essentially the same question. A review of the

35

testimony reflects that, unlike his complaints in his Brief, counsel's restraint at trial was appropriate, but for the two instances cited. The mechanics of cross examination often properly call for the putting of a proposition to the witness that is at odds with the witness' earlier testimony, and an objection to that approach is not proper. That defendant's counsel understands this is on clear display in the following exchange:

Question:(by Mr. McGettigan)

> You understand my question. Were you still feeling the emotional impact of Jason's loss at the time you talked to the police?

By Mr. Linhardt:

> Objection, Your Honor. Mr. McMann was not known to be dead until April. These interviews took place the first one in February.

By the Court:

> I sustain the objection.
> (N.T. 10/11/04, A.M., p. 144)

An objective reading of the record reflects that the question was asked in a fashion that would have permitted the witness to respond by differentiating her emotional posture according to the timing of her knowledge or lack of knowledge of the victim's death, if she could. Counsel, well aware of the uncertain state of his witness' recollections of events and dates, interposed not just an objection, but an explanation for his witness' benefit.

20. At 20, defendant complains of his inability to obtain a variety of items from the Commonwealth, including photographic negatives, bench notes of the pathologist, and

36

bills. Both prior to trial and during trial, the Commonwealth followed an "open file" policy. That is, the prosecutor's entire file, but for work product like personal notes of the prosecutor, was available to defense counsel at all times. In fact, defense counsel took advantage of that policy by dispatching his law clerk to the District Attorney's Office on at least one occasion. On that occasion, the trial prosecutor opened his entire file to the defense clerk and over a period of hours personally copied any document requested. The items complained of in 20 either did not exist, had been destroyed, were not in the possession of the prosecutor, or were incapable of being obtained by him. In addition, even the most casual consideration of the defendant's complaint on this issue reveals its complete irrelevancy to any misconduct or prejudice to the defendant.

21.      Defendant, at 21, makes the last of his complaints of misconduct by admitting that he is "unable to specifically identify the improper arguments which were made." It is the Commonwealth's recollection that one objection was made during the Commonwealth's closing, by Mr. Travis, to a statement by trial prosecutor McGettigan regarding what was referred to as the GDI videotape. The GDI tape was one which showed the defendant on videotape at an outdoor party location not far from the site of the discovery of the victim's body. Mr. Travis and Mr. McGettigan had agreed to a stipulation that the tape did, in fact, show the defendant at the GDI party site. Mr. Travis objected to a reference to this fact, correctly pointing out that the stipulation, while agreed to, had never been reduced to writing  nor placed in the record before the

37

jury. After a brief sidebar, Mr. McGettigan was made by the court to appreciate his oversight, and moved on in his closing argument without further reference to the tape. Mr. McGettigan, Mr. Travis, and the court had all failed to remember that there was direct testimony on this issue, by Trooper Rausher, who testified that he had personally reviewed the videotape and observed the defendant on the tape. (N.T. 10/4/04, P.M., 140, 146) The Commonwealth believes that only one additional objection was made by defense at closing, by Mr. Travis after Mr. McGettigan had completed his remarks. The Commonwealth's recollection is that Mr. Travis complained that the prosecutor had said that he "spoke for the victim" and that the "jury should speak for the victim as well." Whether or not Mr. Travis' complaints accurately state the language used by the prosecutor in closing, the remarks made do not constitute misconduct, certainly not misconduct warranting a new trial. It is believed that the prosecutor repeatedly urged the jury to be guided by the testimony and the law. In addition, the trial Court instructed the jury that neither questions nor arguments of the attorneys constituted evidence, and that their verdict must be based on the evidence alone.

In considering the defendant's claims of prosecutorial misconduct, scrutiny of the complained of instances reveals that some remarks were unobjected to at trial, some questions objected to were withdrawn, and many of defendant's complaints have been made without defendant providing any context to the complained of remarks. The record of the trial will reflect that the trial Court provided scrupulous oversight of the trial, including the conduct of all counsel. Defendant can not reasonably contest the

38

scrutiny that the trial Court gave to the conduct of the trial, nor the position of the trial Court to consider and rule on allegations of misconduct and fashion a remedy, if indeed, a remedy was required. The Commonwealth is confident that the trial Court repeatedly instructed the jury that neither questions nor the remarks of counsel constituted evidence, and that it was the evidence that should form the sole basis of the jury's verdict. Moreover, the trial record will clearly reflect that the jury's verdict was, in fact, not the result of questions or remarks by either counsel, but rather was properly derived from the overwhelming evidence provided by the Commonwealth's case.

