

IN THE SUPERIOR COURT OF PENNSYLVANIA
HARRISBURG DISTRICT

SUPERIOR COURT DOCKET NO. 588 MDA 2005

**COMMONWEALTH OF PENNSYLVANIA V. FABIAN D. SMART**

BRIEF FOR APPELLANT

---

Appeal from final order entered in the Court of Common Pleas, Clinton County,
Pennsylvania, on October 21, 2004, at No. 175-02

---

Eric R. Linhardt, Esquire
Attorney Id. 59981
Attorney For Appellant
25 West Third Street
Suite 803
Williamsport, Pa 17701
Telephone (570) 320-7788

Ronald C. Travis, Esquire
Attorney Id. 08819
Attorney For Appellant
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
Williamsport, Pa 17701
Telephone (570) 323-8711

## TABLE OF CONTENTS

|                                        | PAGES |
|----------------------------------------|-------|
| TABLE OF CITATIONS                     | iii   |
| STATEMENT OF JURISDICTION              | 1     |
| SCOPE OF REVIEW/STANDARD OF REVIEW     | 2     |
| ORDER IN QUESTION                      | 3     |
| STATEMENT OF QUESTIONS INVOLVED        | 4     |
| STATEMENT OF CASE                      | 5     |
| SUMMARY OF THE ARGUMENT                | 7     |
| ARGUMENT                               | 13    |
| CONCLUSION                             | 57    |

Statement of Matters Complained of on Appeal which
was mailed for filing contemporaneously with this brief

\*\* Trial Court's 1925(A) Opinion has not been written and,
therefore, is not attached.

REPRODUCED RECORD

VOLUME I

| Sentencing Order of October 21, 2004                                   | 001a |
|------------------------------------------------------------------------|------|
| Sentencing Order of January 24, 2005                                   | 004a |
| Post-Sentence Motion                                                   | 008a |
| Order granting extension of time to issue a decision on Post-Sentence Motion | 028a |
| Order denying Post-Sentence Motion without hearing                     | 029a |
| Notice of Appeal                                                       | 030a |

Order declaring Clinton County's jury pool
unconstitutional dated November 24, 2003            062a

Order denying Appellant's second motion to declare
Clinton County's jury pool unconstitutional dated
September 7, 2004                                    063a

Jury Qualification Forms                             064a

Jury List                                           152a

Relevant portion of trial transcript of September 29, 2004   172a

Relevant portion of trial transcript of September 30, 2004   175a

Relevant portion of trial transcript of October 4, 2004, a.m.   183a

Relevant portion of trial transcript of October 4, 2004, p.m.   186a

Relevant portion of trial transcript of October 5, 2004    189a

Relevant portion of trial transcript of October 6, 2004    191a

Relevant portion of trial transcript of October 8, 2004, a.m.   195a

Relevant portion of trial transcript of October 8, 2004, p.m.   201a

Relevant portion of trial transcript of October 11, 2004   204a

VOLUME II

Media reports and news articles                     211a

PROOF OF SERVICE

## TABLE OF CITATIONS

Cases                                                                    Pages

*Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859 (2000)................................37

*Commonwealth v. Hickman*, 319 Pa. Super 261, 466 A.2d 148 (Pa. Super 1983)......15,16

*Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086 (1998).......................37

*Commonwealth v. La*, 433 Pa.Super 432, 640 A.2d 1336, 1351 (1994)....................45

*Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203 (1997)...........................36

*Commonwealth v. McCloskey*, 835 A.2d 801 (Pa.Super 2003)..............................44

*Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995)...............................36

*Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa.Super 2003).......................11, 44

*Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958 (2001)...............................37

*Adams v. Pennsylvania Board of Probation and Parole*, 885 A.2d 1121 (2005)...........33

*Berger v. United States*, 295 U.S. 78, 88," at 651.......................................13,14

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974............................................13

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 570 (1979).............29

*Griffin v. Kirsch*, 886 A.2d 249, 2005 Pa.Super 361 (2005)................................33

*State v. Biegenwald*, 126 N.J. 1, 594 A.2d 172 (1991).......................................55

*State v. Moore*, 113 N.J. 239, 550 A.2d 117 (1988)..........................................55

*State v. Pinnell*, 311 Ore. 98, 121, 806 P.2d 110, 116 (1991)................................55

*United States v. Meyers*, 550 F.2d 1036, 1044 (5th Cir. 1997)...............................56


Statutes                                                                Pages

42 Pa.C.S. §4521(a), §4521(d), §4524.............................................8-10, 27-35

## STATEMENT OF JURISDICTION

This Appeal is taken pursuant to the Judicial Code of 1976, July 9, P.L. 586, No. 142, Section 2, 42 Pa.C.S.A. §742 as amended in that this is an appeal from a final order issued from the Court of Common Pleas of Clinton County, Pennsylvania.

## SCOPE OF REVIEW/STANDARD OF REVIEW

Appellant Smart argues that the trial court erred in denying his motions for change of venue, his motion to declare Clinton County's jury pool unconstitutional and his motion to empanel a jury which was neither life nor death qualified to hear and decide the first phase of the trial. Appellant Smart also argues that he is entitled to a new trial due to the pervasive and accumulated acts of prosecutorial misconduct. Lastly, Appellant Smart argues that the verdict was against the weight of the evidence.

All of these issues are to be reviewed by an abuse of discretion standard. An abuse of discretion occurs when the course pursued by the trial court represents not merely an error of judgment, but a judgment that is manifestly unreasonable, for example, when the law is not applied, or when the record shows that the action is a result of partiality, prejudice, bias, or ill will.

## STATEMENT OF QUESTIONS INVOLVED

I.  DID THE INSTANCES OF PROSECUTION MISCONDUCT WHEN
    TAKEN TOGETHER SO TAINT THE FAIRNESS OF THE TRIAL THAT
    APPELLANT SHOULD BE GRANTED A NEW TRIAL IN THE
    INTEREST OF JUSTICE?

    --Answered in the affirmative

II. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION
    TO DECLARE CLINTON COUNTY'S JURY POOL IN VIOLATION OF
    42 PA.C.S.A. §4521(a), 4521(d), 4524 AND THE SIXTH AMENDMENT
    TO THE UNITED STATES CONSTITUTION?

    --Answered in the affirmative

III. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION
     FOR CHANGE OF VENUE OR VENIRE?

    --Answered in the affirmative

IV. WAS THE VERDICT AGAINST THE WEIGHT OF THE EVIDENCE?

    --Answered in the affirmative

V.  DID TRYING THE APPELLANT BEFORE A DEATH QUALIFIED JURY
    DURING THE MERITS PHASE OF THE TRIAL DEPRIVE THE
    APPELLANT OF A TRIAL BEFORE A CROSS-SECTION OF THE
    COMMUNITY?

    --Answered in the affirmative

## STATEMENT OF THE CASE

Appellant Fabian Smart was charged with First Degree Murder, Kidnapping and Conspiracy. Said charges arise out of an allegation that on January 22, 1999, Fabian Smart and his co-conspirators beat Jason McMann unconscious, placed him in the trunk of Fabian Smart's car and drove him to a rural area of Clinton County, where his body was discovered approximately three months later on April 8, 1999.

Because the Commonwealth sought the death penalty, attorneys Ronald Travis and Eric Linhardt were appointed by the court to represent Fabian Smart at his trial and in this appeal. In the course of preparing for trial, Appellant's counsel filed numerous pretrial motions, nearly all of which, except for a motion to suppress evidence, were denied without hearing.

Ultimately, trial commenced with jury selection on September 13, 2004. After several weeks of jury selection and trial, the Appellant was ultimately found guilty of all charges. However, the jury deadlocked on the question of death, and consequently, on October 21, 2004, the court sentenced Appellant Smart on the charge of Murder in the First Degree to life in prison. Subsequently, on January 24, 2005, Appellant Smart was sentenced on the remaining counts of Conspiracy to Commit Kidnapping, Kidnapping and Conspiracy to Commit Murder. On November 1, 2004, Appellant filed a Post-sentence Motion. The court, on Motion of the Appellant, granted itself a thirty (30) day extension of time to rule on Appellant's Post-sentence Motions. By Order dated March 15, 2004, Appellant's Post-sentence motions were denied. No opinion was filed in support of this Order.

Appellant filed a Notice of Appeal to this Court on April 7, 2005. Appellant's brief was due to be filed on or before August 31, 2005. However, Counsel had requested, but at that point not received, the complete transcripts from Appellant's trial, including the mitigation portion of the trial. These transcripts would include the notes of testimony of October 11, 2004 through the pronouncement of sentence by the Honorable Richard Saxton. Because counsel required complete transcripts to file a meaningful 1925(B) Statement of Matters Complained of on Appeal, by Order dated April 21, 2005, the Honorable Richard Saxton granted counsel an extension of time to file the Statement of Matters Complained of on Appeal until fourteen (14) days after the filing of all transcripts. As a result, Defense Counsel requested and received an extension of time to file his brief with this Court. Appellant's brief was now due to be filed no later than September 30, 2005. However, as this briefing deadline approached, counsel continued to await the preparation of trial transcripts and, consequently, had not filed a Statement of Matters Complained of on Appeal and the court had not issued a 1925(A) Opinion.

A second extension of time was requested and granted. Appellant's brief is now due no later than December 21, 2005. Unfortunately, counsel continues to await the preparation of trial transcripts. However, so as not to delay Appellant Smart's appeal any further, Appellant's counsel has filed contemporaneous with this brief, his Statement of Matters Complained of on Appeal, as well as a Motion with the lower court requesting that the court compel the immediate production of trial transcripts. For these reasons, however, Appellant's brief is being filed without the benefit of a 1925(A) Opinion.

