**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FABIAN D SMART,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-10-1447** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **LOUIS S FOLINO, et al.,** | : | |
| | : | |
| **Respondents** | : | |

**M E M O R A N D U M**

## I.    Introduction

Presently before the court is the *pro se* Petition for Writ of Habeas Corpus filed by the Petitioner, Fabian D. Smart, pursuant to 28 U.S.C. § 2254.  Petitioner is incarcerated in the Greene State Correctional Institution located in Waynesburg, Pennsylvania.

Following careful consideration of the parties' submissions, and for the reasons discussed below, the petition for habeas relief as well as a certificate of appealability will be denied.

## II.    Background

### A.    Factual Background

Following a jury trial before the Honorable Richard N. Saxton and a death-qualified jury in the Court of Common Pleas of Clinton County, Fabian D. Smart was

convicted of first degree murder,[1] conspiracy to commit first degree murder,[2]

kidnapping,[3] and conspiracy to commit kidnapping[4] on October 14, 2004.  *See* CCP

Clinton Dkt. No. CP-18-CR-000175-2002.  In disposing of Mr. Smart's direct appeal,

the Pennsylvania Superior Court provided the following background:

> On the night of January 22, 1999, [Fabian Smart] got into
> a fight with the victim, Jason McMann.  McMann had
> confronted [Mr. Smart] on half a dozen previous occasions
> on behalf of a cousin, Jeffrey Stauffer, who had paid [Mr.
> Smart] $6,000.00 (six thousand dollars) for marijuana
> which [Mr. Smart] never delivered.  That night, a fight
> began at a party in a football fraternity house at Lock
> Haven University, where [Mr. Smart] was a football player.
> The fight spilled outside.   [Mr. Smart] beat McMann
> unconscious and with the aid of associates, put him in the
> trunk of his car, took him to a remote location some twenty
> miles away, tried unsuccessfully to shoot him with a pistol
> that would not fire, beat him again, and left him there to die.
> McMann was reported missing shortly afterwards, but his
> body was not discovered until several months later, in April.
>
> When McMann disappeared, his family began a campaign
> to find him, posting placards, offering a reward, and trying
> to generate as much public interest as they could.  The
> case attracted attention in the local media and was
> featured three times on the nationally televised program,
> "America's Most Wanted."  After his body was discovered,
> McMann's death was originally attributed to a drug
> overdose. However, police investigating the disappearance
> and death learned of [Mr. Smart's] dispute with McMann.
> [Mr. Smart]'s co-conspirators initially denied involvement
> but eventually confessed.   [Mr. Smart] was arrested in
> 2002, and at trial in 2004, his co-conspirators testified
> against him.  The death-qualified jury convicted [Mr. Smart]

---

[1]  18 PA. CON. STAT. ANN. § 2502(a).

[2]  18 PA. CON. STAT. ANN. § 903(a)(1).

[3]  18 PA. CON. STAT. ANN. § 2901(a)(2).

[4]  18 PA. CON. STAT. ANN. § 903(a)(1).

> of all charges, but deadlocked on imposing the death penalty.  The trial court imposed a life sentence for the murder conviction.  Post-sentence motions were denied without a hearing.

(Doc.  21-11, ECF pp. 1-2, *Commonwealth v. Smart*, No. 588 MDA 2005 (Oct. 19, 2006).)  On January 24, 2005, the court imposed additional sentences on the related charges.

### B.      Proceedings on Direct Appeal

Mr. Smart filed post-sentence motions with the trial court of November 1, 2004.  The motions were denied on March 15, 2005.  On March 15, 2005, Mr. Smart, represented by this trial counsel, Ronald Travis, Esq. and Eric Linhart, Esq., filed a timely notice of appeal.  Mr. Smart raised the following issues on direct appeal: (1) the instances of prosecutorial misconduct, when taken together, so taint the fairness of the trial that [Mr. Smart] should be granted a new trial in the interest of justice; (2) the trial court erred in denying [Mr. Smart's] motion to declare Clinton County's Jury Pool in violation of 42 PA. CONS. STAT. ANN. § 4521(a), 4521(d), 4525 and the Sixth Amendment to the United States Constitution; (3) the trial court erred in denying [Mr. Smart's] motion for change of venue or venire; (4) the verdict was against the weight of the evidence; and (5) trying [Mr. Smart] before a death qualified jury during the merits phase of the trial deprive [him] of a trial before a cross-section of the community.  *See* Doc.  21-11, ECF p. 3, *Commonwealth v. Smart*, No. 588 MDA 2005 (Pa. Super. Oct. 19, 2006).

-3-

The Pennsylvania Superior Court affirmed the judgement of sentence on October 19, 2006.  *See Commonwealth v. Smart*, 913 A.2d 947 (Pa. Super. Oct. 19, 2006)(Table, No. 588 MDA 2005).  The petition for allowance of appeal was denied by the Pennsylvania Supreme Court on May 1, 2007.  *See Commonwealth v. Smart*, 592 Pa. 759, 923 A.2d 410 (Pa. May 1, 2007)(Table, No. 973 MAL 2006).   Mr. Smart did not seek a writ of certiorari.

### C.    Proceedings on Post-Conviction Relief

On October 1, 2007, Mr. Smart filed a timely *pro se* petition for post-conviction relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. CONS. STAT. ANN. §§ 9541-9546.  After Attorney David Strouse was appointed to represent Mr. Smart an amended PCRA petition was filed on January 25, 2008. *See Commonwealth v. Smart*, 2008 WL 6855791 (Appellate Br.)(Pa. Super. 2008), Appellant's Br.  On January 25, 2008, Mr. Smart filed an Amended PCRA petition. Two evidentiary hearings were held with respect to Mr. Smart's Amended PCRA Petition, one on February 26, 2008 (Doc. 23-1), and the other on March 17, 2008 (Doc. 23-2).  The trial court, now acting as the PCRA court, denied the Petition on March 18, 2008.  On appeal Mr. Smart raised three issues: (1) whether the PCRA court erred in concluding that, pursuant to Pa. R.E. 606, a juror's testimony was inadmissible to the extent it referenced racially biased statements made by jury members during the course of deliberations, when said testimony was offered to show [that Mr. Smart] had been deprived of his rights as guaranteed by the Sixth

-4-

Amendment and, alternatively, to show that jurors had been untruthful during voir dire relating to racial bias; (2) whether the PCRA court erred in concluding that trial and appellate counsel were not ineffective for failing to compel forensic testing of evidence in the possession of the Commonwealth, when such testing could have substantially corroborated the defense theory of the case, and the decision not to pursue such testing was never discussed by trial counsel with defendant; and (3) whether the PCRA court erred in concluding that trial and appellate counsel were not ineffective for failing to pursue defendant's claim of racial bias based upon information provided by a juror, post-trial, showing other jury members to have falsely answered questions pertaining to racial animus during voir dire.  (Doc. 21-10, *Commonwealth v. Smart*, No. 696 MDA 2008 (Pa. Super. July 10, 2009).)