## II. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO DECLARE CLINTON COUNTY'S JURY POOL IN VIOLATION OF 42 PA.C.S.A. §4521(d), §4524 AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Defendant claims the trial Court erred in denying his motion to declare that the Clinton County jury pool was improperly assembled in violation of Pennsylvania statutes and the United States Constitution. Defendant's claim relies on unsupported and unsupportable assumptions, and assertions with no basis in fact.

In a complaint that relies solely on an allegation of a minor and technical deviation from the approved manner of assembling a jury panel, the defendant fails to offer anything but the most vague of assertions of facts in support of his claim. Defendant has not shown that he was deprived of a fair trial or that the jury which sat in judgment on his case was anything other than fair and unbiased. See, Commonwealth v. Craver, 547 Pa.17, 27-28, 688 A.2d 691, 696 (1997). Proof is required of an actual

discriminatory practice in the jury selection process, not merely an under-representation of one particular group. And the defendant bears the burden of presenting prima facie evidence of discrimination in the jury selection process.  Commonwealth v. Jones, 452 Pa.299, 312, 304 A.2d 684, 692 (1973). To establish a prima facie violation of the requirement that a jury array  fairly represent the community, the defendant must show

> (1) the group allegedly excluded is a distinctive group in the
> community; (2) the representation of this group in venires
> from which the juries are selected is not fair and reasonable in
> relation to the number of such people in the community; and
> (3) this underrepresentation is due to systematic exclusion of
> the group in the jury selection process. "Systematic" means
> caused by or inherent in the system by which juries were
> selected. Commonwealth v. Johnson, 576 Pa. 23, 838 A.2d 663
> (2003).

Defendant clearly misses the mark in his claim, particularly in that there has been no showing that those individuals not represented on the occupational tax rolls of Clinton County represent a "distinctive group."    He merely baldly asserts that the "elderly, the poor, handicapped and minorities" are a disproportionate number of those not on the occupational tax rolls.

Because the Opinion of the trial Court is not yet available, and because the actions of the jury commissioners were pursuant to an Order of the trial Court, who is also the President Judge of Clinton County, the Commonwealth is not able to specifically articulate the mechanics of the selection of the jury pool.    However, after the defendant's counsel filed their first Motion complaining of the makeup of the jury pool, the trial Court issued an Order, dated November 24, 2003, directing the jury commis-

40

sioners to adjust the selection process consistent with the requirements of the law. Subsequently, when advised of the steps taken by the commissioners, the Court was satisfied with those steps, as evidenced by its denial without a hearing of the defendant's second motion complaining of the manner of selecting potential jurors.

In addition, the Commonwealth, based on information and belief, can make certain assertions of fact relevant to the issue at hand.

First, prior to jury selection in the above captioned case, the jury commissioners did alter their historical practice of selecting potential jurors from the occupational tax rolls following the trial Court's Order, and supplemented the pool of potential jurors by the addition of the names of those persons registered to vote in Clinton County.

Second, defendant and his counsel consulted with each other and were fully engaged in the process of selecting a jury, and made no complaint about the makeup of the panel immediately prior to jury selection.

Third, defendant did not exhaust his peremptory challenges during jury selection.

Fourth, the jury eventually selected was made up of persons whose names were on either the occupational tax rolls or the voter registration list.

Fifth, even if the jury pool had been drawn solely from the occupational tax rolls, defendant's assertion that those presumptively excluded are disproportionately the "elderly, the poor, handicapped and minorities," is not only unsupported by any objective empirical evidence, such an assertion is repugnant. It clearly implies that the "elderly, the poor, handicapped and minorities" do not work or pay taxes. This

41

proposition is patently absurd on its face, and insulting, as well.

Sixth, defendant offers no support for his implicit claim that those whose names are not on the occupational tax rolls represent a "distinct class."

Seventh, defendant's claim under 42 Pa. C.S.A. §4521 ignores the section of that chapter that addresses the effect of a jury verdict on complaints such as his.

> Except as otherwise prescribed by general rule, errors and omissions under this subchapter shall not constitute grounds to set aside any jury verdict in any civil or criminal matter or to arrest, reverse, open or strike any judgment entered on a jury verdict, and the trial by jury and its rendition of a verdict in any matter shall constitute a waiver of all such errors and omissions.
> 42 Pa.C.S.A. §4527.

The above-referenced section is particularly pertinent to the defendant's additional claims in II of his Brief. One of those complaints argues that the "jury qualification forms ...did not appear to plainly and conspicuously state thereon that its execution is subject to the penalty for perjury." (defendant's Brief, p.32) Defendant also complains that the selection of the jury pool was not "public" and "random". A clear reading of §4527 readily reveals its legislative intent; that is, to prevent those convicted in a fair trial by an impartial jury from seeking relief by claims of minor technical deviations committed by county officials in the conduct of their administrative tasks.