## SUMMARY OF ARGUMENT

First, the pervasive misconduct engaged in by the prosecution denied Smart due process of law under both the federal and state constitutions. Further, the accumulated taint occasioned by each individual act of prosecution misconduct served to deprive Smart of his constitutional entitlement to a fair trial under both the federal and state constitutions. No fair-minded person can review the transcript in this case and avoid the conclusion that the chance for Fabian Smart to have the question of his innocence or guilt fairly deliberated by the jury was significantly negatively impacted by the repeated, unrelenting misconduct engaged in by counsel for the Commonwealth. The inescapable conclusion is that counsel for the Commonwealth tried the case in a manner demonstrating an attitude of the end justifying the means, and win at all costs. This approach is totally inconsistent with the appropriate approach for a prosecutor to take in a criminal case, and in violation of Smart's federal and state constitutional rights.

As a review of the trial transcript clearly shows, day after day, witness after witness, the attorney for the Commonwealth engaged in improper questioning of witnesses suggesting the existence of certain "facts," when there was no record to support the unwarranted assertions. When challenged by objection, the attorney for the Commonwealth did not attempt to offer a legitimate legal basis which would permit the question to be asked, and did not offer a "good faith basis" for asking the objected to questions. The continual practice of the attorney for the Commonwealth was to announce the question was being "withdrawn" as the objection was being sustained. This pervasive practice of making unprovable factual assertions in front of the jury would leave behind the misleading, unprovable and willfully false innuendo for the jury to grasp. It is only

when one reviews the trial transcript and observes the continued conduct of the attorney for the Commonwealth that one is able to grasp the significant, egregious misconduct on the part of the attorney for the Commonwealth.

Second, Appellant contends that Clinton County's jury pool was in violation of 42 Pa.C.S. §4521(a), §4521(d), §4524 and the Sixth Amendment to the United States Constitution. Title 42 Pa.C.S. §4521(a) is the statutory section governing the selection of jury pools in Pennsylvania state courts. Section 4521(a) states that, in preparing a master list of prospective jurors, "the list shall contain all voter registration lists of the County, which list may be incorporated by reference, or names from such other lists which in the opinion of the Commission will provide a number of prospective jurors which is equal to or greater than the number of names contained in the voter registration list."

On or about November 6, 2003, Appellant Smart filed a Motion to Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution. At that time, Clinton County selected its pool of potential jurors from the occupational tax rolls only. These names then comprised the pool from which one hundred and thirty-two (132) names were pulled every two months for jury selection. The names are put into a wheel and were drawn from the wheel.

In 2003, the number of prospective jurors in Clinton County's occupational tax roll was not greater than the number of names contained in the voter registration list and Clinton County's jury pool was, therefore, in violation of Title 42 Pa.C.S. §4521(a). Specifically, the voter registration rolls in Clinton County at that time listed 21,750 individuals. The occupational tax rolls of Clinton County, as of October 8, 2003, listed 20,998.

8

Limiting the selection of potential jurors to the names contained on the occupation tax rolls also violated Appellant Smart's Sixth Amendment right to an impartial jury trial because it left him with a jury panel that did not represent a fair cross-section of the community at large.

On November 24, 2003, the trial court issued an Order granting Appellant Smart's Motion, and declared Clinton County's Jury Pool in violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment to the United States Constitution. That Order stated, inter alia, "The Jury Commissioners are revising the jury pool to include voter registration lists as well as any other lists deemed appropriate in accordance with §4521".

Consistent with that Order, Appellant Smart believed that the Jury Commission would revise the jury pool, discard the jury pool found by the trial court to be in violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment to the United States Constitution, and select a new jury pool for 2004, using voter registration lists and other lists in accordance with section 4521, and the United States Constitution. However, this did not occur. Consequently, therefore, Appellant Smart filed on August 27, 2004, a Second Motion to Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution. On September 7, 2004, without hearing, Appellant Smart's Second Motion was summarily denied in a Court Order containing only three words: "Motion Frivolous. Denied."

Appellant Smart filed a Motion for Reconsideration from the trial court's September 7, 2004 Order. Appellant Smart's Motion for Reconsideration was also denied without hearing. Appellant Smart avers that his Second Motion to Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United

9

States Constitution clearly set forth sufficient facts to establish that the September 2004 jury pool from which Appellant Smart's jurors were selected continued to be in violation of §4521(a), §4521(d), §4524 and the Sixth Amendment to the United States Constitution. At the very least, Appellant Smart contends that he was entitled to an evidentiary hearing to establish a record and to prove the facts as set forth in his Motion, which, if accepted by the trial court, would have entitled him to relief.

Third, Appellant Smart contends the trial court erred in denying his Motion for Change of Venue or Venire. Due to the centralized location and rural nature of Clinton County, local media coverage and dissemination comes from a variety of media sources. However, a primary source of local news to the community is the Lock Haven Express newspaper which Appellant Smart believes has a circulation in excess of ten thousand (10,000) customers. According to the U.S. Bureau of Census, Clinton County has only 14,773 households and a total population over the age of 18 of just 29,610 persons.

From the time of Mr. McMann's reported disappearance until the arrest of Appellant Smart, and continuing through the time of the filing of Appellant's Motion For Change of Venue, no less than thirty five newspaper articles had appeared in the Lock Haven Express alone. *America's Most Wanted* television program aired three (3) stories regarding the McMann investigation and the arrest of Appellant Smart. The Williamsport Sun Gazette, with circulation in Clinton County, as well as radio and television broadcasts had also saturated the County with stories about McMann's disappearance and Appellant Smart's arrest. Furthermore, during this period of time, the family of Jason McMann had pasted placards throughout the community, offered

10

rewards, held vigils of support, enlisted local friends, prodded police, and encouraged media outlets to print stories.

Appellant Smart avers that a change of venue or venire became necessary because a fair and impartial jury could not be selected in Clinton County. During jury selection, it became clear that very few of the prospective jurors had not read or had not heard news reports and had not formed an opinion regarding the guilt or innocence or Fabian Smart.

The media coverage had been sensational and inflammatory, and slanted toward conviction. It had referred to alleged confessions, admissions and reenactments of the crime by the accused. Its sources had derived from police and prosecuting officer reports. Furthermore, the publicity had been so extensive, sustained and pervasive that the small community of Clinton County must be deemed to have been saturated with it. Because the extensive media coverage continued through the time of jury selection, there had not been sufficient time for this prejudice to have dissipated.

Fourth, Appellant contends the verdict was against the weight of the evidence. "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." _Commonwealth v. Sullivan_, 820 A.2d 795, 806 (Pa.Super 2003). In the instant matter, after five years of investigation, nearly five hundred (500) interviews, weeks of trial, numerous witnesses, and close to ninety (90) exhibits, ultimately, the Commonwealth's case came down to the testimony of four witnesses; Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. However, the testimony of these four individuals, and the Commonwealth's theory of the case could not be reconciled with the overwhelming evidence and testimony from lay and expert

11

witnesses. Consequently, no reasonable jury could have accepted the testimony of these four Commonwealth witnesses and concluded that Fabian Smart was guilty beyond a reasonable doubt.

Lastly, Appellant Smart requested that the court empanel a jury, which was neither life nor death qualified, to hear and decide the first phase of the trial. This request was denied. Various studies have established that death qualified jurors are biased in favor of conviction. As a result, the exclusion of potential jurors, based on death penalty attitudes, served to deprive Fabian Smart of his state and federal constitutional right to be tried by jurors drawn from a fair cross-section of the Clinton County community. In holding that the same jury would hear the merits phase and also the penalty phase, if a first-degree conviction was returned, the court effectively eliminated from jury service Clinton County citizens whose death penalty views would disqualify them from participating in the penalty phase of a capital trial. As was the case with virtually all of the pre-trial motions which were filed, the court summarily denied the motion without an evidentiary hearing, and thus prevented the defense from creating a record concerning the fact that death qualified jurors are biased in favor of conviction.

## ARGUMENT

I.   DID THE INSTANCES OF PROSECUTION MISCONDUCT WHEN
     TAKEN TOGETHER SO TAINT THE FAIRNESS OF THE TRIAL THAT
     APPELLANT SHOULD BE GRANTED A NEW TRIAL IN THE
     INTEREST OF JUSTICE?

The pervasive misconduct engaged in by the prosecution denied Smart due

process of law under both the federal and state constitutions. Further, the accumulated

taint occasioned by each individual act of prosecution misconduct served to deprive

Smart of his constitutional entitlement to a fair trial under both the federal and state

constitutions. No fair-minded person can review the transcript in this case and avoid the

conclusion that the chance for Fabian Smart to have the question of his innocence or guilt

fairly deliberated by the jury was significantly negatively impacted by the repeated,

unrelenting misconduct engaged in by counsel for the Commonwealth. The inescapable

conclusion is that counsel for the Commonwealth tried the case in a manner

demonstrating an attitude of the end justifying the means, and win at all costs. This

approach is totally inconsistent with the appropriate approach for a prosecutor to take in a

criminal case, and in violation of Smart's federal and state constitutional rights.

The correct approach to the role of the prosecutor was eloquently defined by

Justice Douglas in his dissenting opinion in *Donnelly v. DeChristoforo*, 416 U.S. 637

(1974), wherein he stated, "Prosecutors are often eager to take almost any shortcut to win,

yet as I have said they represent not an ordinary party but We the People. As I have

noted, their duty is as much 'to refrain from improper methods calculated to produce a

wrongful conviction as it is to use every legitimate means to bring about a just one,'

*Berger v. United States*, 295 U.S. 78, 88," at 651. The Douglas dissent is totally

consistent with the unanimous decision of the United States Supreme Court in _Berger v._ _United States_, 295 U.S. 78 (1935). Speaking with a unanimous voice, the court shouted, "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." at 88. The unanimous court went on to condemn the repetitive misconduct, stating: "Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded." at 89. Although the language from the Supreme Court was directed towards misconduct engaged in by federal prosecutors, it certainly has equal application to state prosecutors. When this court considers the totality of the repeated foul blows struck by the Commonwealth, day after day, witness after witness, unrelenting and undeterred even when chastised by the court, the Commonwealth has earned "disqualification." The cumulative impact of the acts of misconduct clearly scuttled Smart's chances for a fair deliberation on the issue of innocence or guilt, thus depriving him of his due process rights and fair trial entitlement

14

as recognized under both the United States and Commonwealth of Pennsylvania Constitutions.