The Superior Court of Pennsylvania affirmed the PCRA court's decision by memorandum opinion dated July 10, 2009.  *Commonwealth v. Smart*, 981 A.2d 935 (Pa. Super. Jul. 10, 2009)(Table, No. 696 MDA 2008).  Mr. Smart filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court which was denied on December 17, 2009.  *Commonwealth v. Smart*, 604 Pa. 696, 986 A.2d 150 (Pa. Dec. 17, 2009)(Table, No. 561 MAL 2009).  Mr. Smart did not seek a writ of certiorari.

### D.    Other Post-Conviction Proceedings

In 2012, while his habeas petition was pending, Mr. Smart filed a Petition for Post-Conviction DNA Testing pursuant to 42 PA. CONS. STAT. § 9543.1.  The trial

court ruled that Mr. Smart did not meet the threshold requirements for such testing

and that nonetheless even if DNA testing was conducted it would not establish his

actual innocence of the crimes for which he was convicted.  (Doc. 21-14,

*Commonwealth v. Smart*, No. 175-02 (Clinton Ct. Com. Pl. July 5, 2012).)  In

reaching this decision the trial court wrote:

> ... the testimony of multiple eyewitnesses at trial was that
> the victim had engaged in a series of physical altercations
> with a number of individuals, including [Mr. Smart] on the
> evening in question.  Direct eyewitness testimony indicated
> that [Mr. Smart] returned to the scene of the earlier
> altercation, where victim lay unconscious but breathing
> and, with the help of his cousin and two acquaintances, all
> of whom testified against [Mr. Smart], proceeded to load
> the still-breathing victim into the trunk of a car, which [Mr.
> Smart] then drove away.     [Mr. Smart]'s cousin
> accompanied [Mr. Smart] on his journey to another location
> several miles away.  The cousin's testimony was that [Mr.
> Smart] then beat the unconscious victim to death with two
> blunt instruments — namely, a firearm and a tree branch.
> Testimony by [Mr. Smart]'s college roommate additionally
> indicated that [Mr. Smart] twice confessed to murdering the
> victim.  One of these confessions, the roommate testified,
> occurred while the victim's missing person report appeared
> on the television news coverage.   Given these facts of
> record, neither the absence of [Mr. Smart]'s DNA nor the
> presence of another individual's DNA under the victim's
> fingernails would yield conclusive results.

(*Id.*, ECF p. 4.)

> The deathblow was the central issue in [Mr. Smart]'s trial
> and it remains the issue central to our scrutiny of his motion
> requesting post-conviction DNA testing.  [Mr. Smart] was
> one of several individuals who engaged in physical combat
> with the victim.  An unconscious man would obviously enjoy
> no means of self-defense against being bludgeoned to
> death; the victim had no opportunity to scratch or grab his
> murderer at that point in time, although he may have
> scratched or grabbed [Mr. Smart] or any of the several
> others during the fights in which he engaged earlier in the

> evening ... we cannot reasonably say with any degree of conviction that it is more likely than not that no reasonable juror would have convicted [Mr. Smart] if another person's DNA was now found under victim's fingernails.

(*Id.*, ECF pp. 5-6.)

> With regard to the towel found near the location where victim's body was recovered, [Mr. Smart] fails to articulate what might be found thereupon or what significance should attach to that which might be found.  The trial testimony of a State Police investigator indicated that forensic laboratory testing detected no blood or hairs on the towel and that "[i]f there was no blood or foreign material, then there was nothing to submit for DNA analysis."  *See* Trial Transcript, October 4, 2004, at pp. 117-18.  In this respect, [Mr. Smart]'s request appears to us to be a last ditch fishing expedition, lacking any evidentiary basis in the record.  The plain language of the statute places the burden of establishing a *prima facie* case of actual innocence, as a prerequisite to post-conviction DNA testing, on [Mr. Smart]. We believe this precludes its use to support such a fishing expedition.

(*Id.*, ECF p. 7.)  Mr. Smart's appeal to the Superior Court of Pennsylvania was dismissed due to his failure to file a supporting brief.  (Doc. 21-12, *Commonwealth v. Smart*, No. 1371 MDA 2012 (Pa. Super. Dec. 10, 2012).)

### E.    Present Habeas Proceedings

Mr. Smart filed his Petition for Writ of Habeas Corpus on July 8, 2010.  (Doc. 1, Pet.)  In his Petition, Mr. Smart raises the following claims:  (1) whether the state courts erred in determining appellate counsel were not ineffective for failing to file a motion to compel discovery of specific items of physical evidence for purposes of forensic testing and/or to have such evidence tested by an expert; (2) whether the

-7-

state courts erred in determining that trial and appellate counsel were not ineffective for failing to pursue Petitioner's claim of racial bias based upon information provided by a juror post-trial, showing that jurors falsely answered questions during voir dire; (3) whether the state court erred in finding that trial counsel was not ineffective for failing to move for a mistrial post-verdict, based on statements made by a juror relating to racial bias during voir dire; (4) whether the state courts erred in not finding that trying the petitioner before a death qualified jury during the merits phase of the trial, deprived him of a trial before a cross-section of the community; (5) whether the state courts erred in not finding that instances of prosecutorial misconduct when taken together, so tainted the fairness of the trial, that Mr. Smart should be granted a new trial in the interest of justice; (6) whether Pa. R. E. 600(b) is unconstitutional as applied in a case where it prevents rectification [sic] of fifth and sixth amendment violations; and (7) whether the state court erred or abused it's [sic] discretion, in determining it could not hear testimony concerning racist statements made by a juror.  (Docs. 1 and 9.)

In accordance with *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) and *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), this court issued formal notice to Mr. Smart that he could either have the petition ruled on as filed, that is, as a § 2254 petition for writ of habeas corpus and heard as such, but lose his ability to file a second or successive petition, absent certification by the court of appeals, or withdraw his petition and file one all-inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act (AEDPA).  (Doc. 5.)  On September 10, 2010, Mr. Smart returned the notice of

-8-

election form, indicating that he wished to proceed with his petition for writ of habeas corpus as filed.  (Doc. 6.)  However, simultaneous to this filing Mr. Smart sought an extension of time to supplement his habeas petition.  (Doc. 4.)  Accordingly, he was granted until October 8, 2010, to amend his habeas petition.  (Doc. 8.)  On October 8, 2010, Mr. Smart filed a memorandum of law in support of his habeas petition. (Doc. 9.)