In brief, defendant's claim rests on unreasonable assumptions, unsupported assertions, and an insulting claim about the "elderly, the poor, the handicapped and minorities." Defendant clearly hopes that the weakest of claims of minor, mechanical

faults in the jury selection process will be strengthened by the insertion of an illogical argument relying on the use of "buzz words."   Defendant must acknowledge that defendants are not entitled to a jury of any particular composition, but rather a fair and unbiased one, reasonably representative of the community.

> The constitution of this commonwealth guarantees: Trial by jury shall be as heretofore, and the right thereof remain inviolate." Pa. Const. Art.I §6.  This Court has interpreted the inviolability of the right to mean "freedom from substantial impairment.  It does not import rigidity of regulation in the manner of impanelling a jury. The cardinal principal is that the essential features of trial by jury as known at the common law shall be preserved."
> Commonwealth v. Craver, supra, at 25.

For further support of the Commonwealth's position, we will rely on the trial record and the Opinion of the trial Court which will reflect the jury commissioners compliance with the Order of the Court, the assembly of a proper panel, and the participation of the defendant in selection of a fair and impartial petit jury from the panel called.

## III.   THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION FOR CHANGE OF VENUE OR VENIRE.

Next, defendant argues that the trial Court erred in denying his Motion for a Change of Venue or Venire based on pretrial publicity.  Our Supreme Court presented a comprehensive overview of the law regarding pretrial publicity in Commonwealth v. Chambers, 546 Pa. 370, 385, 685 A.2d 96 (1996), as follows:

> An application for a change of venue is addressed to the sound discretion of the trial court, which is in the best position to assess the community atmosphere and judge the necessity for a venue change, and its exercise of discretion will not be disturbed in the absence of an abuse of

43

discretion. Commonwealth v. Pursell, 508 Pa. 212, 220-221, 495 A.2d 183, 187 (1985). The mere existence of pretrial publicity does not warrant a presumption of prejudice. Commonwealth v. McCullum, 529 Pa. 117, 125, 602 A.2d 313, 317 (1992). If pretrial publicity occurred, its nature and effect on the community must be considered. Commonwealth v. Casper, 481 Pa. 143, 151-1 54, 392 A.2d 287, 292-293 (1978). Factors to consider are whether the publicity was sensational, inflammatory and slanted toward conviction rather than factual and objective; whether the publicity revealed the accused's prior criminal record, if any; whether it referred to confessions, admissions or reenactments of the crime by the accused; and whether such information is a product of reports by the police or prosecuting officers. Id. If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. Commonwealth v. Breakiron, 524 Pa. 282, 288, 571 A.2d 1035, 1037 (1990). Finally, if there has been inherently prejudicial publicity which has saturated the community, no change of venue is warranted if the passage of time has significantly dissipated the prejudicial effects of the publicity. Id.

As noted above, even when there is pretrial publicity which is presumed to be prejudicial to a defendant, a change in venue or venire is not necessarily required. In cases of potential presumed prejudice, the trial Court can rightfully look to the voir dire process to determine whether the publicity has been so extensive or pervasive as to cause potential jurors to have formed an opinion of the innocence or guilt of the defendant. See, Commonwealth v. McCullum, 529 Pa, 117, 127-128, 602 A.2d 313, (1992).

The Commonwealth does not dispute the defendant's assertion that the disappearance and discovery of Jason McMann were attended by significant attention in

44

the media. Nor does the Commonwealth deny that the investigation, arrest and trial that followed were also covered in a fairly extensive manner. But the mere existence of significant publicity surrounding a case does not mean that the defendant is incapable of being tried before a fair and impartial jury in the jurisdiction in which the crime and the publicity occur.

Indeed, if that were the case, virtually every moderate to small sized county in the Commonwealth would be required to send most of its murder cases elsewhere, and to accept the burden of trying other counties' cases in its own court. That is because in other than the dozen or so largest counties in the Commonwealth, murders remain, fortunately, rather rare events that generate interest. Events of interest inspire news coverage, and ongoing events, like investigations and trials tend to generate continuing coverage. Notwithstanding that a murder case in a location with a relatively small population will be well reported, the responses of readers and listeners to the media is not terribly different than that in larger media markets. Readers and listeners ingest the materials generated for a while, then file it with the other detritus that is of no consequence in their lives.