In *Commonwealth v. Hickman*, 319 Pa. Super 261, 466 A.2d 148 (Pa. Super 1983), this court also drew the line over which prosecutors cross, at their own peril. The drawn line establishes that the cumulative effect of improper behavior by the District Attorney can obviate the preeminent purpose of the trial – the determination of the innocence or guilt of the accused. The conduct of the District Attorney while questioning witnesses and during closing argument in Hickman was found by this court to be so prejudicial to the truth seeking process that the cumulative effect was that a fair trial was impossible. This court vacated the verdict, and ordered a new trial for Hickman. In comparing the complained of conduct in Hickman with the complained of conduct in the instant case, the inescapable conclusion is that the misconduct of the District Attorney in the instant case was significantly more egregious than the conduct found to warrant the granting of a new trial for Hickman.

As a review of the trial transcript in the instant case clearly shows, day after day, witness after witness, the attorney for the Commonwealth engaged in improper questioning of witnesses suggesting the existence of certain "facts," when there was no record to support the unwarranted assertions. When challenged by objection, the attorney for the Commonwealth did not attempt to offer a legitimate legal basis which would permit the question to be asked, and did not offer a "good faith basis" for asking the objected to questions. The continual practice of the attorney for the Commonwealth was to announce the question was being "withdrawn" as the objection was being sustained. This pervasive practice of making unprovable factual assertions in front of the jury would

15

leave behind the misleading, unprovable and willfully false inuendo for the jury to grasp. It is only when one reviews the trial transcript and observes the continued conduct of the attorney for the Commonwealth that one is able to grasp the significant, egregious misconduct on the part of the attorney for the Commonwealth. In concluding in <u>Hickman</u> that that District Attorney's conduct warranted a new trial, this court noted, "We conclude that the cumulative effect of the District Attorney's remarks so prejuced the Appellant that a fair trial was impossible. The status of the District Attorney as an officer of the court places him in a position of trust with the responsibility to fairly and objectively prosecute criminals. It is in this light that he or she is seen by the jury, and, as such, his or her remarks are given great weight by the members of the jury in reaching their determination." <u>Id</u>. at 268, 152. Just as the repeated foul blows struck in <u>Hickman</u> resulted in the awarding of a new trial, so to do the blatant and unrestrained misconduct engaged in by the attorney for the Commonwealth in the instant case support the granting to Smart of a new trial.

The litany of the instances of misconduct engaged in by the prosecutor during the merits phase of the trial are as follows:

1.     On the first day of trial during cross-examination of one of the first police witnesses the facts were developed that crime scene tape was placed in various areas near where the body was found in order to allow these areas to be checked for the possible existence of tire tracks. Defense counsel established that no tire tracks matching the vehicle owned by the Defendant were lifted from any of these areas. On redirect examination, counsel for the Commonwealth asked a leading question asserting the fact that because of the passage of time from January 23rd until April it would not be expected

that any tire tracks would remain. (R.R. 173a) The question was immediately objected to on the basis that it was a leading question, and further that it assumed facts not in evidence. The court sustained the objection and counsel for the Commonwealth stated he was withdrawing the question. (R.R. 173a-174a) Counsel for the Commonwealth did not offer to the court any argument as to why the question was proper, and did not question on the subject matter in a correct manner. Since it was redirect examination counsel for the Commonwealth was well aware that the use of leading questions was improper, but nonetheless framed the question in a leading manner in order to plant with the jury the concept that the lack of any tire tracks tied to Smart's vehicle was explainable by the passage of time.

    2.    During the examination of Commonwealth witness Allen in trying to develop why witness Allen initially told the police he knew nothing about the death of the victim, but now was claiming that Smart told him in January that he had killed the victim and how he killed the victim, the Commonwealth attorney asked the leading question, "Would not getting killed, that would be in your best interest, too, wouldn't it?" (R.R. 176a) The question was objected to, the objection sustained, and the Commonwealth attorney indicated he was withdrawing the question. Since the question was asked of a Commonwealth witness by the Commonwealth attorney, clearly it was known that the use of the leading question was improper. Nonetheless, counsel for the Commonwealth went forward and asked the question in order to put in front of the jury the suggestion that witness Allen was fearful of Defendant Smart and that witness Allen's life possibly would have been taken by Smart had Allen disclosed his knowledge of what Smart allegedly told him.

3.      On September 30, 2004 the Commonwealth called Sgt. Shoemaker as a Commonwealth witness. The Commonwealth intended to attempt to put in through Sgt. Shoemaker the content of a statement given by a female individual claiming that Jamie Allen had told her that Fabian Smart had told Mr. Allen that Fabian Smart killed the victim. Counsel for the defense objected to Sgt. Shoemaker being allowed to testify concerning the content of the statement taken from the female. (R.R.177a-182a) The court sustained the objection and specifically ruled that Sgt. Shoemaker was limited to testifying to the fact that he took a statement from the female individual on a certain date. As part of the ruling the court specifically instructed counsel for the Commonwealth not to elicit from Sgt. Shoemaker the content of the statement. (R.R. 177a-182a) When counsel for the Commonwealth resumed questioning he elicited the information he was permitted to elicit, and then posed the following question, "And had you been advised at some point during the course of the investigation that Jamie Allen had told Nicole Killinger what Fabian Smart said about the murder of Jason McMann?" (R.R. 181a) The question was objected to and the objection was sustained. After sustaining the objection the court called counsel to sidebar and admonished counsel for the government about having specifically disobeyed the court's ruling entered less than five minutes earlier. Counsel for the Commonwealth could not have had a good faith basis for asking the question given the court's ruling made immediately prior to the question having been asked.

4.      On redirect examination of one of the prosecuting officers, Trooper Rausher, the first question asked was, "Gee, I thought you did a pretty good

investigation?" (R.R. 187a-188a) The question was objected to, the objection sustained, and even Commonwealth counsel was moved to offer an apology for asking the question.

5.    During the redirect examination of the forensic pathologist, Dr. Ross, Commonwealth counsel asked a leading question containing the factual assertion that Dr. Land had only been a forensic pathologist for a year at the time he did the initial autopsy on the victim. (R.R. 190a) The question was objected to and the court instructed the jury to ignore the suggested factual assertion contained in the question put by Commonwealth counsel. Not content to leave well enough alone, after the judge gave the jury the instruction to ignore the suggested factual assertion, counsel for the Commonwealth stated on the record, in front of the jury, "I'll support that with testimony later, Your Honor." (R.R. 190a) The fact of the matter is the Commonwealth did not support the factual assertion with later testimony, for in fact the factual assertion was totally false. The conclusion arrived at by Dr. Land when he did the initial autopsy was that the victim had died of a drug overdose. The obvious intention of Commonwealth counsel in making the totally false factual assertion, by way of leading question, that Dr. Land had only been a forensic pathologist for one year when he did the initial autopsy was to suggest to the jury that obviously Dr. Land could not have been right in his conclusion given his limited experience. Not only was the question put in improper form, as it was leading, it also included the totally inaccurate factual assertion concerning Dr. Land's experience.

6.    In cross-examining defense witness Duck, commonwealth counsel, without a good faith basis, suggested that the tire tracks which were seen in the snow on Lily Pond Road were there because "somebody got lost." (R.R. 192a-193a) This is but

19

another example of counsel for the Commonwealth making factual assertions by way of leading question where he had no good faith basis to support the facts being asserted.

7.      During the same cross examination counsel for the Commonwealth stated the following, "And there would probably be enough snow – well, in your hunting experience, somebody is laying down flat down there at the bottom and snow covering that body, you couldn't even see it." (R.R. 193a)  An objection was made and the Commonwealth immediately said the question was withdrawn.  Commonwealth counsel did not attempt to support the propriety of having asked such a question as he well realized that he had succeeded in making this factual assertion in front of the jury, which was the whole purpose for asking the question.

8.      During the cross-examination of defense witness Kristin Hull, a teenage girl who had been at a party with the victim on some date in January other than January 22, counsel for the Commonwealth asked the following question, "If you spoke with a private investigator would that help you?" (R.R. 194a)  An objection to the question was made, the objection was sustained, and the trial judge admonished counsel for the Commonwealth to not question a witness in that manner.

9.      During the cross-examination of Coroner Walker counsel for the Commonwealth asked the following question, "And in part, you would agree that was because he was just completing or had completed a kind of complex baby murder investigation in which Dr. Ross had been the medical examiner?"  This question was immediately objected to, and the objection was sustained, which prompted counsel for the Commonwealth to announce that he was withdrawing the question.

10.     While cross-examining a defense expert entomologist the attorney for the Commonwealth asked a series of questions concerning whether the witness had asked for and reviewed statements of Commonwealth witnesses. (R.R. 196a-198a) These questions were objected to on the basis of relevancy, and counsel for the Commonwealth asserted that although he believed the information to be relevant he would move into another topic area. The topic area he moved to was to ask, "Did you ever ask the Defendant anything about this?" (R.R. 198a) The defense objected to the question and moved for mistrial. The mistrial motion was denied, but the objection was sustained, and counsel was directed by the court to move on to another area of questioning.

11.     As a further part of the cross-examination of the forensic entomologist, counsel for the Commonwealth asked about membership in professional organizations and then asked: "Have there ever been efforts to remove you from any of those?" (R.R. 199a-200a) The question was answered no by the witness, and at no future date did the Commonwealth put into the record any evidence to establish that Commonwealth counsel had a "good faith basis" for asking this "smear" question.

12.     When expert witness Siek, who was not a forensic pathologist, was being cross-examined, counsel for the Commonwealth asked the following question: "Are you in any position to argue with the conclusion of Dr. Ross that the cause of death was the result of blunt trauma?" (R.R. 202a) This question was objected to and the objection was sustained. It should be noted that witness Siek had not been called to testify concerning cause of death, and had not been asked any questions about cause of death as part of the direct examination. The fact that the question was put on a subject matter Siek did not testify about did not deter the Commonwealth's attorney from asking the

question. No evidence was presented to establish there was a good faith basis for the question.