On October 15, 2010, a show cause order was issued directing service of the original habeas petition and supporting memorandum on respondents.  (Doc. 10.) After receiving an enlargement of time to respond to the Petition, respondents filed their response to the habeas corpus petition for writ of habeas corpus on February 3, 2011.  (Doc. 18.)  Long after respondents filed their response, on August 7, 2014, and almost two years after the trial court denied his petition for post-conviction DNA testing, Mr. Smart filed yet a second amended petition for writ of habeas corpus. (Doc. 19.)

**III.    Standard of Review**

Since Mr. Smart filed his Petition after the effective date of the Antiterrorism and Effective Death Penalty of 1996 (AEDPA), review of his claims is governed by 28 U.S.C. § 2254(d).  *Lindh v. Murphy*, 521 U.S. 320, 326-27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).  Under AEDPA, a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"

or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 97-98, 131 S.Ct. 770, 783-84, 178 L.Ed.2d 624 (2011); *Williams v. Taylor*, 529 U.S. 362, 404 - 05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams*, 529 U.S. at 384 - 86, 120 S.Ct. at 1508 - 1509, while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412 - 13, 120 S.Ct. at 1523.  A state court decision is an "unreasonable application of Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S.  at 413, 120 S.Ct. at 1523.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, 529 U.S. at 411, 120 S.Ct. at 1522.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*, 529 U.S. at 413, 120 S.Ct. at 1523.   "Under § 2254(d)(1)'s 'unreasonable application' clause, ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.,* 529 U.S. at 411, 120 S.Ct. at 1523.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.,* 529 U.S. at 409, 120 S.Ct. at 1522.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 – 04, 111 S.Ct. 2590, 2594-95, 115 L.Ed.2d 706 (1991).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  *See Ylst*, 501 U.S. at 804, 111 S.Ct. at 2595.

The Supreme Court has affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  *See*

*Harrington,* 562 U.S. at 97-99, 131 S.Ct. at 783 – 85; *Felkner v. Jackson*, 562 U.S.

594, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011).  The Court explained: "[o]n

federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating

state-court rulings' and 'demands that state-court decisions be given the benefit of

the doubt.'"  *Id.* at 594, 131 S.Ct. at 1307 (citation omitted).

However, "if a properly preserved claim was not addressed by the state court

on the merits, the deferential standards of the AEDPA do not apply."  *Id*. at 392.  In

such instances, a "federal habeas court must conduct a de novo review over pure

legal questions and mixed questions of law and fact."  *Id*. (quoting *Appel v. Horn*,

250 F.3d 203, 210 (3d Cir. 2001)).


## IV.    Discussion

Mr. Smart's habeas petition contains seven grounds for relief.  Claims 2, 3, 6

and 7 are either redundant or related and thus will be addressed collectively.

Claims 1, 4 and 5 will be addressed in individually.   Although respondents argue

that Mr. Smart failed to properly exhaust his state court remedies with respect to

some of the claims presented, the court will not address this argument but proceed

under 28 U.S.C. § 2254(b)(2) to dismiss all of Mr. Smart's claims on the merits.[5]

*See Carrascosa v. McGuire,* 520 F.3d 249, 254 (3d Cir. 2008)(reaching the merits of

petitioner's claim based on her incarceration for civil contempt despite her failure to

---

[5]  Mr. Smart concedes that he did not present Claims 6 and 7 to the state court.
(Doc. 9, Am. Habeas Pet., ECF p. 24.)

-12-

complete exhaustion of state court remedies at the time petition was filed).   The

petition will be denied as none of the claims raised has merit.

> **A.    Whether the State Court Erred by Following Pa. R. Evid. 606(b) when Refusing to Admit Post-Verdict Juror Testimony of Alleged Racial Comments by other Juror(s) During Deliberations to Determine if Fifth and Sixth Amendment Violations Occurred (Claims 2, 3, 6 and 7).**

Mr. Smart claims he was denied due process and an impartial jury because

his jury deliberations were tainted by racial prejudice.  From this general assertion

Mr. Smart casts three intertwined habeas claims.  First, he alleges trial counsel was

ineffective for not seeking a post-verdict mistrial after it was revealed that a juror

made racially charged statements during jury deliberations or inquiring whether the

juror lied when responding to *voir dire* questions relating to racial bias.  Second, he

alleges the PCRA court erred in failing to hear testimony from a juror as to racial

comments made by another juror during deliberations which would have

demonstrated a violation his Sixth Amendment rights.  Third, Mr. Smart argues that

Pa. R. E. 606(b) is unconstitutional because it precludes the introduction of

evidence which would conclusively demonstrate his Fifth and Sixth Amendment

rights were violated.  Mr. Smart raised the first two claims in his PCRA proceedings.

At least two months after the verdict in this case, an empaneled juror, Ms.

Vicki Lynn Adams, sought out defense counsel[6] for the purpose of contacting Mr.

Smart.  She testified at Mr. Smart's PCRA proceedings that another juror made race

---

[6] Ms. Adams contacted Attorney Travis.  (Doc. 23-2, 02/26/08 PCRA Hr'g Tr., ECF p. 38.)

based comments during jury deliberations.  (Doc. 23-1, 02/26/08 PCRA Hr'g Tr.,

ECF p. 39.)  Once Ms. Adams confirmed that the alleged racial comments were

made only during the course of deliberations, the PCRA court prohibited her from

testifying further citing Pa. R. Evid. 606(b).  (*Id*., ECF pp. 39 and 42.)  Mr. Smart's

PCRA counsel argued that the Ms. Adams' testimony was not sought "for the

purposes of impeachment of the verdict ... [but rather] to show that another juror had

knowingly or intentionally answered voir dire questions falsely."  (*Id*., ECF p. 40.)

Counsel argued that "since her testimony in no way is being offered for the purpose

of impeachment of the verdict or to attack the deliberation process that the no

impeachment rule should not apply".[7]  (*Id*.)

On appeal, Mr. Smart's counsel argued "that his due process rights and right

to a fair and impartial jury were violated and both trial and appellate counsel were

---

[7]  This "no impeachment" rule is codified at Rule 606(b) of the Pennsylvania Rules of Evidence.  At the time relevant to Mr. Smart's state proceedings the rule was entitled *Competency of juror as witness*.  The nameline for section b was *Inquiry into validity of verdict* and read as follows:

> Upon an inquiry into the validity of a verdict, including a sentencing verdict pursuant to 42 Pa. C.S.A. § 9711 (relating to capital sentencing proceedings), a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions in reaching a decision upon the verdict concerning the juror's mental processes in connection therewith, and a juror's affidavit or evidence of any statement by the juror about any of these subjects may not be received.  However, a juror may testify concerning whether prejudicial facts not of record, and beyond common knowledge and experience, were improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Pa.R.E. 606(b).

ineffective in failing to pursue Smart's claim of racial bias or prejudice based upon information provided by one of the jurors post-trial."  (Doc. 21-10, *Commonwealth v. Smart*, No. 696 MDA 2008 (Pa. Super. Jul. 10, 2009), ECF p. 4.)  In denying this claim, the Pennsylvania Superior Court, relying on the "no impeachment" rule of Pa. R.E. 606(b), held that juror testimony of another juror's statements exposing racial bias made during deliberations were not claims of "outside influences," but internal to the jurors themselves.  Accordingly, the PCRA court properly barred post-verdict testimony of the juror in accordance with Pa. R.E. 606(b).  The superior court relied on *Commonwealth v. Steele*, 599 Pa. 341, 377-79, 961 A.2d 786, 807-08 (2008) in reaching its decision.