Any experienced trial practitioner can predict the responses on voir dire to a question regarding publicity, whether in a small county or a large one. "Have you read or heard reports of this murder?" "Yeah, I think so." "Have you formed an opinion about the defendant's guilt?" "Well, he's locked up, so I guess he did something." "Even though you may have formed an opinion about the defendant's guilt, can you set

45

aside anything you may know, or think you know, and presume the defendant innocent, give him a fair trial, and reach a verdict only on the evidence you hear in this trial and the law this Court gives you?"   "YES."   These questions, or ones similar to them are asked virtually every trial day in every trial Court in the Commonwealth.   "In reviewing the trial Court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pretrial publicity." Commonwealth v. Kichline, 468 Pa. 265, 274, 361 A.2d 282, 287 (1976).   Courts, defendants, their counsel and prosecutors rely on the candor and truthfulness of potential jurors when they ask those questions and hear the responses.

> Although it is conceivable that pretrial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective.  The discretion of the trial Court is given wide latitude in this area.
> Commonwealth v. Breakiron, 524 Pa. 282, 288, 571 A.2d..1035, 1037 (1990).

Defendant properly cites cases that explain the factors to consider when determining if a change of venue or venire is required. But defendant fails to explain how the case at bar meets those standards.

It is noteworthy that the events of public interest in this case took place over an extended period of time. Jason McMann was last seen on the night of January 22nd

46

-23rd, 1999. His body was found on April 8, 1999. His death was (wrongly) announced as the result of a drug overdose months later, in the fall of 1999. The defendant was not arrested until June 11th of 2002, in Georgia. His preliminary hearing was on July 17th, 2002. Jury selection for the defendant's trial was initially scheduled for early March of 2004, but a defense request for a continuance delayed jury selection until September 13th of 2004, and the trial proper began on September 29th, 2004. The jury found the defendant guilty of first degree murder and related charges on October 14th, 2004, and deadlocked on penalty on October 21st, 2004. As the time line reflects, the events in this case which generated public interest took place over a span of five years.

Neither the defendant nor his victim were public figures. In fact, the victim had resided in another state before returning to Lock Haven shortly before his murder. He was only intermittently employed and had a small circle of youthful friends. The defendant was at Lock Haven only as a student/athlete and was likely known to just as few local residents as the victim. The cause of death was not unique, or even particularly novel, nor was the motive. None of the witnesses were public figures, or widely known. In fact, the only even mildly unusual factor connected to the case was the concealment of the victim's body for a period of time, which generated interest as a missing person case. Indeed, much of the attention to the case was generated by the family of the victim during the time before his body was discovered. This is not only understandable, but natural, and by no means noteworthy in a manner prejudicial to

47

the defendant.

Notwithstanding the commonplace, if fairly extensive publicity generated by this case before trial, defendant's counsel filed a Motion for Change of Venue or Venire well in advance of trial. The trial Court, quite properly, held the Motion in abeyance, pending any demonstration that the publicity had tainted the jury pool. The defendant failed to supplement his Motion with additional evidence prior to voir dire, and, as voir dire began and continued, it became clear that the selection of an untainted jury was easily achievable. As of this date, the Notes of Testimony of the jury selection process are not yet available, so the Commonwealth must rely on personal notes and recollection to address this issue. However, it is believed and therefore averred that the trial Court gave all counsel extraordinary latitude to explore the issue of taint or prejudice with each individual venire person questioned. Some of those questioned, did, in fact, profess a fixed and unchangeable opinion. They were few in number, and excused without hesitation. A greater number had little knowledge and no opinion whatsoever about the case. Every single juror who was seated committed himself or herself to deciding the case on the evidence presented in court, and that alone, not once, but multiple times, on their oaths. But whatever the state of the panel members knowledge or attitude, the trial Court was scrupulously protective of the defendant's right to a jury committed to deciding the case on its merits. The record, when completed will reflect that inquiry in the area of prejudice or taint was never constrained, and challenges for cause on that basis were infrequently required and

48

freely granted. Both of defendnat's trial counsel were present for the entire jury selection process, and the Court observed their extensive consultation with the defendant during those efforts. The defendant expressed his satisfaction with his representation on multiple occasions, and, significantly, defendant did not exhaust his peremptory challenges, nor did his counsel complain of impossibility or even difficulty in selecting a fair jury during or after the selection process.

A fair reading of the defendant's Motion and its attachments reflects that he failed to meet the standard required for a change of venue or venire prior to jury selection, and that jury selection then yielded a fair and impartial fact finder. And a fair reading of the record in its entirety clearly reveals that defendant was convicted, not by a tainted jury, but by overwhelming evidence.