13. In cross-examining defense witness Weber, counsel for the Commonwealth asked witness Weber: "Which of your friends dated him [Smart]?" (R.R. 203a) Witness Weber was a female Caucasian college student at the time of the disappearance and death of the victim, and certainly the Commonwealth had no good faith basis for attempting to create the impression that Weber was committing perjury to assist Smart because of some romantic relationship between one of her friends and Smart. Commonwealth counsel did not ask if any of her friends had ever dated Smart, he asserted as a fact that one of her friends had in fact dated Smart and he was asking her to identify which friend had dated Smart.

14. During cross-examination of defense witness Rini, counsel for the Commonwealth injected into one of his questions that he personally had been a lead investigator in one hundred homicide cases. (R.R. 205a) The injection of this "fact" into the trial could have only been an effort by Commonwealth counsel to elevate his status in the eyes of the jury and to improperly cause the jury to believe that if he had that much investigative knowledge and experience that for sure the Commonwealth had arrested the right person.

15. In further cross-examination of witness Rini, Commonwealth counsel asserted that a laboratory report from the Pennsylvania State Police Crime Lab concluded that soil samples taken from the trunk of Smart's automobile were "identical" with soil samples from the area where the victim's body was found. (R.R. 206a) This allegation of "identical" was an utterly false factual assertion made by Commonwealth counsel.

16.     During the cross-examination of witness Cicconi counsel for the

Commonwealth asserted that her recollection of when she had last seen Jason McMann

alive was inaccurate because of the "emotional impact" on her of Jason's loss at the time

she talked to the police. (R.R. 207a)  Witness Cicconi was a former girlfriend of Jason

McMann's who testified that she saw him alive and well in the business establishment

where she worked on Ground Hog's Day, some two weeks after the Commonwealth

theorized that he had been murdered by Fabian Smart.  Witness Cicconi had talked to the

police in February and the body of Jason McMann was not discovered until April and

therefore as of the time of her initial interview there was no "loss" which would have

upset her emotionally.  Thus, clearly Commonwealth counsel lacked a good faith basis

for making this factual assertion.  Immediately following the question about loss having

elicited an objection which was sustained, counsel for the Commonwealth next asked:

"And at the time you reported to the police about seeing Jason just a few days before that,

that you were still under the emotional impact of learning of his death; isn't that true? Or

did you get over it that quick?" (R.R. 207a)  It bears repeating that the initial contact

between witness Cicconi and the police occurred in February and the body of Jason

McMann was not discovered for another two months, nonetheless counsel for the

Commonwealth falsely asserted in his question that she was still under the emotional

impact of learning of his death.  The question was objected to and the objection

sustained; the court also observing how unfair the question was.  The egregious nature of

this second question falsely asserting that when initially interviewed witness Cicconi was

under the emotional impact of knowing Jason McMann was dead is compounded by the

fact that the question immediately before this question had elicited an objection which

was sustained. Since the initial interview with the police was months prior to the discovery of the body, counsel for the Commonwealth could not have had a good faith basis for suggesting for the jury's benefit that her observations of McMann on February 2 were inaccurate because of her emotional state.

17.     Not being satisfied with being chastised by the court for the improperly asked questions, counsel for the Commonwealth continued his efforts to undermine the credibility of witness Cicconi by asserting as a fact in his question that she had heard rumors about him being dead at the time she spoke to the police. (R.R. 208a)

18.     Apparently, unsure whether his cheap shots and low blows had sufficiently damaged the credibility of witness Cicconi, the attorney for the Commonwealth displayed to the witness the photograph of a black t-shirt which the victim's parents had picked up from the apartment where he was squatting, and without a good faith basis for doing so, suggested in questions to witness Cicconi that the black t-shirt in the photograph was in fact the black t-shirt she described McMann as wearing when she saw him on February 2nd. (R.R. 209a)

19.     At his parting shot at witness Cicconi, counsel for the Commonwealth factually asserted in a question that she had left her employment "because of stress and disorders" connected with her pregnancy. (R.R. 210a) The attorney for the Commonwealth had no good faith basis for asking the question, and certainly produced no evidence during the course of the trial to support the suggestion he made in the question.

20.     In addition to the misconduct by the attorney for the Commonwealth insofar as his questioning of witnesses the prosecution engaged in additional misconduct

24

in failing to follow orders entered by the court during the trial itself to produce certain withheld discovery items. Specifically, the Commonwealth was ordered to produce, and failed to produce, the following:

    a. Through witness Rodriguez the government produced a photograph which was allegedly taken on the evening of January 22 at a party which preceded the party at the football house. This photo was one of a series of photos on a roll of film, and witness Rodriguez, who took the photograph, testified that she gave to the police all of the negatives. The defense asked for access to the negatives, and counsel for the Commonwealth was directed to turn those negatives over to the defense. (R.R. 184a-185a) The January 22 date as the date when the photograph was taken was in dispute, and Ms. Rodriguez testified that possibly the production of the negatives would have shown some photograph which would have helped to establish when in point of time the photograph in question was taken. For example, if the negatives showed photos of a Christmas tree which was taken subsequent to the date on which the photograph in question was taken, this obviously would establish that the photograph was taken sometime in December as opposed to sometime in January. Notwithstanding the court's direct order that the negatives be produced for the defense, the Commonwealth failed to do so.

    b. During his direct examination Dr. Ross testified that he was the only one involved in conducting the autopsy of the victim insofar as his

office was concerned. When the Coroner was called as a defense
witness the Coroner identified a bill submitted by Dr. Ross which
showed time charges on it for individuals in addition to Dr. Ross. The
defense requested, and the court ordered, that the Commonwealth
produce any bench notes or other writings made by Dr. Ross or any of
the other identified individuals with respect to conducting the autopsy
of the victim. No documents were produced by the Commonwealth.

c. Dr. Ross testified that although his initial bill was submitted to the
Coroner, his bill for work done on the case after the initial bill was
submitted would have been submitted to the Office of the District
Attorney, and he just did not recall how much he had been paid for his
additional work. The defense requested and the court ordered that the
District Attorney turn over to defense counsel copies of subsequent
bills from Dr. Ross, and this was not done.

21. In addition to the misconduct engaged in with respect to the questioning of
witnesses, and the failure to produce documents as directed by the court, the District
Attorney also offered inflammatory and prejudicial closing argument during the merits
phase of the trial. Counsel for Appellant objected to the inflammatory and prejudicial
closing comments, and moved for a mistrial. The judge denied the motion for mistrial,
but indicated the court was bothered by the content of the closing offered by the District
Attorney, and was going to give further thought to how best to deal with the improper
comments made during the Commonwealth's closing. Unfortunately, the court reporter
has yet to provide to counsel a copy of the transcript of the closing argument as made by

26

the Commonwealth. Because of the failure of the court reporter to provide a transcript, counsel is unable to specifically identify the improper arguments which were made. Smart relies on the record of the sidebar discussion of the objection, which the court will hopefully have when considering this appeal.

Although it may be true that none of the individually identified acts of misconduct, standing alone, would warrant the granting of a new trial, it is abundantly clear that the accumulated taint occasioned by each of these individual acts serve to deprive Smart of a fair trial in violation of both the state and federal constitutions.

II.   DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION TO DECLARE CLINTON COUNTY'S JURY POOL IN VIOLATION OF 42 PA.C.S.A. §4521(a), 4521(d), 4524 AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

Title 42 Pa.C.S. §4521(a) is the statutory section governing the selection of jury pools in Pennsylvania state courts. Section 4521(a) states that, in preparing a master list of prospective jurors, "the list shall contain all voter registration lists of the County, which list may be incorporated by reference, or names from such other lists which in the opinion of the Commission will provide a number of prospective jurors which is equal to or greater than the number of names contained in the voter registration list."

On or about November 6, 2003, Appellant Smart filed a Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution. At that time, Clinton County selected its pool of potential jurors from the occupational tax rolls only. These names then comprised the pool from which one hundred and thirty-two (132) names were pulled every two months for jury selection. The names are put into a wheel and were drawn from the wheel.

27

In 2003, the number of prospective jurors in Clinton County's occupational tax roll was not greater than the number of names contained in the voter registration list and Clinton County's jury pool was, therefore, in violation of Title 42 Pa.C.S. §4521(a). Specifically, the voter registration rolls in Clinton County at that time listed 21,750 individuals. The occupational tax rolls of Clinton County, as of October 8, 2003, listed 20,998.

Appellant Smart further averred in his motion that limiting the selection of potential jurors to the names contained on the occupation tax rolls violated Appellant Smart's Sixth Amendment right to an impartial jury trial because it left him with a jury panel that did not represent a fair cross-section of the community at large. Specifically, Appellant Smart contended that Clinton County's method for drawing its jury pool solely from the occupational tax roll systematically excluded from jury service those individuals who were unemployed, poor, elderly or handicapped. Appellant Smart further contended that by using occupational tax rolls, the County excluded minorities in greater numbers than it excluded other citizens.

In order to make out a prima facia case that a county's jury pool selection process violates the Sixth Amendment of the United States' fair cross-section requirement for jury pool selection, a defendant must show that (1) the group allegedly excluded is a distinctive group in the community; (2) representation of this group in the pool from which jurors are selected is unfair and unreasonable in relation to the number of such persons in the community; and (3) the under-representation is due to the systematic exclusion of the group in the jury selection process. _Duren v. Missouri_, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 570 (1979). Appellant Smart averred that the poor, the

handicapped, the elderly and minorities, are a distinctive group in the community; their representation in the pool from which jurors are selected was unfair and unreasonable; and the under-representation was due to the systematic exclusion of the group in the jury selection process because the jury pool was selected solely from the occupational tax rolls.

Because the occupational tax roll was limited to those individuals who are employed, it excluded all individuals in the community who were unemployed but otherwise eligible to serve as jurors. Among the unemployed, in disproportionate numbers, are the elderly, the poor, handicapped and minorities.