> In *Steele*, the appellant sought to introduce racial bias on the part of one of the jurors during deliberations; however, such testimony was barred pursuant to Pa.R.E. 606(b). Specifically, the [Pennsylvania] Supreme Court in *Steele* found that "despite [a]ppellant's contentions, the exception to the general no impeachment rule was [not] implicated" because the exception ... applies to *outside* influences, not statements made by the jurors themselves.  *Steele*, 961 A.2d at 808 (emphasis added).
>
> Similarly, in the case *sub judice*, at the PCRA hearing, testimony was elicited from a juror who contacted defense counsel approximately two months post-verdict requesting Smart's address.  The juror allegedly corresponded with Smart regarding comments made by another juror during deliberations in relation to racial bias or prejudice.  *See* N.T. PCRA Hearing, 2/26/08 at 39-40.  However, under the rationale espoused in *Carter*[8] and *Steele*, the PCRA court

---

[8]  *See Carter v. U.S. Steel Corp.*, 529 Pa. 409, 415, 604 A.2d 1010, 1013 (Pa. 1992)(jurors cannot impeach their own verdict by testifying to what occurred during deliberations with the exception when the jury is affected by "extraneous influences" which might have prejudiced their deliberations; in such cases a court can inquire into "the

(continued...)

was authorized to permit testimony only as to the existence of the alleged prejudicial statement, which it did. The PCRA court permitted the juror to testify that, during deliberations, another juror expressed his/her viewpoints which may or may not have included elements of racial bias.

The fact that these influences occurred during deliberations renders the no impeachment rule applicable herein as the statement was made by a juror themselves and not an outside influence. Thus, the PCRA court properly barred the post-verdict testimony of the juror in accordance with Pa. R.E. 606(b) as all of the information the juror sought to offer concerned comments made during the course of jury deliberations. Further, any claim that counsel was ineffective for failing to pursue such a meritless claim is itself without merit. *See Commonwealth v. Harris*, ____ A.2d ____, ____, 2009 WL 1069793, *8 (Pa. Super., filed April 22, 2009) (counsel cannot be ineffective for failing to raise a meritless claim).

(Doc. 21-10, ECF pp. 5-7.)

Turning to Mr. Smart's habeas petition, respondents argue that Mr. Smart's claim that the state court erred when it decided Pa.R.E. 606(b) prohibited it from hearing the testimony of a juror concerning discussions during deliberations does not present a claim for federal habeas review. Respondents' argument is sound. Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. *See* 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 383 (1991) ("[I]t is not the province of a federal habeas court to

---

[8](...continued)
existence of the outside influence, but not as to the effect this outside influence may have had on deliberations ... Under no circumstances may jurors testify regarding their subjective reasoning process."  (internal citation omitted).

reexamine state-court determinations on state-law questions.")  "This remains true even if the state procedural ruling is incorrect."  *Leake v. Dillman*, No. 13-4389, 2014 WL 6844820, *2 (3d Cir. Dec. 5, 2014)(citing *Estelle*, 502 U.S. at 71-72, 112 S.Ct. at 482).   However, within his habeas petition, and his PCRA petition, Mr. Smart challenged his Sixth Amendment rights, therefore, the court construes his claim also as one of jury misconduct and will address it.

States are free to implement procedures regarding the admission and/or exclusion of evidence provided those procedures do not infringe on a constitutional guarantee.  *Williams v. Price*, 343 F.3d 223, 230 n. 3 (3d Cir. 2003).  Pennsylvania's rule 606(b) "provide[s] for the same ["no impeachment"] policy in language nearly identical to the" Federal rule 606(b).  *Id*. at 232.  In *Williams*, the Third Circuit Court of Appeals affirmed the denial of a state defendant's federal habeas petition alleging the PCRA court violated clearly established federal law by excluding evidence presented by way of affidavit by jury member that she heard other jurors used racist remarks based on the "no-impeachment rule".  *Id*. at 235-39.  In reaching this decision the court held that there was no "Supreme Court decision [which] clearly establishes that it is unconstitutional for a state to apply a 'no impeachment' rule that does not contain an exception for juror testimony about racial bias on the part of jurors."  *Id*. at 239.  Mr. Smart has not suggested the existence of such a Supreme Court case, thus, his claim that Pa. R. E. 606(b) is unconstitutional or unconstitutionally prohibits his right to present a Fifth or Sixth Amendment challenge

based on reports of one juror that another juror made racial remarks during deliberations must fail.

To the extent Mr. Smart alleges that Pa. R. E. 606(b) improperly tied the hands of the state court from hearing evidence from one juror as to what another juror said in deliberation to demonstrate the other juror lied during *voir dire*, the United States Supreme Court has recently examined this issue in the context of the similarly worded Federal Rule of Evidence 606(b).[9]  *See Warger v. Shauers*, ____ U.S. ____, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014).  In *Warger*, the United States Supreme Court ruled unanimously that juror comments during deliberations cannot be used to show dishonesty during jury selection.  Following a defense verdict in a negligence case where a motorcycle and truck collided, a juror approached plaintiff's counsel and advised him that during deliberations one of the jurors, the foreperson,

---

[9]  Fed. R. E. 606, *Juror's Competency as a Witness*, Section (b), *During an Inquiry Into the Validity of a Verdict or Indictment*, states:

(1) *Prohibited Testimony or Other Evidence.*  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) *Exceptions.*  A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. E. 606.

revealed that her daughter had been at fault in an accident and a lawsuit would

have ruined her life.  Plaintiff's counsel, armed with the sworn statement of the juror

detailing the actions of the foreperson during deliberations, filed a motion for a new

trial.  The federal trial judge refused to admit the affidavit into evidence and denied

the motion.  The Eighth Circuit Court of Appeals affirmed.  The Supreme Court held

"that Rule 606(b) applies to juror testimony during a proceeding in which a party

seeks to secure a new trial on the ground that a juror lied during *voir dire* ... A

postverdict motion for a new trial on the ground of *voir dire* dishonesty plainly entails

'an inquiry into the validity of [the] verdict': If a juror was dishonest during *voir dire*

and an honest response would have provided a valid basis to challenge that juror for

cause, the verdict must be invalidated."  *Warger*, ____ U.S. at ____, 135 S.Ct. at