## IV.   THE VERDICT WAS SUPPORTED BY THE WEIGHT OF THE EVIDENCE

Defendant claims that the trial Court erred in denying his motion for a new trial based on the argument that the verdict was against the weight of the evidence. Cases which explicate the standard of review regarding the weight of the evidence are legion. "The decision to grant or deny a motion for a new trial on the ground that the verdict is against the weight of the evidence is committed to the trial court's sound discretion. Commonwealth v. Pronkoskie, 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982); Commonwealth v. Taylor, 324 Pa. 420, 425, 471 A.2d 1228, 1230 (1984). The test is not whether this Court would have made the same decision but whether the verdict is so contrary to the evidence that justice compels a new trial. Id. For a new trial to be

49

awarded on this challenge, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court". Commonwealth v. La, 433 Pa. Super 432, 640 A.2d 1336, 1351 (1994), appeal denied, 540 Pa. 597, 655 A. 2d 986 (1994).

In reviewing appeals based on a denial by the trial Court regarding the weight of the evidence issue, this Court has held that "a trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is one of the least assailable reasons for granting or denying a new trial." Commonwealth v. Sullivan, 2003 Pa. Super 123, 820 A.2d, 806 (2003) (citing Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 751 (2000)).

Although at this time the Commonwealth does not have the benefit of the trial Court's Opinion, it is clear from the Court's denial of defendant's motions for a new trial that the trial Court's conscience was not shocked by the jury's determination of the defendant's guilt. Indeed, we assert that no reasonable person's conscience would be shocked by the jury's verdict in the instant case. In fact, the weight of the Commonwealth's evidence against the defendant was overwhelming. Defendant's argument on the weight of the evidence seems to rely on the number of witnesses he called, and ignores the injunction of a standard charge to the jury that, "The number of witnesses offered by one side or the other does not, in itself, determine the weight of the evidence.... The important thing is the quality of the testimony of each witness."

The weight of the Commonwealth's evidence is derived from the testimony of an eyewitness to the murder, Willie Williams, further testimony from two additional

50

eyewitnesses to the abduction of the unconscious victim which immediately preceded the murder, Jermaine Ballard and Quincy Teel, and the testimony of the defendant's roommate, Jamie Allen, to whom he had confessed his crimes, not once, but twice. The Commonwealth also presented strong evidence of motive. (See testimony of Stauffer, Ballard, Teel, Williams, and Allen)

Ballard, Teel, Allen, and Williams all testified to their presence at a party in which the victim had been involved in a series of altercations, culminating in one with the defendant which resulted in the defendant and his companions leaving the victim unconscious in a deserted courtyard in Lock Haven.

Ballard and Teel then testified that they accompanied the defendant and Willie Williams in the defendant's car to the scene, where they discovered the unconscious victim laying on the ground. They assisted the defendant and Willie Williams in placing the victim in the trunk of defendant's car before abandoning the enterprise. Williams testified that he accompanied the defendant on the drive to a secluded location where he helped the defendant unload the victim from the trunk. He then watched as the defendant beat the unconscious, but still breathing victim, first with a pistol and then with a tree branch before dragging the victim down a snowy ravine.

These eyewitnesses to the abduction and murder made their statements to investigators at a time when no charges were pending against them for the crimes involved in this case, or any other case. The statements of the three were made independent of each other. All three lived in different locations; in fact, Ballard lived in

51

Maryland. Neither Ballard or Teel had met Williams before the night of the murder, nor did they see him again after the day following the murder. Ballard and Teel had met only that week when Teel arrived at Lock Haven. None of the three knew the victim. None of the three were on probation or parole when they gave their statements to investigators or their testimony at trial. Ballard and Teel pleaded guilty to the charge of conspiracy to kidnap, Williams pleaded guilty to conspiracy to commit third degree murder. Jamie Allen was incarcerated on drug charges at the time he advised investigators that the defendant had made a statement of admission to him, however he had told his girlfriend, Nicole Killinger, of the defendant's admission prior to his (Allen's) arrest. Ms. Killinger's statement to the police regarding Allen's revelation to her of the defendant's admission was read into the record pursuant to a stipulation between the parties.

Thus, the rationale that is the underpinning of the defendant's argument is that three individuals who barely knew each other, with nothing to gain by inculpating themselves, decided to manufacture (consistent) testimony which resulted in them being charged with crimes, pleading guilty, and being incarcerated. Nor did any of the three have any motive to incriminate the defendant. Teel had met the defendant the week of the murder, Ballard and the defendant were football teammates, and Williams was the defendant's drug supplier. In light of the testimony of the Commonwealth's four primary witnesses, defendant's Brief does not, indeed, cannot, plainly state the proposition underlying his weight of the evidence argument. He declines to do so for

52

good reason; it is patently absurd.