In reviewing Title 42 Pa.C.S. §4521(a), the master list may include people from the following:

    A. Persons listed in telephone, city, municipal directories and similar directories.

    B. Persons who pay taxes or are assessed for taxes imposed by any political subdivisions.

    C. Persons in the County participating in any State, County or Local program authorized by law and, to the extent such names are available, persons participating in any federal program authorized by law.

    D. Persons who are on school census lists.

    E. Any other person whose name does not appear on a master list of prospective jurors and who meets the qualifications for jurors set

29

forth in this chapter and who makes application to the commission

to be listed on the master list of prospective jurors.

In 2003, Clinton County did not supplement its master list with any of the aforementioned category of persons. For all of the above stated reasons, Appellant Smart contended that the manner in which Clinton County selected its prospective jury pool violated the statutory requirements of Title 42 §4521 and Defendant's Sixth Amendment right to an impartial jury representing a fair cross-section of the community at large.

On November 24, 2003, the trial court issued an Order granting Appellant Smart's Motion, and declaring Clinton County's Jury Pool in violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment to the United States Constitution. That Order stated, inter alia, "The Jury Commissioners are revising the jury pool to include voter registration lists as well as any other lists deemed appropriate in accordance with §4521". (R.R. 062a).

Consistent with that Order, Appellant Smart believed that the Jury Commission would revise the jury pool, discard the jury pool found by the trial court to be in violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment to the United States Constitution, and select a new jury pool for 2004, using voter registration lists and other lists in accordance with section 4521, and the United States Constitution. However, this apparently did not occur. Consequently, therefore, Appellant Smart filed on August 27, 2004, a Second Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution.

In this Second Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution, Appellantt Smart avered as follows:

30

"A.      Prior to this Court's Order of November 24, 2003, the Jury

           Commission had already mailed and had returned to it, jury

           qualification forms for the year 2004.

B.      The names of the prospective jurors who had returned their jury

           qualification forms, and who by their answers were not

           disqualified from jury service, were placed in the jury wheel.

C.      In spite of this Court's Order finding this jury pool to be

           unconstitutional, and in violation of §4521, the jury wheel was not

           purged, nor did the Jury Commission attempt to supplement the

           jury pool with a second mailing of qualification forms, "to include

           voter registration lists as well as any other lists deemed appropriate

           in accordance with §4521." (Court Order of November 24, 2003).

D.      As a result, the list of jurors for Appellant Smart's September 13,

           2004 trial, have been selected from the jury wheel containing the

           names from the jury pool which this Court has ruled

           unconstitutional."

Because the Clinton County Jury Commission failed to revise the jury pool,

discard the jury pool found by the trial court to be in violation of §4521(a) and the Sixth

Amendment of the United States Constitution, and select a new jury pool for 2004 using

voter registration lists and other lists in accordance with §4521 and the United States

Constitution, the list of jurors for Appellant Smart's September 2004 trial was selected

from the jury pool which the trial court had already ruled unconstitutional.

Further, Appellant Smart argued in his Second Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution that, contrary to section 4521(d), the jury qualification forms used by Clinton County, did not appear to "plainly and conspicuously state thereon that its execution is subject to the penalty for perjury." Section 4521(d) states that the jury commission may mail to each person whose name has been selected, a jury qualification form. "The juror qualification form shall be executed by the prospective juror *and shall plainly and conspicuously state thereon that its execution is subject to the penalty for perjury.* " (emphasis added).

And, contrary to section 4524, the Jury Commission had failed to select the names for his jury array either "publicly" or "randomly". Section 4524 states that, "the jury selection commission shall maintain a master list or jury wheel and shall place therein the names of the persons included on the list of qualified jurors. Upon receipt of a court order pursuant to section 4531 (relating to issuance of court orders for jurors), the commission shall *publicly select at random from the master list or jury wheel* such number of names of persons as may be required to be summoned for assignment to jury arrays." (emphasis added). The names which appear on Defendant Smart's Jury List for September 13, 2004 include an alphabetical listing of 237 names beginning with letters "A" through "R". (R.R. 152a-171a). It is statistically unlikely that a jury array of 237 names could have been selected at random from a jury wheel, and exclude all last names beginning with the letters "S" through "Z". Further it is statistically unlikely that an array of only 237 names could have been selected at random and include four individuals with the last name "Allen"; three individuals with the last name "Eisenhower"; three

32

individuals with the last name, "Gallagher"; three individuals with the last name "Jacobs" (two of whom appear to be husband and wife); five individuals with the last name "Johnson"; and six individuals with the last name "Miller". Lastly, Defendant Smart argued that the Jury Commission failed to select its names from the jury wheel "publicly", as required by section 4524, but rather selected them privately in their office. For all of the above stated reasons, Defendant Smart contended that the manner in which Clinton County selected its prospective jury pool continued to violate the statutory requirements of Title 42 §4521 and §4524 and Defendant's Sixth Amendment right to an impartial jury representing a fair cross-section of the community at large.

On September 7, 2004, without hearing, Appellant Smart's Second Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution was summarily denied in a Court Order containing only three words: "Motion Frivolous. Denied." (R.R. 063a). A matter may be said to be frivolous when it has neither basis in law nor fact. See *Adams v. Pennsylvania Board of Probation and Parole*, 885 A.2d 1121 (2005), *Griffin v. Kirsch*, 886 A.2d 249, 2005 Pa.Super 361 (2005).

In the instant matter, Appellant Smart filed a Motion For Reconsideration from the trial court's September 7, 2004 Order. In his Motion For Reconsideration, Appellant Smart argued again that the list of jurors for Defendant Smart's September 13, 2004 trial, had been selected from the jury wheel containing the names from the jury pool which the trial court had ruled unconstitutional. Prior to the trial court's Order of November 24, 2003, the Jury Commission had already mailed and had returned to it, jury qualification forms for the year 2004. These jury qualification forms were postmarked on or about

September 2003. The names of the prospective jurors who had returned their jury qualification forms, and who by their answers were not disqualified from service, were placed in the wheel. It was this jury wheel, which contained the names of prospective jurors postmarked on or about September 2003 that this court declared unconstitutional. **The fact that Defendant Smart's jury list has been selected from this unconstitutional jury pool was evidenced by the fact that the jury qualification forms for many of the names from Defendant Smart's jury list were postmarked on or about September 2003.** (R.R. 064a-151a).

If Defendant Smart's jury list had been selected from the September 2003 jury wheel, which contained the names from the jury pool that the trial court had already declared unconstitutional, then not only was his motion not frivolous, it entitled him to relief. Furthermore, in addition to having been selected from the unconstitutional September 2003 jury pool, the jury qualification forms used by Clinton County did not appear to "plainly and conspicuously state thereon that its execution is subject to the penalty for perjury. 42 Pa.C.S.A. §4521(d). In fact, some of the jury qualification forms for Mr. Smart's jury, had not even been signed. (R.R. 064a-151a). The statutory requirement that the qualification form plainly and conspicuously state that its execution is subject to the penalty for perjury, is not a frivolous requirement. And, if in fact, the jury qualification forms used by Clinton County do not "plainly and conspicuously state thereon that its execution is subject to the penalty for perjury", then not only was Mr. Smart's motion not frivolous, he was entitled to relief.

Lastly, section 4524 requires that the Jury Commission, "publicly select at random from the master list or jury wheel such number of names of persons as may be

34

required to be summoned..." The names which appear on Defendant Smart's jury list included an alphabetical listing of 237 names beginning with letters "A" through "R". It is statistically unlikely that a jury array of 237 names could have been selected at random from a jury wheel, and exclude all last names beginning with the letters "S" through "Z". The statutory requirement that the Commission select the names for the jury array at random, is not a frivolous requirement. And, if in fact, the names for Mr. Smart's jury array had not been selected at random, not only was his motion not frivolous, he was for this reason as well, entitled to relief."

In spite of this, Appellant Smart's Motion For Reconsideration was also denied without hearing. Appellant Smart avers that his Second Motion To Declare Clinton County's Jury Pool in Violation of 42 Pa.C.S.A. §4521(a) and the Sixth Amendment of the United States Constitution clearly set forth sufficient facts to establish that the September 2004 jury pool from which Appellant Smart's jurors were selected continued to be in violation of §4521(a), §4521(d), §4524 and the Sixth Amendment to the United States Constitution. At the very least, Appellant Smart contends that he was entitled to an evidentiary hearing to establish a record and to prove the facts as set forth in his Motion, which, if accepted by the trial court, would have entitled him to relief.

III.   DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION FOR CHANGE OF VENUE OR VENIRE?

Due to the centralized location and rural nature of Clinton County, local media coverage and dissemination comes from a variety of media sources. However, a primary source of local news to the community is the Lock Haven Express newspaper which Appellant Smart believes has a circulation in excess of ten thousand (10,000) customers.

According to the U.S. Bureau of Census, Clinton County has only 14,773 households and a total population over the age of 18 of just 29,610 persons.

From the time of Mr. McMann's reported disappearance until the arrest of Appellant Smart, and continuing through the time of the filing of Appellant's Motion For Change of Venue, no less than thirty five newspaper articles had appeared in the Lock Haven Express alone. (Copies of which were attached to Appellant Smart's Motion For Change of Venue and are reproduced again and attached hereto. R.R. 211a-502a). *America's Most Wanted* television program aired three (3) stories regarding the McMann investigation and the arrest of Appellant Smart. The Williamsport Sun Gazette, with circulation in Clinton County, as well as radio and television broadcasts had also saturated the County with stories about McMann's disappearance and Appellant Smart's arrest.

Furthermore, during this period of time, the family of Jason McMann had pasted placards throughout the community, offered rewards, held vigils of support, enlisted local friends, prodded police, and encouraged media outlets to print stories.

Appellant Smart avers that a change of venue or venire became necessary because a fair and impartial jury could not be selected in Clinton County.