525.  This decision is consistent with earlier Supreme Court rulings that have

affirmed a trial judge's refusal to receive jury testimony that some jurors were either

high or intoxicated during trial denied the criminal defendant his Sixth Amendment

right to be tried by a competent jury.  *See Tanner v. United States,* 483 U.S. 107,

116-17, 107 S.Ct. 2739, 2745, 97 L.Ed.2d 90 (1987).  In *Tanner*, a criminal case,

the Supreme Court considered whether a district court erred in concluding that a

juror's testimony about the intoxication of fellow jurors was inadmissible under

Federal Rule of Evidence 606(b).  483 U.S. at 121–22, 107 S.Ct. at 2748.  The

petitioners in that case filed a motion for a new trial because, after the trial was

completed, two jurors informed petitioners that several members of the jury had

consumed alcohol and illegal drugs during the course of the trial.  *Id*. at 115–116,

107 S.Ct. at 2745.  The Supreme Court concluded that Rule 606(b) proscribed the use of juror testimony about substance abuse by fellow jurors during trial to impeach the verdict because juror incompetence was an internal, not extraneous, influence on the deliberations.  *Id.* at 125, 107 S.Ct. at 2750.  Likewise, evidence of racial bias do not fall within Fed. R. E. 606(b)'s exceptions of "outside" influence as racial bias is an "internal" matter "because it goes to 'any juror's mental processes concerning the verdict or indictment.'"  *United States v. Shalhout*, 507 F. App'x 201, 205-06 (3d Cir. 2012).  "[B]oth the Federal and the Pennsylvania Rules of Evidence categorically bar juror testimony 'as to any matter or statement occurring during the course of the jury's deliberations' even if the testimony is not offered to explore the jury's decision-making process in reaching the verdict."  *Williams*, 343 F.3d at 235. Thus, the PCRA court's decision not to hear juror statements made during the course of deliberations did not violate "clearly established Federal law."

Finally, it was not unreasonable to conclude that Mr. Smart could not demonstrate that his counsel's performance was deficient because they failed to raise a legally meritless claim.  *Ross v. Dist. Atty. of the Cnty. Of Allegheny*, 672 F.3d 198, 211 n. 9 (3d Cir. 2012)(quoting *Wertz v. Vaughn*, 228 F.3d 178, 202 (3d Cir. 2000).

Based on the record before the court, Mr. Smart has failed to offer any evidence to support a claim that the state court erred in prohibiting a juror to testify as to statements of alleged racial bias made during the course of jury deliberations pursuant to Pa.R.E. 606(b), that the rule itself is unconstitutional, or that Mr. Smart's legal counsel were ineffective for not pursuing this issue upon learning about it.

Without presentation of any supporting evidence or case law that juror statements of racial bias, made exclusively during jury deliberations, fall within the exception of 606(b), Mr. Smart's claims involving the "no impeachment" rule fail.  The state court's conclusion that it was unable to receive post-verdict juror testimony concerning racial comments made during deliberations by another juror, or that his counsel was ineffective for failing to further investigate such claims did not violate clearly established federal law as determined by the Supreme Court.  Accordingly, there is no merit to this consolidated claim and it will denied.

> **B.     Whether the State Courts Erred in Determining Appellate Counsel were not Ineffective for Failing to File a Motion to Compel Discovery of Specific Items of Physical Evidence for Purposes of Forensic Testing and/or to have such Evidence Tested by an Expert.**

Mr. Smart claims his attorneys' failure to DNA test material found under the victim's fingernails or a towel found near the victim's body, or to retain an expert to conduct DNA testing of these items was deficient and that he was prejudiced as a result of this failure.  He claims the testing of available DNA would have exonerate him.  He raised this claim in his PCRA.

The Sixth Amendment to the United States Constitution guarantees the right of a person accused of a crime to the effective assistance of counsel.  A habeas petitioner is required to establish two elements in order to state a successful claim for ineffective assistance of counsel: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland v.*

*Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  The

two-prong test for ineffective assistance of counsel established in *Strickland*

"qualifies as 'clearly established Federal law'" for the purposes of the AEDPA.

*Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010)(quoting *Williams v. Taylor*, 529

U.S. 362, 391, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000)).  Thus, under §

2254(d)(1)-(2), the relevant inquiry in assessing ineffectiveness claims that have

been adjudicated on the merits is whether the state court's decision involved an

unreasonable application of *Strickland* or is based on an unreasonable

determination of the facts.  *Jacobs v. Horn*, 395 F.3d 92, 107 n. 9 (3d Cir.2005).

The *Strickland* test is conjunctive and a habeas petition must establish both

the deficient performance prong as well as the prejudice prong.  *See Id*. at 687, 104

S.Ct. at 2064; *Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010).  However, "[i]f it

is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, ... that course should be followed."  *Strickland*, 466 U.S. at 697, 104 S.Ct.

at 2069.

Counsel's performance is deficient only if it falls below the wide range of

competence demanded of attorneys in criminal cases.  *Id*. at 687 - 89, 104 S.Ct. at

2064 - 65.  This requires a showing "that counsel made errors so serious that

counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment."  *Harrington*, 562 U.S. at 104, 131 S.Ct. at 788 (quoting *Strickland*, 466

U.S. at 687, 104 S.Ct. at 2064).  In considering this part of the standard, the

reviewing court "must apply a 'strong presumption' that counsel's representation was

within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104, 131 S.Ct. at 787 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). The Court recognizes that there are "'countless ways to provide effective assistance in any given case'" and that "'[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *Id.*, 562 U.S. at 106, 131 S.Ct. at 778–89 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). In assessing whether counsel performed deficiently, the court must "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'" *Id.*, 562 U.S. at 107, 131 S.Ct. at 779 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). With regard to the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.,* 562 U.S. at 112, 131 S.Ct. at 792 (quoting *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067-68). "In assessing prejudice, courts 'must consider the totality of the evidence before the judge or jury.'" *Berghuis v. Thompkins*, 560 U.S. 370, 389, 130 S.Ct. 2250, 2265, 176 L.Ed.2d 1098 (2010)(quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069).

In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066. A decision supported by "reasonable professional judgment does not

constitute ineffective assistance of counsel.  *See Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).  It follows that counsel cannot be deemed ineffective for not pursuing a meritless claim. Hartey v. Vaughn, 186 F.3d 367, 372 (3d Cir.1999).  Further, the inquiry is contextual in that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."  *Id*., 562 U.S. at 111, 131 S.Ct. at 791.

Here, the Pennsylvania Superior Court addressed Mr. Smart's ineffective assistance claim on the merits.  *See* Doc. 21-10, ECF pp. 7-9.  In doing so, the Superior Court relied on the Pennsylvania state law test of ineffectiveness announced in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (Pa. 1987).[10] This standard has been found to be materially identical to the test enunciated in *Strickland.  Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir.2000).