In contesting the Commonwealth's evidence at trial, defendant offered a hodgepodge of testimony, which he now argues should have overcome the weight of the Commonwealth's evidence. His witness' testimony gain no weight in the reading.

Defendant challenges the Commonwealth's testimony regarding the clothing worn by the victim on the night of his murder. The Commonwealth elicited the testimony of Rosa Rodriguez, who said that she took a picture of the victim, in a group which included her brother, the victim, and some of the victim's friends (who went with him) on the night of the party where the fight occurred that preceded the victim's abduction and murder. The picture showed the victim wearing the shirt that was recovered from the scene where his body was found. Defense witnesses Kristian Hull and Amber Fye testified that they remembered the circumstances of the taking of that picture, and that it occurred on a different night, even though they never saw the picture until shown it by the defense investigator within a few months of the trial, more than five years after it was taken. (N.T. 10/6/04, A.M., p.79, 85)

Defendant offers the testimony of Christine Cecconi to attempt to prove that the victim was alive on a date after January 22nd - 23rd, 1999, the date on which the Commonwealth witnesses described his abduction and murder. Mrs. Cecconi's sole alleged contact with the victim occurred on "Groundhog Day," and lasted, according to her, "...a few seconds to a minute." Mrs. Cecconi's testimony is discussed at length in this Brief, at I, supra, but a brief review of her testimony in an unsolicited response is

53

revealing of the clear basis for the jury's rejection of her testimony. This testimony had to do with her psychological state at around the time of the victim's disappearance and her statements to the police.

By the witness Christine Cecconi:

> Because I had asked for a week off because I was suffering through severe postpartum depression due to my pregnancy, being taken out of my management position, losing my apartment, and trying to stay off my feet. So I was on my medication. I was going through therapy to try to get myself out of my relationship, to get a better job, to better myself, and to better my life. (N.T. 10/11/04, A.M., p.152)

Defendant states that, "Chris Hileman testified that he and John Caldwell saw Jason McMann at a Wendy's Restaurant *after* they had seen Jason McMann's picture in missing person posters throughout the community." (defendant's Brief, p.48). (Italics added)   This misstates the record.   Mr. Hileman, in fact, testified that he saw an individual who caught his eye in a Wendy's on January 23rd, 1999, and that when he saw the missing person posters two or three weeks later he thought it might have been the same person.  He did not know Mr. McMann, and the best he could say as to the identity of the individual he saw is that it" looks like the guy we saw in Wendy's." "Maybe is, maybe isn't ?   "Correct" (N.T. 10/11/04, A.M., p.87)

Andrew Garbrick, another defense witness relied upon in defendant's Brief, testified that he saw a missing poster of the victim, and shortly thereafter, that same day,  saw somebody "a hundred feet away, maybe more," wearing a hat, who "might have been" Jason McMann, whom he  had  never  met and never seen in his life. (N.T.

54

10/8/04, A.M., p.79-80) After Mr. Garbrick made his observation, he had a discussion with a clerk in a West Coast Video store which aided him in making a decision to go to the police with his information.

Defendant then discusses the testimony of police officer Marvin Fritts. In a somewhat misleading statement, the Brief asserts that Fritts told another officer, Stephen Falatico, that he had seen the victim after the assault of January 23rd, 1999. (defendant's Brief, p.48) This assertion ignores the fact that Falatico's notes were ambivalent, and Falatico had never confirmed the specifics of that report with Fritts, and Fritts, when called as a defense witness, testified on cross examination that his best recollection of seeing the victim last was in the beginning of January, "like the 8th or 9th of January." (N.T. 10/8/04, P.M., p.75-76)

Defendant asserts that "if there was even a reasonable possibility" that the testimony of Dr. Theodore Seik, a defense forensic toxicologist, was true and accurate, then "Fabian Smart must be not guilty." (defendant's Brief, p.49) Defendant makes this rather astounding assertion on the basis that the blood alcohol measured in the victim's body after his autopsy was inconsistent with the amount of alcohol that he was anecdotally reported to have consumed on the night of his murder. However, Dr. Siek admitted on the witness stand that witness reports of the amount of drinking done were, "...in many cases...inaccurate." He also admitted that he had no knowledge of the state of sobriety of the reporters of Mr. McMann's consumption of alcohol. Nor did he have any specific knowledge of the time frame during which the victim consumed

55

alcohol on the night of his murder. And finally, there is no testimony reflecting that Dr. Siek considered that Mr. McMann may have lingered for some time after absorbing his fatal wounds, all the while dissipating the quantum of alcohol in his blood. The value of Dr. Siek's testimony is capsulized in one of his responses to a question on direct examination; when asked if the blood alcohol found in Jason McMann at the time of his autopsy was his blood alcohol at the time that he died, Dr. Siek replied, "Yes. *In general*, yes, that's true." (N.T. 10/8/04, P.M., p. 40) (Italics added) Clearly, defense counsel did not wish to inquire about reasonable scientific certainty, and just as clearly, Dr. Siek avoided any but a general response. Scientific testimony about "general" propositions, and what is merely a "possibility" are unlikely to inspire the confidence of a jury, nor should they. The jury properly discounted Dr. Siek's testimony.