A trial court's decision on a motion for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion. *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203 (1997); *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995). A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the County in which the crime occurred. *Commonwealth v. Bridges*,

563 Pa. 1, 757 A.2d 859 (2000); *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086 (1998).

Normally, one who claims that he has been denied a fair trial because of pre-trial publicity must show actual prejudice in the impaneling of the jury. In certain cases, however, pre-trial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice. *Bridges*, 757 A.2d at 872.

Pre-trial prejudice is presumed if (1) the publicity is sensational, inflammatory and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports. *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958 (2001).

Even where pre-trial publicity is presumed, a change of venue or venire is not necessarily warranted unless the defendant also shows that the pre-trial publicity has been so extensive, sustained and pervasive that the community must be deemed to have been saturated with it, and that there has been insufficient time between the publicity and the trial for any prejudice to have likely dissipated. *Karenbauer*, 715 A.2d at 1092.

In the instant matter, the publicity surrounding this case had been sensational, inflammatory and slanted toward conviction; the publicity had referred to confessions, admissions and reenactments of the crime by the accused; and the publicity had derived from police and prosecuting officer reports.

For example, a banner headline in the June 11, 2002 issue of the Lock Haven Express read, "He Thought He Got Away With Murder...Officials In Georgia Aid Pa Police in Apprehension of Fabian Smart on Murder Charges". Other headlines also from

37

the June 11, 2002 issue of the Lock Haven Express read, "Family Finds Some Comfort"

and "Criminal Complaint Ends Much of the Mystery." (R.R. 218a-225a)

Much of the media coverage had been derived from police and prosecuting

officer's reports. The article from the June 11, 2002 issue entitled "Criminal Complaint

Ends Much of the Mystery", is troublesome not only for this reason, but also because it

sets forth much of the police and prosecuting officer's reports not as *allegations* but as

fact. Specifically, the article begins,

> "A three page document released by the Clinton
> County District Attorney's Office Monday does
> much to explain the mystery surrounding Jason
> McMann's disappearance and death over three years
> ago. The document outlines, step by step, how
> McMann, 22 of Lock Haven, was kidnapped and
> murdered in a series of actions that began in Lock
> Haven and ended in a wooded area near a stream in
> Logan Township."

The article goes on to reprint the details of the criminal complaint that had been

filed, including statements made by four witnesses, the pathologist Dr. Wayne K. Ross,

as well as an interview conducted of the Defendant in 1999 by Trooper Shawn Fischer.

(R.R. 222a-225a)

Another headline in the June 11, 2002 Lock Haven Express reads, "Long and

Winding Road To Justice For McManns". Defendant avers that the article was

sensationalistic, inflammatory and slanted toward conviction. The article reads, beginning

with its second paragraph,

> "On Monday, suspicions they alone held from the
> start became widely accepted. Police and
> prosecutors now believe that at least four people
> were involved in the death of Jason McMann. ...
> And as the McManns have claimed from the

> beginning, the demise of their child now appears to
> be a matter of murder... It must feel like a huge
> lantern has been ignited, where formerly only
> candlelight illuminated the path."

The article goes on to report rumors in support of the Commonwealth's theory of

the case. "Family and friends heard rumors of a fight between McMann and several Lock

Haven University students the night of January 22-23, 1999."   Continuing with its

sensationalistic tone, the article continues, "Unlike other parents who at least might have

had the emotional closure that can come with accidental death, the open-ended months

that followed Jason's disappearance were unending and nightmarish. The uncertainty

certainly challenged their marriage. It transformed their beliefs in the criminal justice

system. At times, it worked against their sense of balance and sanity." The article goes on

to explain, "The family marshaled it's resources, enlisted local friends, prodded police

and encouraged media outlets to print stories. Largely due to their efforts, the

disappearance sparked a widespread search by family members and friends, a public

appeal for witnesses, the pasting of placards throughout the community, the offering of

rewards, a multitude of newspaper and newspaper interviews and vigils of support. Signs

showing McMann's face were placed in store fronts, on trees, utility poles, walls and

other surfaces throughout the city...When police focused on a confrontation between

Jason and 'townies' the family heard the rumors about the possibility of a fight involving

the University's football players. They pushed the theory, sought information and

contacted investigators to offer what they found. Wild rumors also surfaced." The article

concludes with these emotional words, "The love of a son sparked the flame of their

search for truth. At least for a time the promise of justice has banked that fire." (R.R. 226a-227a)

Another example of a news story derived from police and prosecuting officer reports can be found in the June 12, 2002 edition of the Lock Haven Express in an article headlined, "Smart shows little emotion as charges are explained" (R.R. 212a-213a). The article reads in relevant part, "Police reports indicate that Smart and McMann had been feuding over money owed to McMann's cousin. They got into a fight the night of Jan. 22, 1999, and McMann was severely beaten. Police say Smart and Williams later returned to the scene, put McMann into the trunk of Smart's car and drove to a secluded spot in Logan Township, Clinton County, where Smart beat McMann with a gun and a branch and left him to die."

The local media only served to bolster the sensational, inflammatory and slanted allegations which were lodged by the popular television show, *America's Most Wanted.* An example of the support which the local media and law enforcement has given to *AMW* and its investigator Joe Matthews can be found in the June 12, 2002 issue of the Lock Haven Express as well. In an article entitled "Traffic ticket turns out to be lucky" (R.R. 212a-214a) the paper reports that the prosecution, as well as the McMann family, "agree that the popular television show *America's Most Wanted* developed many of the leads that actually broke this case…investigator Joe Matthews is credited with much of the leg work that led to police breaking the case." This same article goes on to read that "According to friends and family members, McMann had been involved in an ongoing feud with… Fabian Smart over money… Eyewitnesses say McMann was involved in a

fight on the night of his disappearance and that they last say him running away from a group led by Smart."

The degree to which this story had saturated the local community was clear from a front page article in the June 19, 2002 edition of the Lock Haven Express. It read in part, "The McMann disappearance and death first drew a great deal of local attention, amid rumors of a beating, a longstanding feud, a drug deal gone bad, a large party, and members of the local university's football team being involved.... The episode eventually gained national notice, mostly due to the efforts of McMann's parents, Tucker and Paula, who marshaled local forces, raised funds and consistently kept the mystery of their son's death in the unblinking eye of television and unfaded ink of newspaper coverage. The height of this effort occurred in 2000 when the McMann death was featured on the nationwide television show *America's Most Wanted*. Earlier this month, District Attorney Ted McKnight credited the show's investigator with breaking open the case." The article goes on to repeat police and prosecuting officer reports implicating the Defendant. "Smart and Williams put McMann into the trunk of Smart's car and drove to a secluded spot in Logan Township, where Smart beat McMann with a gun and a branch and left him to die." (R.R. 212a-214a).

Appellant Smart avers that the jury pool in Clinton County had also been tainted by media reporting that had been slanted toward conviction rather than factual and objective. For example, numerous articles published in the Lock Haven Express repeat the Commonwealth's theory that McMann was last seen on January 23, 1999; the night the Commonwealth alleges he was beaten by the Defendant. This is in spite of the fact

that police investigation revealed that McMann was in fact seen by a number of witnesses, including a local police officer, in the days *after* January 23, 1999.

As part of its newspaper, the Lock Haven Express also has a section of the paper entitled "Your Turn" where readers can offer opinions and comments on the news of the day. Throughout the investigation of the disappearance of Jason McMann and the arrest of Defendant Smart, numerous letters to the newspaper were published expressing opinions about this case. Some of these opinions were quite inflammatory. One, for example, reads, "If a person kills another and the death penalty is considered, it should be enforced! If he or she takes a life, that person's life should be taken as easily. Families are devastated. The killer's family should have to suffer equally as the victim's. Putting a murderer in jail still gives the family the luxury of visits, where the victim's family has only memories. The consequences for murder should be the same done in return." (R.R. 233a-235a).

In addition to the publicity surrounding the disappearance and arrest, the investigation itself resulted in the interview of hundreds of individuals both in the community and at the local University. Media reports as well as police investigations are replete with examples of wild rumors and suspicions saturating the community. One early newspaper article revealed that the McMann family had already received over one hundred (100) calls from people in the Community since the disappearance.

Furthermore, because of the number of placards displayed throughout the community and vigils held, not to mention the threatening letter allegedly found in the lockers of a number Lock Haven High School students, it appeared unlikely that the small community of Clinton County would be able to find and seat a jury that had not been

42

touched by or formed an opinion regarding this investigation, the Victim or the guilt of the Defendant. And this in fact, turned out to be the case. During jury selection, it became clear that very few of the prospective jurors had not read or had not heard news reports and had not formed an opinion regarding the guilt or innocence or Fabian Smart.

For all of the above stated reasons, Defendant Smart asserts that pre-trial prejudice in this case must be presumed.  The media coverage had been sensational and inflammatory, and slanted toward conviction. It had referred to alleged confessions, admissions and reenactments of the crime by the accused.  Its sources had derived from police and prosecuting officer reports.  Furthermore, the publicity had been so extensive, sustained and pervasive that the small community of Clinton County must be deemed to have been saturated with it.  Because the extensive media coverage continued through the time of jury selection, there had not been sufficient time for this prejudice to have dissipated.

On November 24, 2003, the trial court issued an Order holding Appellant's Motion For Change of Venue or Venire in abeyance until such time as the Court determined that a fair and impartial jury could not be empaneled in Clinton County. Since the time of the filing of Appellant Smart's first Motion For Change of Venue or Venire, the Clinton County community continued to be saturated with pretrial publicity in newspapers, magazines, television and radio. These newspaper, magazine articles and television news segments including twenty eight (28) segments from WNEP-16 and three (3) airings of America's Most Wanted of April 29, 2000, September 1, 2001 and August 24, 2002, which were attached as exhibits to Appellant Smart's Second Motion For

Change of Venue. The newspaper and magazine articles and transcripts of the television news segments are reproduced again and attached hereto. (R.R. 211a-502a).