At his PCRA hearing, both of Mr. Smart's trial counsel testified that because the Commonwealth had no forensic evidence to link Mr. Smart to the death of the victim, it was part of their trial strategy not to seek DNA testing of any material found under the victim's fingernails.  (Doc. 23-2, ECF pp. 10-11.)  They thought it too "risky" to do any DNA testing of the victim's fingernails because they were aware that Mr. Smart and the victim had physical interaction the evening in question.  (*Id*.) Counsel testified that if DNA testing of the victim's fingernails "was shown to be that of Fabian Smart that the jury would never be acceptive of what we believed to be a

---

[10]  The PCRA Superior Court opinion cited to *Commonwealth v. Johnson*, 868 A.2d 1278 (Pa. Super. 2005) for the test of ineffectiveness, and the *Johnson* Court, in turn cited to *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332 (Pa. 1999), which explicitly cited to *Pierce.*

very strong case or reasonable doubt." (*Id.*, ECF p. 11.)  Counsel could not recall

whether a specific conversation was held with Mr. Smart concerning the decision not

to conduct any DNA testing.  (*Id.*)

The PCRA court "[a]fter consideration of all the evidence, [was] satisfied

beyond any question that such trial strategy was reasonable and intended to be in

the best interest of [Mr. Smart]."  (Doc. 21-15, ECF p. 1.)  When Mr. Smart raised

this issue on appeal, the Pennsylvania Superior Court held:

> Here, Smart argues that DNA evidence would have been
> immeasurably helpful in his defense and that the decision
> of trial counsel not to pursue DNA testing on physical
> evidence recovered during the course of the autopsy,
> namely fingernails, the victim's clothing, and a towel,
> constitutes ineffective assistance of counsel.  While this
> claim *may* have some arguable merit, the second prong of
> the test enunciated in *Johnson*, is clearly not met as trial
> counsel had a reasonable strategic basis for their inaction.
>
> At the PCRA hearing, trial counsel testified that, the entire
> defense was based on reasonable doubt.  According to
> Attorney Lindhart, "there was substantial reasonable doubt
> in this case."  N.T. PCRA Hearing, 2/26/08 at 14.
>
> When we cross-examined Trooper Rausher for three
> hours, we were cross-examining him about, I believe,
> nineteen investigative leads that he failed to follow.  When
> we cross-examine[d] Troopers about a lack of forensic
> evidence found in Mr. Smart's trunk that would have tied
> the victim to the trunk of that car, that was a reasonable
> doubt issue.  When we call[ed] witnesses to testify that they
> had seen Mr. McMann alive in the days and weeks
> following when Mr. Smart was to have killed him, that's
> reasonable doubt.  So, if there wasn't any testing done on
> a towel or if there wasn't any hair or fiber to tie Mr. Smart to
> the victim, that was a reasonable doubt argument we
> made.
>
> *Id.*

> Based on the foregoing, it is evident that the defense theory at trial was reasonable doubt: reasonable doubt as to whether Smart committed the offenses charged.  As such, trial counsels' assessment that it would be too risky to seek DNA testing because of the possibility that the testing would confirm the involvement of Smart was a reasonable trial strategy and certainly intended to be in the best interest of Smart's defense.  Accordingly, we are in agreement with the PCRA court that, the decision by trial counsel not to request DNA testing was based upon considered trial strategy and as such, counsel was not ineffective, rendering Smart not entitled to PCRA relief on this issue.

(Doc. 21-10, ECF pp. 8-9.)

Where, as here, the state court already has rejected an ineffective assistance of counsel claim, a federal court must defer to the state court's decision pursuant to 28 U.S.C. § 2254(d).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Premo v. Moore*, 562 U.S. 115, 123, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011) (quoting *Harrington,* 562 U.S. at 105, 131 S.Ct. at 788.)  Based on the above facts, it was not unreasonable for trial counsel to avoid the possibility of generating damaging evidence which could have come to light from further investigation should Mr. Smart's DNA be found on the victim's body or clothing.  The superior court could reasonably conclude that trial counsel's decision not to request DNA testing was clearly consistent with their overall trial strategy of reasonable doubt given the absence of any forensic evidence linking Mr. Smart to the victim.  This court cannot grant relief on this claim as the superior court's ruling does not involve an unreasonable application of *Strickland* or is based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.

As detailed above, Mr. Smart has failed to overcome *Strickland's* deferential standard.  He has failed to show that his trial counsel's performance was deficient and caused him prejudice.  *Strickland*, 466 U.S. at 687-96, 104 S.Ct. at 2065-2069. Here the question is not whether counsel's performance "had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."  *Harrington*, 562 U.S. at 111, 131 S.Ct. at 791.  The question is whether Mr. Smart can demonstrate "whether it is 'reasonably likely' the result would have been different."  *Id*. at 111, 131 S.Ct. at 792.  "The likelihood of a different result must be substantial, not just conceivable."  *Id*. at 112, 131 S.Ct. at 792.  Contrary to Mr. Smart's contentions, had DNA testing been conducted and either his DNA was not found on the victim or the towel, but the DNA of a third party was found, there is no reasonable probability that Mr. Smart would have been exculpated by such evidence.  While such evidence may have bolstered Mr. Smart's theory of the case, it would not have ruled out his guilt.  The DNA testing would do little damage to the Commonwealth's case or the devastating testimony of several eyewitnesses who affirmed seeing Mr. Smart physically assault the victim to the point of unconsciousness, place his body in the truck of a car, drive the victim to a remote location, and assault the unconscious and defenseless victim again. Additionally, one witness testified that Mr. Smart admitted to killing the victim.

In sum, it was not unreasonable for the state court to conclude that Mr. Smart was not prejudiced by the absence of his counsel obtaining DNA testing of the

victim's fingernails or the towel found near the victim's body.  While it is conceivable

that the result of the proceedings would have been different had such testing been

completed, Mr. Smart has not shown that the likelihood of a different result was

"substantial."  *Id*. at 112, 131 S.Ct. at 792.

Mr. Smart has also failed to show that the state court's determination resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law as determined by the Supreme Court of the United States,

or in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. §

2254(d)(1) and (2).  Habeas relief will be denied on this claim.

**C.    Whether the State Courts Erred in not Finding that Trying
the petitioner before a death qualified jury during the merits
phase of the trial, deprived him of a trial before a cross-
section of the community.**

Mr. Smart argues that he was denied a trial before a jury consisting of a

"cross section of the community" during the guilt phase of his trial because he was

tried before a death-qualified jury.[11]  He argues that "death qualified jurors are

biased in favor of conviction."  (Doc. 9, ECF p. 17.)  He finds it inappropriate that a

Clinton County citizen's opposition to the death penalty would disqualify them from

participating in the penalty phase of a capital trial as it would not prevent them from

---

[11]  A death qualified jury is one from which prospective jurors have been excluded for
cause based on their inability to set aside their views about the death penalty that would
prevent, or substantially impair the performance of their duties in accordance with the
court's instructions and oath.  *Buchanan v. Kentucky*, 483 U.S. 402, 407 n. 6, 107 S.Ct.
2906, 2909 n. 6, 97 L.Ed.2d 336 (1987).

rendering "a fair and impartial verdict of not guilty or guilty in the merits phase of the trial." (*Id*., ECF p. 18.)  Mr. Smart argues that the state court's resolution of this issue on direct appeal was an unreasonable determination of the facts in light of the evidence presented during his trial.