Defendant then begins to address what he refers to as the "third part of the Commonwealth's theory of the case," with the assertion that "Jason McMann's body was recovered in view of the road..." (defendant's Brief, p.50) Arguments about the likelihood of a sighting of the body by passers-by or casual observers, based upon its nearness to the road, are undercut by the fact that the jury had not only the benefit of exact measurements of the scene, and photographs of the body *in situ*, they also visited the scene! Thus, the jury was as well postured as possible to assess what passers-by could or could not see. Defendant's Brief offers that seven witnesses who "lived, worked, or had been in the area..." failed to note the presence of the body. (defendant's Brief, p.50)   The Commonwealth did not challenge the sincerity of these

56

witnesses, it merely permitted the finder of fact to consider the utility of their testimony. The jury obviously reasoned that the body's location was such that the witnesses' failure to observe it was unremarkable.

A similar rationale applies to the testimony of Dr. Way and Allen Gontz, a professor and his student who were near the area of the body during the time it lay undiscovered. The Commonwealth readily accepted at trial that these witnesses had been in the area. The witnesses explained that the focus of their attention was on an area away from where the body lay, and photographs were displayed to the jury taken on the date of the witnesses' visit to the snow covered site. Neither witness claimed that they would necessarily have seen the body from their vantage points. The jury, having visited the site, was capable of assessing the likelihood of the body laying unseen under the circumstances described. (N.T. 10/1/04, A.M., p.3-6) The jury rejected defendant's argument at trial.

Defendant next argues that the testimony of Dr. Neil Haskell was dispositive of the defendant's guilt. Haskell was a forensic entomologist who testified that the insect development found on the victim's body was inconsistent with the body having been continuously at the site where it was found from January through April. Haskell's unlikely testimony offered the theory that the victim, after his murder, was taken to some warm location where insect development began, and then later removed to the site where the body was discovered.

Question to witness Haskell: (by Mr. McGettigan)

57

> Okay. So in your theory that this body was not at this location
> at this time essentially means, and see if you can follow me along,
> that this body was, and I think you said indoors at one point; but
> I won't hold you to that – was someplace before it was moved to
> Loganton. And at that someplace, maggot development began;
> and that body was in – maggot infested, maggot generated body
> was then driven, flown, or perhaps carried by hand to this cold
> location and dumped. Is that what your theory says ?

Answer: (by witness Haskell)

> Well, we have to – yes it is. And you have to have that extra
> energy come from some source. And that source has to be
> artificially generated because the air temperatures in the
> environment certainly was not conducive to get that energy
> unit available.
> (N.T. 10/8/04, A.M., p. 59-60)

Haskell's testimony was directly contradicted by the Commonwealth's expert entomologist, Dr. Kim, on rebuttal. The finder of fact was free to accept or reject the testimony of Dr. Haskell. They rejected it and accepted that of the Commonwealth 's expert witness.

Defendant suggests that the defense testimony of Dr. Samuel Land, a forensic pathologist, was sufficient to exculpate the defendant. Dr. Land's testimony, in brief, was that he was unable to determine a cause of death for more than four (4) months after conducting an autopsy. He then reached a conclusion that he admitted on the witness stand was wrong, and that "no reasonable forensic pathologist" would reach, and then, finally, he stated that he was unable to reach any conclusion as to cause of death. (N.T. 10/8/04, P.M., p.5-6) The Commonwealth called forensic pathologist Dr. Wayne Ross, who testified to a reasonable degree of medical certainty that the cause of

58

the victim's death was traumatic brain injury, complicated by hypothermia. (N.T. 10/5/04, A.M., p.11, 43)  The jury was able to consider the testimony of one forensic pathologist who had been uncertain, wrong, and then uncertain again, versus the conclusive and unhesitating testimony of a more experienced expert witness called by the Commonwealth.  The jury properly rejected the defense witness and its argument.