The trial court indicated in its Order of November 24, 2003 that it would defer any decision on Appellant Smart's request for a change of venue or venire until the time of jury selection. In spite of the evidence that the sensational and inflammatory publicity that preceded Mr. Smart's trial had saturated the small community of Clinton County, at the conclusion of jury selection, Appellant Smart's Motion for Change of Venue or Venire was denied.

IV.    WAS THE VERDICT AGAINST THE WEIGHT OF THE EVIDENCE?

Appellant Smart was charged with Murder in the First, Second and Third Degree, Conspiracy to Commit Murder, Kidnapping, and Conspiracy to Commit Kidnapping. It was the Commonwealth's theory that on the evening of January 22, 1999, extending into the early morning hours of January 23, 1999, Jason McMann was beaten unconscious; placed bleeding in the trunk of Fabian Smart's car; and driven thirty (30) minutes to Lily Pond Road in Loganton, Pennsylvania, where he was removed from the trunk and left to be found nearly three months later on April 8, 1999.

On October 14, 2004, the jury returned a verdict of guilty on all charges.

The determination of the weight of the evidence exclusively is within the province of the fact finder, who may believe all, part, or none of the evidence. *Commonwealth v. McCloskey*, 835 A.2d 801 (Pa.Super 2003). "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa.Super 2003) (citation

44

Willie Williams offered testimony that on January 22, 1999, at a party in Lock Haven, Jason McMann was beaten unconscious and driven to Lily Pond Road in Loganton where he was left. Ms. Rodriguez was called to testify that a photograph that she had taken of Jason McMann wearing a green stripped shirt was taken on January 22, 1999. This is because a green stripped shirt that was found at Lily Pond Road where Jason McMann's body was recovered. The photograph therefore, potentially, gives the Commonwealth a time of death.

The problem, however, with Ms. Rodriguez' testimony is that Rosa Rodriguez testified that she regularly took photographs of her friends and that she was at the house where this photograph was taken as often as four times per week. The parties at this house were routine and she did not recall where in the roll of photographs this particular picture was taken. The negatives from this roll of film were given to the police. Furthermore, Ms. Rodriguez acknowledges that if she had had the negatives she could have better placed the date of this particular photograph. At the time of trial, the Defense requested the Commonwealth provide the negatives and the judge ordered Special Prosecutor McGettigan to provide them to the Defense. In spite of the Court Order that he provide these negatives to the Defense, Mr. McGettigan never provided them either for the Defense or for Ms. Rodriguez to review.

Furthermore, at the time of trial, Kristian Hull and Amber Fye testified that they were at the party where this picture was taken. They indicated that they had arrived at the party from a dance at the Lock Haven High School at about 8:00 p.m. While neither Ms. Hull nor Ms. Fye could remember nearly five years later which Friday night in January, 1999 this was, they both testified with certainty that they would not have been coming

from the dance at Lock Haven High School if Lock Haven was playing a home basketball game. The parties then stipulated that Lock Haven High School was, in fact, playing a home basketball game against Phillipsburg High School on Friday, January 22, 1999. Therefore, while neither Ms. Hull nor Ms. Fye could state with certainty which Friday night in January this picture was taken, it was clear, that it could not have been taken on January 22, 1999. Furthermore, knowing this, the District Attorney's Office did not call as witnesses in rebuttal any of the other eight individuals in the photograph to corroborate Ms. Rodriguez or rebut the testimony of Ms. Hull or Ms. Fye.

This is not the only problem, however, with the Rosa Rodriguez photograph or the Commonwealth's theory that Jason McMann died on January 22/23, 1999. Both Quincy Teel and Jermaine Ballard testified that on January 22, 1999, Jason McMann was not wearing a green stripped shirt, but rather a white T-shirt. No such white T-shirt was found at the scene where Mr. McMann's body was recovered. Furthermore, no witness described Jason McMann wearing the Tommy Hilfiger sweatshirt that was found at the scene where his body was recovered.

These, however, were not the only problems the Commonwealth had in its efforts to corroborate the testimony of Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. Christine Hostrander-Cicconi testified that she worked at the Old Corner Bottle Shop in Lock Haven and that she saw Jason McMann alive at the Old Corner Bottle Shop on February 2, 1999, Groundhog's Day, ten days after Jason McMann was supposedly dead. In her testimony, Ms. Cicconi described the clothes that Mr. McMann was wearing, their conversation, and customers that she attended to both before and after Jason McMann. She testified for the jury regarding the store receipt from the Old Corner Bottle

47

Shop reciting which customers corresponded with each purchase. The receipt corroborated her recollection that Jason McMann purchased beer from her at the Old Corner Bottle Shop at approximately 9:35 p.m. on February 2, 1999. Ms. Cicconi testified that she was positive when she provided this information to Officer Fritts of the Lock Haven Police Department on February 21, 1999, positive when she testified before the jury and positive in every one of the five interviews she had with law enforcement prior to trial. It is simply not possible to reconcile the testimony of Ms. Cicconi with the testimony of Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. If there was even a reasonable possibility that Ms. Cicconi's recollection was accurate and true, then the jury would have had a reasonable doubt and would have been required to have found Fabian Smart not guilty of all of the offenses with which he was charged.

Yet, Ms. Cicconi was not the only witness to testify that she had seen Jason McMann alive after January 23, 1999. Chris Hileman testified that he and John Caldwell saw Jason McMann at a Wendy's Restaurant after they had seen Jason McMann's picture in missing person posters throughout the community. Andrew Garbrick testified that he had seen an individual who appeared to look like Jason McMann walking across one of the bridges in Lock Haven in the days and weeks after his reported disappearance. And, perhaps most compelling, Officer Fritts of the Lock Haven Police Department, on February 11, 1999, told Officer Falatico that he, himself, saw Jason McMann alive since the assault on January 23, 1999. The conversation was memorialized in Officer Falatico's report as follows: "Officer Fritts stated he has seen McMann since the assault took place, approximately two weeks ago, as Fritts did see McMann with a black eye and asked what happened but didn't really get an explanation..." Again, if there was even a reasonable

possibility that Jason McMann was seen alive after January 23, 1999, the jury would have had to have a reasonable doubt and was required to find Fabian Smart not guilty.

Lastly, Dr. Seik, a forensic toxicologist testified for the defense that Jason McMann's postmortem blood alcohol level of .05% was not consistent with the blood alcohol level that Mr. McMann would have had on January 22, 1999, as reported by numerous witnesses interviewed by law enforcement. Numerous witnesses had provided information to law enforcement that Mr. McMann's alcohol consumption on January 22, 1999 would have placed his blood alcohol level far in excess of .05%. Dr. Seik's testimony simply cannot be reconciled with the testimony of Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. Therefore, if there was even a reasonable possibility that Dr. Seik's testimony was true and accurate, then Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams' testimony could not have been true and Fabian Smart must be not guilty.

This only addresses the first problem with the Commonwealth's case; their inability to prove beyond a reasonable doubt that Jason McMann died on January 23, 1999. The Commonwealth also had problems, however, with the second part of their theory; that Jason McMann was knocked unconscious, then placed bleeding in the trunk of Fabian Smart's car and driven thirty (30) minutes to Lily Pond Road in Loganton. The only witnesses which the Commonwealth called to support this theory were, once again, Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. Angie Weber testified, however, that she was at the party on January 22, 1999 and had witnessed the fight between Jason McMann and Fabian Smart. She testified that she witnessed Jason McMann, with his two friends, run to a white car on North Fairview Avenue and *drive*

*away from the scene*. The Commonwealth did not call any of Jason McMann's friends who were at the party with him to rebut this testimony. Again, this testimony from Angie Weber cannot be reconciled with the testimony of Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams that Jason McMann was beaten unconscious and placed in the trunk of Fabian Smart's car. If there wsa even a reasonable possibility that what Angie Weber had seen was true and accurate, then Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams' testimony cannot be true, and Fabian Smart must have been found not guilty.

Beyond the eyewitness testimony of Ms. Weber, a State Police forensic search of the trunk of Fabian Smart's car did not reveal any blood, hair or fiber evidence that would be consistent with an unconscious, bleeding person being placed in the trunk of Mr. Smart's car and driven thirty minutes to an isolated area in Clinton County.

The third part of the Commonwealth's theory of the case was that on January 23, 1999, Jason McMann's body was put in the woods at Lily Pond Road and left there until it was found nearly three months later on April 8, 1999. The Commonwealth called only one witness to support this theory; Willie Williams. Jason McMann's body was recovered in view of the road, and his shirt was found only eight feet from the berm. Seven witnesses were called to testify that they either live, work or had been in the area where the body was recovered between January 1999 and April 1999. All of these witnesses testified that they neither saw, nor smelled, a decomposing body. Furthermore, Dr. Way, a professor at Lock Haven University and Allen Gontz, one of his students, were in the very woods where Jason McMann's body was discovered, on March 13, 1999 and photographed the area. One of these photographs provided to the jury was a photograph

Kidnapping and the right to request of the court that he be sentenced in the mitigated range. A sentence in the mitigated range for Mr. Ballard could result in a sentence as short as probation. Quincy Teel was offered a similar plea bargain. However, because of a prior conviction for Forgery, a sentence in the mitigated range for Conspiracy to Commit Kidnapping could result in a sentence as short as six months for Mr. Teel. Willie Williams was offered a plea bargain that would allow him, in exchange for his testimony, to receive a sentence as short as five years, rather than face the penalty of death. Jamie Allen, in exchange for his testimony, was not charged with any offense.

Additionally, beyond the difficulties with the Commonwealth's case, Dr. Land, a forensic pathologist who had conducted the initial autopsy of Jason McMann testified that a cause of death could not be determined. Dr. Land further testified that after the District Attorney came to him with witness statements that suggested that Mr. McMann had died from blunt force trauma, Dr. Land explained both to the District Attorney and ultimately to the jury that the wounds which Mr. McMann suffered were non-lethal wounds and that, therefore, the cause of death must remain undetermined. As with all of the other testimony which cannot be reconciled with the finding of guilt, a jury could not have reconciled the testimony of Dr. Land with the testimony of Jamie Allen, Jermaine Ballard, Quincy Teel, and Willie Williams. Therefore, if there was even a reasonable possibility that the testimony of Dr. Land was true and accurate, then the testimony of Willie Williams could not be true and Fabian Smart could not be found guilty of any of the offenses with which he had been charged.