The Pennsylvania Superior Court found this claim lacking any factual support. (Doc. 21-11.)

> [Mr. Smart's] final claim is that he was deprived of a trial before a cross section of the community because this jury was death-qualified. [Mr. Smart] concedes his argument to be a "novel concept" in Pennsylvania. ([Mr. Smart's] Brief at 55).  In essence, [Mr. Smart] argues by reference to the procedures and case law of other states he should have had one jury for the guilt phase and a second jury for the penalty phase.  Citing unspecified studies, he claims that death-qualified juries are biased toward conviction.  He asserts that the procedure employed in his trial "is not only inherently unfair, but runs afoul of [his] rights under both the State and Federal Constitution [sic]."  (*Id*. at 56.)

> The United States Supreme Court has held that the Constitution does not prohibit states from "death qualifying" juries in capital cases.  *Lockhart v. McCree*, 476 U.S. 162, 173 (1986).  Our Supreme Court has also held:

>> Appellant next asserts that he was deprived of a fair and impartial jury from a representative cross section of the community because his case was decided by a death-qualified jury.  Specifically, appellant maintains that a death-qualified jury is more prone to convict a defendant than a jury that is not death-qualified.  This precise argument has been rejected by both the United States Supreme Court and this Court.  *See Lockhart*, [*supra*]; *Commonwealth v. Bryant*, [  ] 574 A.2d 590 ([Pa.] 1990); *Commonwealth v. Sneed*, [  ] 526 A.2d 749 ([Pa] 1987)' *Commonwealth v. Peterkin*, [  ] 513 A.3d 373 ([Pa.] 1986), *cert. denied*, 479 U.S. 1070 [  ] (1987).  Appellant presents no argument which persuades us to alter this courts; thus, this assertion must fail.

> *Commonwealth v. McCullum*, 602 A.2d 313, 321 (Pa. 1992).
>
> Instantly, [Mr. Smart]'s mere bald assertion of a violation of an unspecified constitutional right fails to address the clear holdings of both *McCree* and *McCullum*.  Accordingly, based on our review, and the well reasoned opinion of the trial court, which we incorporate and adopt by reference, none of [Mr. Smart]'s claims merit relief and the judgement of sentence is affirmed.

(Doc. 21-11, ECF pp. 9-10.)

The Sixth Amendment, applied through the Fourteenth Amendment to the states, provides in part that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State."  U.S. CONST. amend. VI.  Encompassed in this concept is the right to a jury pool drawn from a fair cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).  "[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree*, 476 U.S. 162, 184, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986).  In order to establish a *prima facie* case of a violation of the fair cross-section requirement, a petition must show: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the group is not fairly and reasonably represented in venires from which juries are selected; and (3) that the under representation is due to systematic exclusion in the jury-selection process.  *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

-30-

In a capital case, a defendant may be tried before a death-qualified jury. *McCree,* 476 U.S. at 173-85, 106 S.Ct. at 1764-70.  The Supreme Court has consistently held that a venireperson who has reservations about the death penalty but is able to set aside their doubts and follow the trial court's instructions and consider all penalties provided under the law, including the death penalty, cannot be excluded for cause.  *Id*. at 176, 106 S.Ct. at 1766.  Only when a juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'" may they be excused for cause.  *Wainright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)(quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).  In other words, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."  *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992).  Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause.  *Id*. at 733, 112 S.Ct. at 2232.

The fair cross-section requirement applies to jury pools, not the petit jury itself.  *McCree*, 476 U.S. at 173-74, 106 S.Ct. at 1765.  A jury cannot fulfill its objective if "large, distinctive groups [of the community] are excluded for the pool." *Taylor*, 419 U.S. at 530, 95 S.Ct. at 698; *see also McCree,* 476 U.S. at 174, 106 S.Ct. at 1765.  The Supreme Court has suggested, a "distinctive group" for fair cross section purposes will be identified "on the basis of some immutable characteristic

such as race, gender, or ethnic background." *Id*., 476 U.S. at 175, 106 S.Ct. at

1766.  The Supreme Court has held that the death qualification process does not

create a "distinctive group" in the constitutional sense because jurors are excused

not because of their ethnicity, gender or race, but rather their "shared attitudes that

would prevent or substantially impair members of the group from performing one of

their duties as jurors." *McCree*, 476 U.S. at 174, 106 S.Ct. at 1765.  Thus, the use

of death-qualified juries in capital cases does not violate a capital defendant's right

to a jury pool that represents a fair cross-section of the community.

Next, the court addresses Mr. Smart's non-juror specific challenge that his

Sixth Amendment rights were violated when a death-qualified jury heard the guilt

phase of his case because the jury panel excluded Clinton County citizens who

opposed the death penalty.  He argues that a jury panel of this composition, which is

predisposed to impose the death penalty, slants the outcome of the trial in the

Commonwealth's favor.  (*Id*., ECF p. 18.)  Thus arguing he was denied an impartial

jury.

The Supreme Court has "consistently rejected this view of jury impartiality"

and held that the Sixth Amendment right to trial by an "impartial" jury requires only a

trial by "jurors who will conscientiously apply the law and find the facts."  *Id*. at 178,

106 S.Ct. at 1767.  Contrary to Mr. Smart's assertion concerning the make-up of a

predisposed jury, the Supreme Court stressed that:

> [i]t is important to remember that not all who oppose the
> death penalty are subject to removal for cause in capital
> cases; those who firmly believe that the death penalty is
> unjust may nevertheless serve as jurors in capital cases so

-32-

> long as they state clearly that they are willing to temporarily
> set aside their own beliefs in deference to the rule of law.

*Id*. at 176, 106 S.Ct. at 1766.  Thus, only those jurors who cannot be impartial, i.e.

put aside their own beliefs in deference to the rule of law, are removed for cause in

the selection of a death-qualified jury.

In order to prevail on this claim, Mr. Smart would have to establish that the

Pennsylvania Superior Court's adjudication was an unreasonable application of

clearly established federal law. 28 U.S.C. § 2254(d)(1).  But nothing he has

presented suggests that the state court unreasonably applied clearly established

federal law when it rejected this claim.  Mr. Smart's argument on this issue therefore

fails.