Defendant's final argument on the weight of the evidence seems to complain of the insufficiency of an investigation that included hundreds of interviews because it uncovered no "blood, hair or fiber evidence."   And defendant appears to fail to recognize that the jury need not reconcile the conflicts between the testimony offered by witnesses for the Commonwealth and that offered by the defense witnesses.  The jury may believe all, part, or none of the evidence. Commonwealth v. McCloskey, 835 A.2d 801 (2003).   The jury could, and did, reject the purportedly exculpating portions of the defense testimony, and the defense arguments, in toto.

Based on all of the above, it is clear that the trial Court could readily conclude that there was absolutely no basis for the Court to determine that the evidence in this case was "so tenuous, vague and uncertain that the verdict shocks the conscience of the court."  See, Commonweallth v. La, 433 Pa. Super. 432, 640 A. 2d. 1336, 1351 (1994) appeal denied, 540 Pa. 597, 655 A. 2d 986 (1994).

Accordingly, the trial Court, in the proper exercise of its discretion, denied defendant's motion for a new trial on a weight of the evidence argument and there is no basis for this Court to overturn that decision. See, Commonwealth v. Widmer, 560

59

Pa. 308, 744 A.2d 745 (2000).

## V. TRYING THE DEFENDANT BEFORE A DEATH QUALIFIED JURY DURING THE GUILT PHASE OF THE TRIAL DID NOT DEPRIVE THE DEFENDANT OF A TRIAL BEFORE A CROSS-SECTION OF THE COMMUNITY.

Defendant argues in V of his Brief that he was denied a fair trial because potential jurors were excluded from service by their opposition to the death penalty. Actually, defendant's claim is of a different and broader nature. His claim by the language of the heading at V is that he was entitled to a trial before a jury composed of a "cross-section" of the community that must necessarily include individuals who will not impose the death penalty in any case. In support of this admittedly "novel" proposition defendant makes reference to his pre-trial motion requesting that the Court allow the selection of a jury that was neither "life nor death qualified." Defendant in his Brief stated that, "...the motion asserted that various studies have established that death qualified jurors are biased in favor of conviction, and also contended that the exclusion of potential jurors, based on death penalty attitudes, would serve to deprive Smart of his state and federal constitutional right to be tried by jurors drawn from a fair cross-section of the Clinton County community." (defendant's Brief, p. 53) Defendant has not provided the "various studies" to which he refers, nor the facts underlying their rationale and conclusion.

Unfortunately for the defendant, the rules governing the proper manner in which to select a jury in a case in which the Commonwealth seeks the death penalty are prescribed by statute and case law. See, 42 Pa C.S.A. §9711(a)(1) and Pa.R. Crim.

60

one proposed by defendant. "This precise argument has been rejected by both the United States Supreme Court and this Court See, Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed. 2d, 37 (1986); Commonwealth v. Bryant, 524 Pa. 564, 574 A.2d 590 (1990); Commonwealth v. Sneed, 519 Pa. 597, 526 A.2d 373 (1986), cert denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed. 2d 1010 (1987)." Commonwealth v. McCullum 529 Pa. 117, 602 A.2d 313 (1992).

In addition, there are readily evident logical reasons to reject defendant's demand for what he calls a "fair cross-section" of the community that includes individuals who can not follow the law. By reasonable projection from defendant's argument, a "fair cross-section" could arguably come to include those who don't believe in courts, or guilt, or judicial authority in any respect. This state of affairs might sit well with the defendant and his fellow criminal defendants, but it would hardly suit a criminal justice system committed to the proposition that all parties are entitled to a jury composed of individuals who will adhere to their oath to follow the law.

## **CONCLUSION**

For the foregoing reasons, this Court should reject defendant Smart's claims and

affirm the trial Court's Order of October 21, 2004.

Joseph E. McGettigan, Esquire
 Special Assistant District Attorney
Clinton County
322 East Water Street
Lock Haven, PA 17745
(570) 893-4141
PA Attorney I.D. No.  35821
By:  Ted McKnight, Esquire
District Attorney

63

## CERTIFICATE OF SERVICE

I hereby certify that on the ___7th___ day of February, 2006, I served two (2) true and correct copies of the within Brief of Appellee upon Eric R. Linhardt, Esquire, counsel for Appellant, and that I served the original and seven (7) true and correct copies of the Brief of Appellee upon the Superior Court of Pennsylvania, Office of the Prothonotary, by placing the same in the United States First Class Mail at Lock Haven, Pennsylvania, addressed as follows:

Superior Court of Pennsylvania
Office of the Prothonotary
100 Pine Street
Suite 400
Harrisburg, PA  17101

Eric R. Linhardt, Esquire
25 West Third Street, Suite 803
Williamsport, PA 17701

Ted McKnight, Esquire
District Attorney
322 East Water Street
Lock Haven, PA  17745
570-893-4141
Attorney I.D. No. 15703