Lastly, Trooper Rausher, the lead investigator in this homicide case, was confronted with the fact that there were no less than eleven other leads which he never

pursued. These leads included evidence that Jamie Allen himself confessed to murdering

Jason McMann, and that others may have had a motive to have killed Mr. McMann.

Ultimately, the Commonwealth could provide no blood, hair or fiber evidence to support

their theory. And, the jury was confronted with testimony of both lay and expert

witnesses that simply could not be reconciled with the testimony of Jamie Allen,

Jermaine Ballard, Quincy Teel, and Willie Williams or with their theory that Jason

McMann died on January 23, 1999, and that he was placed unconscious and bleeding in

the trunk of Fabian Smart's car and that he was left in the woods at Lily Pond Road for

nearly three months until his body was discovered on April 8, 1999.

V.    DID TRYING THE APPELLANT BEFORE A DEATH QUALIFIED JURY
DURING THE MERITS PHASE OF THE TRIAL DEPRIVE THE APPELLANT
OF A TRIAL BEFORE A CROSS-SECTION OF THE COMMUNITY?

One of the pre-trial motions filed by Appellant requested that the court empanel a

jury, which was neither life nor death qualified, to hear and decide the first phase of the

trial. The motion asserted that various studies have established that death qualified jurors

are biased in favor of conviction, and also contended that the exclusion of potential

jurors, based on death penalty attitudes, would serve to deprive Smart of his state and

federal constitutional right to be tried by jurors drawn from a fair cross-section of the

Clinton County community. As was the case with virtually all of the pre-trial motions

which were filed, the court summarily denied the motion without an evidentiary hearing,

and thus prevented the defense from creating a record concerning the fact that death

qualified jurors are biased in favor of conviction.

In holding that the same jury would hear the merits phase and also the penalty

phase, if a first-degree conviction was returned, the court effectively eliminated from jury

53

service Clinton County citizens whose death penalty views would disqualify them from participating in the penalty phase of a capital trial. The fact that an individual's views with respect to the death penalty would serve to disqualify the potential juror from participating in the penalty phase of a capital trial, does not serve to disqualify such an individual from being able to render a fair and impartial verdict of not guilty or guilty in the merits phase of the trial. Thus, in requiring the use of one jury to handle the two potential phases of the trial, the Appellant was deprived of being tried by a fair cross-section of the Clinton County community. Individuals who would not be qualified to serve during the penalty phase of a capital trial were disqualified from serving in the merits phase of the trial, although there existed no basis to challenge their participation for cause in the merits portion of the trial. The fact an individual expressed a personal belief concerning the death penalty which could not be set aside, served to disqualify that person from participating in the merits aspect of the trial, even though they were fully competent and qualified to serve as a juror with respect to the question of innocence or guilt. Any number of potential jurors were excused for cause due to their death penalty views or because of problems arising from the potential aggravators or as a result of mitigation impairment. Had the procedure suggested by Smart been employed, the individuals excused for cause based upon death penalty views would have been available potential jurors to determine the innocence or guilt of Smart. Those actually seated to determine the innocence or guilt of Smart did not represent a true cross-section of the Clinton County community as a result of the challenges for cause based on death penalty views. Ones death penalty attitudes and beliefs have no relevance with regard to an ability to be fair and impartial with respect to the merits phase of a homicide trial. If

there was a correlation between death penalty attitudes and beliefs and the ability to be fair during the merits phase of a criminal trial, death penalty attitudes and beliefs would become a common source of inquiry during voir dire in any criminal case. Since death penalty attitudes and beliefs served to "trump" the eligibility of otherwise qualified individuals to serve as a juror with respect to the merits phase of the trial, Appellant was deprived of his entitlement to be tried by a representative cross-section of the community.

Admittedly, the concept which Appellant asked the court to employ in the instant case appears novel in the Commonwealth of Pennsylvania. However, it is a concept which has been employed in other jurisdictions where the aggravating circumstances are deemed so egregious that it would create unfair prejudice to expose the potential merits phase jurors to the potential aggravating circumstances, and therefore two juries, one for the merits phase and, if necessary, one for the penalty phase are used. In *State v. Biegenwald*, 126 N.J. 1, 594 A.2d 172 (1991), the alleged aggravating factor to support a death sentence was a prior murder. In discussing the impact of the prior murder aggravator on the jury selection process, the court noted that in any case where a prior murder is being advanced as an aggravator would "most likely require a two-jury system for all capital cases in which the States do prove [prior murders]." Id. at 70, 194. Likewise in *State v. Moore*, 113 N.J. 239, 550 A.2d 117 (1988), the court recognized that limiting instructions may well be insufficient to protect an accused from prejudice arising from other crimes' evidence and in those circumstances the empanelment of a new jury for the penalty phase may well be required. In *State v. Pinnell*, 311 Ore. 98, 121, 806 P.2d 110, 116 (1991), it was noted that one of the purposes of a bifurcated trial was to prevent evidence of a defendant's bad character, that is admissible only in the penalty

phase, from negatively impacting on the jury's ability to return a fair verdict during the merits phase. Clearly, the concept which the Appellant was presenting to the court for employment in the instant case is one which has been found to be meritorious in sister jurisdictions.

In a capital prosecution there is an inherent conflict between the merits phase and the punishment phase in that during the merits phase the evidence is to be limited to a determination of what the defendant did, whereas during the penalty phase other criminal conduct becomes relevant to the determination of the appropriate sentence. *United States v. Meyers*, 550 F.2d 1036, 1044 (5th Cir. 1997)("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not who he is.")

The summary rejection of the Appellant's motion precluded Appellant from creating a record in the form of the various studies which have established that death qualified jurors are in fact biased towards conviction with respect to the merits phase of a capital trial. Thus, using the one jury system to hear and decide both the merits and punishment phase of the trial served to deprive Appellant of a true cross-section of the community and resulted in his trial being heard by a group of citizens inclined to convict. This procedure is not only inherently unfair, but runs afoul of Appellant's constitutional rights under both the State and Federal Constitution.

## CONCLUSION

For all of the above stated reasons, Appellant Smart contends that the trial court erred in denying his motion to declare Clinton County's jury pool unconstitutional, and erred in denying his motion for change of venue or venire, as well as denying his motion to empanel a jury which was neither life nor death qualified. Appellant further contends that he is entitled to a new trial in light of the pervasive prosecutorial misconduct. Lastly, Appellant Smart contends that the verdict was against the weight of the evidence.

Respectfully Submitted,

Eric R. Linhardt, Esquire
Attorney for Appellant, Fabian D. Smart
Pennsylvania Attorney Id. No. 59981
25 West Third Street, Suite 803
Williamsport, Pa 17701
Telephone (570) 320-7788

Ronald C. Travis, Esquire
Attorney for Appellant, Fabian D. Smart
Pennsylvania Attorney Id. No. 08819
Rieders, Travis, Humphrey, Harris, Waters
& Waffenschmidt
161 West Third Street
Williamsport, Pa 17701
Telephone (570) 323-8711

IN THE COURT OF COMMON PLEAS OF CLINTON COUNTY

COMMONWEALTH OF PENNSYLVANIA :
                                 : NO. 175-02
          V.                      :
                                 :
FABIAN SMART,                 :
      Defendant          :

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

1. The instances of prosecution misconduct when taken together so tainted the fairness of the trial that Appellant should be granted a new trial in the interest of justice.

2. The trial court erred in denying Appellant's motion to declare Clinton County's jury pool in violation of 42 Pa.C.S.A. §4521(a), 4521(d), 4524 and the Sixth Amendment to the United States Constitution.

3. The trial court erred in denying Appellant's motion for change of venue or venire.

4. The verdict was against the weight of the evidence.

5. Trying the Appellant before a death qualified jury during the merits phase of the trial deprived the Appellant of a trial before a cross-section of the community.

6. The details of the above matters complained of are more fully set forth in Defendant Smart's Appeal Brief which was mailed to the Superior Court for filing this day. A courtesy copy has been mailed to the Honorable Richard Saxton to assist him in preparing his 1925(a) Opinion, and therefore, Appellant's Brief is incorporated herein by reference as though fully set forth.

Respectfully submitted,

Eric R. Linhardt, Esquire
Attorney for Appellant, Fabian D. Smart
Pennsylvania Attorney Id. No. 59981
25 West Third Street, Suite 803
Williamsport, Pa 17701
Telephone (570) 320-7788


Ronald C. Travis, Esquire
Attorney for Appellant, Fabian D. Smart
Pennsylvania Attorney Id. No. 08819
Rieders, Travis, Humphrey, Harris, Waters
& Waffenschmidt
161 West Third Street
Williamsport, Pa 17701
Telephone (570) 323-8711

IN THE COURT OF COMMON PLEAS OF CLINTON COUNTY

COMMONWEALTH OF PENNSYLVANIA          :
                                      : No. 175-02
              v.                      :
                                      :
FABIAN D. SMART                       :
        Defendant                     :

## CERTIFICATE OF SERVICE

I, Eric R. Linhardt, Esquire, hereby certify that I have served one (1) copy

of the foregoing Statement of Matters Complained of on Appeal upon:

> Joseph E. McGettigan, Esquire
> Office of the District Attorney
> 322 East Water Street
> Lock Haven, Pa 17745
>
> The Honorable Richard Saxton
> Clinton County Courthouse
> 230 East Water Street
> Lockhaven, Pa 17745

by First Class Mail, on this  21ˢᵗ  day of  December , 2005.

Eric R. Linhardt, Esquire
Pa. Id. No. 59981

25 West Third Street, Suite 803
Williamsport, Pa 17701
Telephone: (570) 320-7788