**D.      Whether the state courts erred in not finding that
          instances of prosecutorial misconduct when taken
          together, so tainted the fairness of the trial, that Mr.
          Smart should be granted a new trial in the interest of
          justice.**

Mr. Smart contends the cumulative effect of the various improper questions

by the prosecution throughout the trial and comments made during closing

arguments served to deny him of a fair trial.  Mr. Smart's discussion of this issue in

his habeas consists of the "Summary of Argument" and "Argument" portions of his

direct appeal brief to the superior court.  *Compare* Doc. 9, ECF pp. 20-24 and

*Commonwealth v. Smart*, No. 0588 MDA 05, 2005 WL 4906896 **6-8, **13-16,

Appellant's Br. (Pa. Super. Dec. 21, 2005).  He then "incorporates by reference

herein, as though set forth at length," the "litany of instances" of alleged

prosecutorial misconduct.  (Doc. 9, ECF p. 23; *see Smart*, No. 0588 MDA 05, 2005
WL 4906896, **16-27.)  Mr. Smart acknowledges that "[a]lthough it may be true that
none of the individually identified acts of misconduct, standing alone, would warrant
the granting of a new trial, it is abundantly clear that the accumulated taint
occasioned by each of these individuals acts serve to deprive [him] of a fair trial in
violation of both the state and federal constitutions."  *Smart*, No. 0588 MDA 05,
2005 WL 4906896, *27.  Although he alleges "[t]he state courts' decisions were
based on an unreasonable determination of the facts in light of the evidence
presented at trial," he does not provide any argument in support of this assertion.
(Doc. 9, ECF pp. 23-24.)

     A cumulative error claim allows for habeas relief when, although no single
error independently warrants reversal or rises to the level of a constitutional
violation, the effect of multiple error caused the litigant to suffer undue prejudice.
*Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3, 93 S.Ct. 1038, 1043 n. 3, 35
L.Ed.2d 297 (1973) (combined effect of individual errors "denied [Chambers] a trial
in accord with traditional and fundamental standards of due process" and "deprived
Chambers of a fair trial"); *see also Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15, 98
S.Ct. 1930, 56 L.Ed.2d 468 (1978) ("[T]he cumulative effect of the potentially
damaging circumstances of this case violated the due process guarantee of
fundamental fairness ...")  Cumulative error warrants habeas relief only where the
errors have "so infected the trial with unfairness as to make the resulting conviction
a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct.
1868, 1871, 40 L.Ed.2d 431 (1974).  Such an "infection" occurs where the combined

effect of the errors had a "substantial and injurious effect or influence on the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123

L.Ed.2d 353 (1993)(internal citation omitted).  "Under *Brecht*, a habeas petitioner

must demonstrate constitutional error resulted in 'actual prejudice' in order to obtain

relief from a federal court".  *Fogg v. Phelps,* 414 F. App'x 420, 525 (3d Cir. 2011);

*see also Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (habeas petitioner

asserting cumulative error claim not entitled to habeas relief unless he can establish

actual prejudice).  To demonstrate actual prejudice, "[t]he habeas petitioner must

show 'not merely that the errors at ... trial created a possibility of prejudice, but that

they worked to his *actual* and substantial disadvantage, infecting his entire trial with

error of constitutional dimensions."  *Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct.

2639, 2648, 91 L.Ed. 2639 (1986)(emphasis in original).  Where weighty evidence of

guilt is in the record, even in spite of all of the petitioner's alleged errors, the

cumulative error standard has not been met.  *Fahey v. Horn*, 516 F.3d 169, 205 (3d

Cir. 2008) ("even if we were to combine all of the prosecutor's allegedly improper

remarks with the admission of Fahy's detailed confession, there is still weighty

evidence of Fahy's guilt in the record."); *see also Alexander v. Shannon*, 163 F.

App'x 167, 176 (3d Cir. 2006) ("Given the strength of the evidence against

Alexander, we cannot say that the alleged errors, considered together, so infected

the proceedings that they denied Alexander a fundamentally fair trial.")

　　　The Superior Court adopted "the trial court's opinion as to these claims."

(Doc. 21-11, ECF pp. 4-5 fn. 4.)  The trial court reviewed all twenty-one of Mr.

-35-

Smart's alleged claims of prosecutorial misconduct and denied this claim finding that "the twenty-one allegations of prosecutorial misconduct are without any merit whatsoever."[12]  (Doc. 24-1, ECF pp. 2- 14.)  It follows, therefore, that when considering all of Mr. Smart's contentions of error in combination, his claim of cumulative error lacks merit.  In short, Mr. Smart cannot establish that his contentions of error, when viewed singly or cumulatively, deprived him of a fair trial. "The cumulative effect of each non-error does not rise to constitutional error; as they saying goes, zero plus zero equals zero."  *United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011).  Moreover, given the superior court review of Mr. Smart's direct appeal sufficiency of the evidence claim, where it held that "our review of the record confirms the jury had ample evidence, including the testimony of four accomplices, on which to base its verdict," it is clear that there is substantial evidence of Mr. Smart's guilt in the record to support his conviction.  Mr. Smart's claims do not approach the level required to establish a denial of a fair trial.

## V.    Certificate of Appealability Denied

Pursuant to 8 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability (COA), an appeal may not be taken from a final order in a proceeding under 8 U.S.C. § 2254.  A COA may issue only if the applicant has

---

[12]  While the superior court noted that the Pennsylvania Supreme Court does not recognize "the cumulative taint argument," *Commonwealth v. (Craig) Williams*, 615 A.2d 716, 723 (Pa. 1992), its review "of each of Appellant's claims on misconduct confirms the trial court's conclusion that neither individually or collectively do they instill the fixed hostility or bias toward Appellant that would have prevented the jury from weighing the evidence objectively and preventing a true verdict."  (Doc. 21-11, ECF p. 4 n. 4.)

made a substantial showing of the denial of a constitutional right.  8 U.S.C. §

2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of

reason could disagree with the district court's resolution of his constitutional claims

or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further."  *Miller–El v. Cockrell*, 537 U.S. 322, 327, 123

S.Ct. 1029, 1034, 154 L.Ed.2d 931 (2003).  Based on the analysis in this

memorandum, there is no basis for the issuance of a COA.


**VI.    Conclusion**

        Based on the foregoing discussion, the petition for writ of habeas corpus will

be denied.  Petitioner is advised that he has the right for thirty (30) days to appeal

the court's Order denying his habeas petition, *see* 8 U.S.C. § 2253(a); Fed. R. App.

P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent

him from doing so, as long as he also seeks a certificate of appealability from the

United States Court of Appeals for the Third Circuit.  *See* Fed. R. App. P. 22(b);

Local Rule of Appellate Procedure 22.1.

        An appropriate Order follows.


                                        **/s/ A. Richard Caputo**
                                        **A. RICHARD CAPUTO**
                                        **United States District Judge**

**Date:  April 2, 2015**